## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

ALEXIS ALBERT
5429 15th Ave NE #F307
Lacey, Washington 98516,
(Thurston County)

MAY ANN HUDGINS
91-1009 Kaiopua Street          CIVIL ACTION NO. _____
Ewa Beach, Hawaii 96706,

*individually and on behalf of all others*          **COMPLAINT—CLASS ACTION**
*similarly situated*,

       Plaintiffs,          (JURY TRIAL DEMANDED)

v.

AMERICAN SOCIETY OF HEALTH-
SYSTEM PHARMACISTS, INC.
4500 East West Highway, Suite 900
Bethesda, Maryland 20814

       <u>Serve on</u>:
       Registered Agent
       The Corporation Trust, Inc.
       2405 York Road, Suite 201
       Timonium, Maryland 21093

NATIONAL MATCHING SERVICES INC.
20 Holly Street, #301
Toronto, Ontario, Canada M4S 3B1,

THE JOHNS HOPKINS HOSPITAL
1800 Orleans Street
Baltimore, Maryland 21202

Serve on:

Registered Agent

SCS-Lawyers Incorporating Service

Company

7 St. Paul Street, Suite 820

Baltimore, Maryland 21202

THE NEW YORK AND PRESBYTERIAN

HOSPITAL d/b/a NEW YORK

PRESBYTERIAN HOSPITAL

525 East 68th Street

New York, New York 10021,

Serve on:

New York Secretary of State

One Commerce Plaza

99 Washington Avenue

Albany, New York 12231,

THE METHODIST HOSPITAL d/b/a

HOUSTON METHODIST HOSPITAL

6565 Fannin Street

Houston, Texas 77030,

Serve on:

Registered Agent

C T Corporation System

1999 Bryan Street, Suite 900

Dallas, Texas 75201,

NORTHWESTERN MEMORIAL HOSPITAL

251 East Huron Street

Chicago, Illinois 60611,

Serve on:

Registered Agent

Julia K. Lynch

211 E. Ontario Street, Suite 1800

Chicago, IL 60611,

RUSH UNIVERSITY MEDICAL CENTER
1653 West Congress Parkway
Chicago, Illinois 60612,

        <u>Serve on</u>:
        Registered Agent
        Carl Bergetz
        1700 W. Van Buren Street
        Suite 301
        Chicago, Illinois 60612,

THE UNIVERSITY OF CHICAGO MEDICAL
CENTER
5841 South Maryland Avenue
Chicago Illinois, 60637

        <u>Serve on</u>:
        Registered Agent
        Rachel Spitz
        5841 South Maryland
        Chicago, Illinois 60637,

ALLEGHENY GENERAL HOSPITAL
320 E North Avenue
Pittsburgh, Pennsylvania 15212,

UNIVERSITY OF PENNSYLVANIA
MEDICAL CENTER-HOSPITAL OF THE
UNIVERSITY OF PENNSYLVANIA
3400 Spruce Street
Philadelphia, Pennsylvania 19104,

UPMC PRESBYTERIAN SHADYSIDE
200 Lothrop Street
Pittsburgh, Pennsylvania 15312,

LEESBURG REGIONAL MEDICAL
CENTER, INC. d/b/a UF HEALTH CENTRAL
FLORIDA
600 E. Dixie Avenue
Leesburg, Florida 34748,

       <u>Serve on</u>:
       Registered Agent
       Philip J. Braun
       715 West Oak Terrace Drive
       Leesburg, Florida 34748,

THE QUEEN'S HEALTH SYSTEMS
1301 Punchbowl Street
Honolulu, Hawaii 96813,

       <u>Serve on</u>:
       Registered Agent
       John S. Nitao
       1301 Punchbowl Street
       Honolulu, Hawaii 96813,

       Defendants.

On behalf of themselves and all others similarly situated, Plaintiffs Alexis Albert and May Ann Hudgins complain and allege as follows based on personal knowledge as to themselves, the investigation of their counsel, and information and belief as to all other matters, and demand trial by jury.  Plaintiffs believe that substantial evidentiary support will exist for the allegations in this complaint, after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.      This case is about upholding the rights of recent pharmacy school graduates to obtain employment as resident pharmacists through a system of fair competition.

2.      Competition for labor is a foundational premise of the free market economy.  It allows working people to compare offers between prospective employers, negotiate improved terms of employment, and change jobs when better opportunities arise.

3.      It is also guaranteed by law.  Under the Sherman Antitrust Act, employers must compete to attract employees.

4.      Agreements between employers not to compete for employees' labor are thus strictly prohibited.  This includes: (1) agreements not to hire one another's employees; (2) agreements which fix, standardize, or suppress the compensation received by employees; (3) agreements to allocate labor inputs; (4) agreements to boycott certain potential employees; (5) agreements to exchange competitively sensitive information pertaining to the relevant labor market; and (6) agreements to reduce the demand for specific labor inputs.

5.      The Defendants in this case are a consortium of organizations that have illegally subverted the system of free competition in the labor market for resident pharmacists.  Instead of competing to hire resident pharmacists, and allowing these individuals to negotiate better terms of employment and move between employers as they wish, Defendants have designed and agreed to

participate in a system that intentionally suppresses competition by forcing all such individuals to apply for employment through a system called the ASHP Resident Matching Program (the "ASHP Match").

6.     The ASHP Match eliminates the prospective employees' ability to negotiate over the terms of employment they are offered, prohibits them from moving between employers after they are hired, bars them from applying for pharmacy residency positions outside of the ASHP Match, and polices compliance with its own rules.

7.     The ASHP Match is an anti-competitive agreement between virtually every employer of resident pharmacists in the United States, as well as National Matching Services, Inc., and the American Society of Health-System Pharmacists, Inc.

8.     The employers and institutions comprising the ASHP Match further conspire to suppress, fix, stabilize, and standardize the compensation of pharmacy residents by exchanging competitively sensitive compensation information regarding residents' salaries and other employment benefits.

9.     These same entities further conspire to suppress, fix, stabilize, and standardize the compensation of pharmacy residents by agreeing to control the number of pharmacy residency positions available in any given year to ensure that the number of positions remains well below the total number of applicants.

10.     As a result of this anti-competitive conspiracy, generations of resident pharmacists have suffered from artificially suppressed wages and employment benefits and been unable to improve their working conditions.

11.     The Sherman Antitrust Act (the "Sherman Act") clearly prohibits what Defendants have done.  The Sherman Act prohibits companies from forming agreements in restraint of trade.

15 U.S.C. § 1.  Persons injured due to violations of the Sherman Act are eligible to recover "threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee," as well as pre-judgment interest.  15 U.S.C. § 15.  Injunctive relief is also available to enjoin continuing violations of the Sherman Act.  15 U.S.C. § 26.

12.    Plaintiffs bring this action, individually and on behalf of the proposed Class defined below, to redress and put a stop to this illegal conspiracy in restraint of trade.

## PARTIES

### I.    Defendants

13.    Defendant American Society of Health-System Pharmacists, Inc. ("ASHP") is a professional organization that represents pharmacists.  Defendant ASHP is a Maryland corporation with its principal office at 4500 East-West Highway, Suite 900, Bethesda, Maryland 20814.  Defendant ASHP has nearly 60,000 members, including pharmacists in every state and the District of Columbia.  Defendant ASHP sponsors, administers, and operates the ASHP Match, and is responsible for establishing the rules of the ASHP Match and monitoring its implementation

14.    Defendant National Matching Services Inc. ("NMS") is a Canadian business corporation.  It is incorporated in Ontario, Canada with its principal office at 20 Holly Street, Suite 301, Toronto, Ontario, Canada M4S 3B1.  Defendant NMS assists in the administration of the ASHP Match on behalf of Defendant ASHP and co-conspiring employers of resident pharmacists.

15.    Defendant The Johns Hopkins Hospital ("Johns Hopkins") is a Maryland corporation.  Its principal office is located at 1800 Orleans Street, Baltimore, Maryland 21202.  Throughout the relevant time period, Defendant Johns Hopkins has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy

resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below.

16.     Defendant The New York and Presbyterian Hospital d/b/a New York Presbyterian Hospital ("New York Presbyterian") is a New York not-for-profit corporation.  Its principal office is located at 630 West 168th Street, New York, New York 10032.  Throughout the relevant time period, Defendant New York Presbyterian has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below.

17.     Defendant The Methodist Hospital d/b/a Houston Methodist Hospital ("Houston Methodist") is a Texas corporation.  Its principal office is located at 6565 Fannin Street, Houston, Texas 77030.  Throughout the relevant time period, Defendant Houston Methodist has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below.

18.     Defendant Northwestern Memorial Hospital ("Northwestern") is an Illinois not-for-profit corporation.  Its principal office is located at 251 East Huron Street, Chicago, Illinois 60611.  Throughout the relevant time period, Defendant Northwestern has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of

pharmacy residency positions available as described below.

19.    Defendant Rush University Medical Center ("Rush") is an Illinois not-for-profit corporation.  Its principal office is located at 1653 West Congress Parkway, Chicago, Illinois 60612.  Throughout the relevant time period, Defendant Rush has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below.

20.    Defendant The University of Chicago Medical Center ("UCMC") is an Illinois not-for-profit corporation.  Its principal office is located at 5841 South Maryland Avenue, Chicago, Illinois 60637.  Throughout the relevant time period, Defendant UCMC has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below.

21.    Defendant Allegheny General Hospital ("AGH") is a Pennsylvania not-for-profit corporation.  Its principal office is located at 320 E North Avenue, Pittsburgh, Pennsylvania 15212.  Throughout the relevant time period, Defendant AGH has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below.

22.     Defendant University of Pennsylvania Medical Center-Hospital of the University of Pennsylvania ("Hospital of the University of Pennsylvania") is a Pennsylvania corporation. Its principal office is located at 3400 Spruce Street, Philadelphia, Pennsylvania 19104. Throughout the relevant time period, Defendant Hospital of the University of Pennsylvania has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below.

23.     Defendant UPMC Presbyterian Shadyside ("UPMC Presbyterian") is a Pennsylvania corporation. Its principal office is located at 200 Lothrop Street, Pittsburgh, Pennsylvania 15212. Throughout the relevant time period, Defendant UPMC Presbyterian has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below.

24.     Defendant Leesburg Regional Medical Center, Inc. d/b/a UF Health Central Florida ("UF Health Central Florida") is a Florida not-for-profit corporation. Its principal office is located at 600 E. Dixie Avenue, Leesburg, Florida 34748. Throughout the relevant time period, Defendant UF Health Central Florida has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below.

25.     Defendant The Queen's Health Systems ("Queen's Health Systems") is a Hawaii nonprofit corporation.  Its principal office address is 1301 Punchbowl Street, Honolulu, Hawaii 96813.  Defendant Queen's Health Systems operates hospitals and outpatient centers across the Hawaii.  Throughout the relevant time period, Defendant Queen's Health Systems has participated in the ASHP Match, entered into agreements to adhere to rules of the ASHP Match, hired pharmacy residents through the ASHP Match, and entered into agreements to exchange competitively-sensitive pharmacy resident compensation information, and entered into agreements to control the number of pharmacy residency positions available as described below. [1]

## II.     Plaintiffs

26.     Plaintiff Alexis Albert is a natural person and a resident of Lacey, Washington. Plaintiff Albert was employed as a pharmacy resident by Defendant UF Health Central Florida beginning in June 2023.  Plaintiff Albert obtained her pharmacy resident position with Defendant UF Central Florida through the ASHP Match.  Plaintiff Albert's annual salary during her pharmacy residency with UF Health Central Florida was $47,985.60.

27.     Plaintiff May Ann Hudgins is a natural person and a resident of Ewa Beach, Hawaii. Plaintiff Hudgins was employed as a pharmacy resident by Defendant Queen's Health System beginning in July 2023.  Plaintiff Hudgins obtained her pharmacy resident position with Defendant Queen's Health System through the ASHP Match.  Plaintiff Hudgins's annual salary during her pharmacy residency with Queen's Health System was $50,000.

---

[1] Defendant Queen's Health Systems, together with Defendants UF Health Central Florida, UPMC Presbyterian, Hospital of the University of Pennsylvania, AGH, Rush, UCMC, Northwestern, Houston Methodist, New York Presbyterian, and Johns Hopkins are referred to throughout this Complaint as the "Employer Defendants."

**JURISDICTION AND VENUE**

28.    Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, to redress the injuries sustained by the named Plaintiffs and the members of the Class as a result of the Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged in this Complaint.

29.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C § 1331 and 28 U.S.C. § 1337.

30.    Personal jurisdiction exists over all Defendants pursuant to § 12 of the Clayton Act, 15 U.S.C. § 22 and Maryland's long-arm statute, Md. Code, Cts. & Jud. Pro. § 6-103.

31.    Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391(b) and (c).   Each of the Defendants maintains offices, has representatives, may be found, and/or transacts business within this District within the meaning of Section 12 of the Clayton Act, 15 U.S.C. § 22.   A substantial portion of the interstate trade and commerce described below has been carried out in this District.

32.    Personal jurisdiction and venue are also proper in this District because each Defendant illegally contracts, combines, and conspires with persons and entities that have committed, and continue to commit, overt acts within this District in furtherance of the illegal contract, combination, and conspiracy alleged in this Complaint.

**FACTUAL ALLEGATIONS**

33.    Each Defendant contracts, combines, and conspires to restrain competition in the recruitment, hiring, employment, and compensation of resident pharmacists for the purpose and

with the effect of depressing, standardizing, and stabilizing the salaries and other employment benefits received by resident pharmacists.

**I.      Pharmacists' Education and Employment**

34.    Every year, thousands of people graduate from colleges of pharmacy across the United States.[2]

35.    Upon graduation from a college of pharmacy, pharmacy students earn a Doctor of Pharmacy degree, which is often abbreviate as "PharmD."

36.    Doctor of Pharmacy graduates must pass the North American Pharmacist Licensure Examination before they are allowed to practice in the United States.  State boards of pharmacy specify additional licensure requirements.

37.    In assessing their employment opportunities before graduating, soon-to-be pharmacists must decide whether to pursue a pharmacy residency.

38.    A pharmacy residency is a one-year employment program pursued by some pharmacists following their graduation from a college of pharmacy.  Completing a pharmacy residency enables pharmacists to develop additional clinical skills.  Residencies are also understood to open additional career pathways beyond traditional retail pharmacy.

39.    A residency is not required to practice as a pharmacist generally.  However, residency experience is required to obtain certain types of employment as a pharmacist.  For example, pharmacists can only obtain positions in various specialized fields of pharmacy (*e.g.*,

---

[2] Pharmacists are not medical doctors.  Individuals seeking to become pharmacists attend colleges of pharmacy rather than medical schools.  Colleges of pharmacy do not train physicians, and their graduates receive Doctor of Pharmacy degrees rather than medical degrees (e.g., Doctor of Medicine or Doctor of Osteopathic Medicine).  At each university in the country that operates both a college of pharmacy and a medical school, the administration, curriculum, instructors, student body, and clinical programs of the college of pharmacy are separate and distinct from those of the medical school.  Colleges of pharmacy are accredited solely by the Accreditation Counsel for Pharmacy Education—and the Liaison Committee on Medical Education, which accredits medical schools, does not accredit colleges of pharmacy.

infectious disease, ambulatory care, emergency medicine, oncology, and solid organ transplant) after finishing a residency. Obtaining a job as a pharmacist in a hospital or other clinical setting typically requires residency experience. The same is true for instructional positions at colleges of pharmacy.

40.    Board certification is available for pharmacists in certain specialty areas. Completing a residency accelerates a pharmacist's eligibility for the certification exams. One requirement to qualify for the board exams is either at least one year of residency experience or more than three years of practice experience.

41.    Pharmacy residencies therefore open considerable new opportunities and career pathways for licensed pharmacists.[3]

42.    However, the market for employment of pharmacy residents is restrained by an anti-competitive conspiracy between virtually every employer of pharmacy residents. This conspiracy intentionally suppresses competition for the employment of pharmacy residents and, in doing so, significantly depresses the wages and other employment benefits received by pharmacy residents.

**II.    ASHP Resident Matching Program**

43.    The anti-competitive conspiracy which restrains competition for the employment of pharmacy residents and suppresses their compensation is called the ASHP Resident Matching Program (the "ASHP Match").

---

[3] Pharmacy residency programs are separate and distinct from any post-medical school residency programs designed for physicians. The structure of pharmacy residency programs differs significantly from post-graduate positions for physicians. Following graduation from medical school, physicians must complete an 'internship' followed by a 'residency' to become fully licensed. Some physicians may complete an additional 'fellowship' program, which provides more advanced training. The ASHP Match program does not place pharmacists into fellowships, nor does it provide matching services to pharmacy fellowship programs seeking applicants. Further, there are no post-graduate 'internships' in the pharmacy field akin to the internships undertaken by physicians.

44.    Defendant ASHP sponsors the ASHP Match.  Defendant ASHP establishes the rules which govern the ASHP Match, regulates the residency programs participating in the ASHP Match, monitors and polices compliance with the rules, and generally coordinates the conspiracy known as the ASHP Match.

45.    Defendant ASHP sponsors, operates, and administers the ASHP Match from and within its headquarters located in Bethesda, Maryland.

46.    Defendant ASHP also provides accreditation to pharmacy residency programs. Defendant ASHP is the sole nationally recognized body for accreditation of pharmacy residencies.

47.    Pharmacists who attend unaccredited residency programs do not receive the same career and reputational benefits as those attending an accredited program.  ASHP accreditation is a *de facto* requirement for residency programs.  Less than ten percent of all pharmacy residency positions offered by employers in the United States at any given time relevant to this action were offered by programs not accredited by Defendant ASHP.  Consequently, pharmacy residency programs without ASHP accreditation are less desirable to graduates than pharmacy residency programs with ASHP accreditation.

48.    Defendant ASHP requires every residency program accredited by it to offer all residency positions exclusively through the ASHP Match.  Exceptions to this rule constitute less than ten percent of all pharmacy residency positions offered by employers in the United States at any given time relevant to this action.

49.    Pharmacists wishing to apply for employment with an accredited residency program must do so through the ASHP Match.  In order to register for the ASHP Match, pharmacists submit applications using Defendant ASHP's application portal, the Pharmacy Online Residency Centralized Application Service ("PHORCAS").  In this system, the applicants rank the

pharmacy programs where they wish to obtain employment in order from most desirable to least desirable. These ranked selections are referred to as a "Rank Order List."

50.     Defendant ASHP requires both the residency programs and pharmacists participating in the ASHP Match to agree to rules which restrain competition for the employment of pharmacy residents.

51.     Defendant ASHP contracts with Defendant NMS to administer the ASHP Match. Residency programs wishing to participate in the ASHP Match must register on a website operated by Defendant NMS (https://natmatch.com/ashprmp/). Using this website, the programs rank the applicants they wish to employ from most desirable to least desirable. The programs then submit their Rank Order List to Defendant NMS.

52.     Defendant NMS receives the Rank Order Lists for both the applicants and the employer residency programs. It then runs an algorithm over the ranked choices of both the programs and the applicants. The results of the algorithm determine which applicants are matched to which programs.

53.     The results of the ASHP Match are contractually binding upon both the residency programs and the pharmacist applicants.

54.     Defendant ASHP imposes penalties on any ASHP Match participant who breaks the terms of their agreement to accept the placements generated by the ASHP Match or otherwise violates the rules governing the program.

55.     Pharmacists who do not accept employment with the residency program to which they are assigned by the ASHP Match may be banned from the re-applying for the ASHP Match.

56.     Defendant ASHP has banned applicants from participating in the ASHP Match as a penalty for not accepting employment at the residency program to which they were assigned by

the ASHP Match.

57.    Defendant ASHP hosts the members of the conspiracy at annual meetings such as the ASHP Midyear Clinical Meeting and the National Pharmacy Preceptors Conference, as well as related working groups, committees, and subcommittees associated with each meeting.

58.    Defendant ASHP regularly hosts Residency Program Design and Conduct workshops attended by the members of the conspiracy.

59.    Defendant ASHP publishes a guide entitled "How to Start a Residency Program." This guide is directed towards pharmacy operators who are considering starting a residency program.  Among other benefits to pharmacy operators, the "How to Start a Residency Program" guide touts the cost-savings associated with employing pharmacy residents.  It states: "Splitting one pharmacist position into two residency positions will usually yield leftover dollars."

60.    The requirements and rules governing the relationships between the individual and entities involved in the ASHP Match are formalized in a series of agreements between Defendants and the members of the Defendants Class.

61.    Defendants contract, combine, and conspire in these ways with the purpose and effect of depressing, standardizing, and stabilizing the salaries and other employment benefits received by resident pharmacists.

62.    Defendants further use their dominant position in the relevant market defined below to require pharmacists wishing to obtain employment in an accredited residency program to enter into anti-competitive agreements as a condition of their participation in the ASHP Match.

A.    *ASHP Regulations on Accreditation of Pharmacy Residencies*

63.    Defendant ASHP plays a central role in the ASHP Match conspiracy.

64.    Defendant ASHP recruits new members into the conspiracy through its

accreditation program and associated regulations.

65.    Defendant ASHP is the nation's only nationally recognized accrediting body for pharmacy residency programs.[4]

66.    As noted above, without an ASHP accreditation, pharmacy residency programs struggle to survive.   They attract fewer applicants, less competitive applicants, and their participants enjoy fewer reputational and career benefits than pharmacists who work for an accredited program.

67.    Fewer than ten percent of pharmacy residency positions nationwide are offered by programs not accredited by ASHP.

68.    As a condition of acquiring ASHP accreditation, residency programs must adhere to the ASHP Regulations on Accreditation of Pharmacy Residencies (the "ASHP Accreditation Regulations").

69.    A copy of the ASHP Accreditation Regulations adopted by the ASHP Board of Directors on September 20, 2024 is attached as **Exhibit A**.[5]

70.    Residency programs agree to the terms of the ASHP Accreditation Regulations as a condition of becoming accredited by the ASHP.

71.    Regulation IX (D) of the ASHP Accreditation Regulations provides that "All postgraduate year one and postgraduate year two residency programs in pre-candidate, candidate, conditional accreditation, or accredited status must participate in the Resident Matching Program conducted by ASHP, unless exempted by the COC [Commission on Credentialing]."

---

[4] ASHP's "How to Start a Residency Program" guide states: "Accreditation of pharmacy residencies is currently provided exclusively by ASHP through their Commission on Credentialing."

[5] The provisions of the ASHP Accreditation Regulations discussed in this Complaint, as presented in **Exhibit A**, were substantively and materially the same at all relevant times.

72.     Exceptions to this requirement are rarely granted.  Less than five percent of accredited programs receive an exemption to the requirement that all programs must participate in the ASHP Match.

73.     Regulation IX(D) of the ASHP Accreditation Regulations further states "all residency programs must adhere to the *ASHP Resident Matching Program Residency Agreement* and *Rules for the ASHP Pharmacy Residency Matching Program*."

74.     Defendant ASHP enforces compliance with the requirements of Regulation IX(D) through Annual Residency Accreditation Reports and other measures.  Penalties for non-compliance with Regulation IX(D) may include loss of accreditation as specified by Regulation XIV(A)(1).  Defendant ASHP has taken remedial actions against non-compliant residency programs to enforce adherence to the ASHP Accreditation Regulations.

75.     Regulation XIV(A)(6) of the ASHP Accreditation Regulations specifically provides that accreditation may be withdrawn from "An accredited program that is required to participate in the Resident Matching Program and fails to do so."

76.     Each Employer Defendant operates at least one accredited pharmacy residency program and has agreed to be bound ASHP Accreditation Regulations.

77.     Each Employer Defendant renews its agreement to be bound by the ASHP Accreditation Regulations each time it renews its residency programs' accreditation with Defendant ASHP.  Accreditations are valid for eight years, then must be renewed.

78.     Each Employer Defendant further renews its agreement to be bound by the ASHP Accreditation Regulations each time the ASHP Board of Directors issues a new version of the

ASHP Accreditation Regulations.[6]

79.    The ASHP Board of Directors issued the most recent version of the ASHP Accreditation Regulations on September 20, 2024.

80.    The September 20, 2024 version of the ASHP Accreditation Regulations superseded the previous version which the ASHP Board of Directors issued on August 12, 2023.

81.    As an example, Defendant Johns Hopkins has agreed to be bound by the ASHP Accreditation Regulations.  Defendant Johns Hopkins entered into that agreement as a condition of operating numerous pharmacy residency programs accredited by Defendant ASHP.  Defendant Johns Hopkins renewed that agreement each time it re-applied for accreditation of its pharmacy residency programs.  Defendant Johns Hopkins further renewed that agreement when Defendant ASHP issued new versions of the ASHP Accreditation Regulations on August 12, 2023 and September 20, 2024.  Defendant Johns Hopkins entered into each of those those agreements from within the State of Maryland.

## B.    *ASHP Match Program Agreement*

82.    All residency programs participating in the ASHP Match must enter into the American Society of Health-System Pharmacists Resident Matching Program Residency Agreement (the "ASHP Match Program Agreement").

83.    As stated in the ASHP Accreditation Regulations, every residency program accredited by the ASHP must enter into the ASHP Match and agree to the ASHP Match Program Agreement.

---

[6] Regulation XIV(A)(1) of the ASHP Accreditation Regulations provides that "In the event that The Standard is revised, all accredited programs will be expected to meet the revised standard within one year."

84.    Residency programs in pre-candidate accreditation status and candidate accreditation status may also participate in the ASHP Match.  In order to do so, they must agree to the ASHP Match Program Agreement.

85.    Residency programs enter into the ASHP Match Program Agreement with Defendant ASHP and with one another.  In other words, each Employer Defendant has entered into the ASHP Match Program Agreement with Defendant ASHP, the other Employer Defendants, and every other employer of pharmacy residents which participates in the ASHP Match.

86.    A copy of the ASHP Match Program Agreement is attached to this Complaint as **Exhibit B**.[7]

87.    Among other provisions, the ASHP Match Program Agreement provides that the "organization, residency and program(s) agree to":

- "Abide by the Rules of the ASHP Pharmacy Resident Matching Program ("ASHP Match Rules") established by ASHP as shown on the Match website (natmatch.com/ashprmp), which are incorporated by reference in and are an integral part of this Agreement."

- "Abide by the Schedule of Dates of the Match as shown on the Match website . . ."

- "Offer in Phase I of the Match all positions available in the residency . . ."[8]

- "Furthermore, positions left unfilled in Phase I of the Match must be offered in Phase II of the Match, in accordance with ASHP Match Rules."

- "Require no commitment from any applicant and make no offer of appointment to any applicant prior to the release of the results for Phase I of the Match, except for PGY2 [Post-Graduate Year 2 or second-year] residency positions that may be

---

[7] The version of the ASHP Match Program Agreement attached as **Exhibit B** applied to residency programs offering positions which commenced between June 1, 2024 and December 31, 2024.  Previous versions in force during the time frame applicable to this action included substantively the same provisions.

[8] This requirement exempts "Department of Defense and Public Health Service positions offered exclusively to commissioned pharmacy officers, positions in Indian Health Service residencies, or positions offered in residencies outside of the United States that have been exempted by ASHP."  These positions constitute less than ten percent of the total pharmacy residency positions available in the United States in any given year during the time period applicable to this action.

committed to PGY1 [first-year] residents in accordance with the Early Commitment Process."

- "Furthermore, require no commitment from any applicant and make no offer of appointment to any applicant prior to the release of the results for Phase II of the Match for any position that is offered in Phase I but not filled in Phase I or that is added for Phase II of the Match."

- "Offer an appointment to each applicant matched with this residency."

- "Contact each applicant matched with this residency in writing within 30 days of the Match results release date for each Phase of the Match, as specified in the ASHP Match Rules."

- "Not offer a position to any applicant who was matched elsewhere, or committed elsewhere through the Early Commitment Process, and who has not received a written release from the residency program concerned."[9]

88.     The ASHP Match Program Agreement further provides that "Programs must never request ranking information from any applicant, and applicants must never request ranking information from any program. Prior to the release of the Phase II Match results, neither party (applicant or program) may disclose to the other party any information regarding the positioning of any applicant or program on a Rank Order List."

89.     The process for entering into the ASHP Match Program Agreement is standardized and routine.  The ASHP Match website explains:

The Residency Program Director of each eligible residency is sent an email with a personalized link and instructions to register their residency for the 2025 Match. If you have not received a personalized email to register your residency by August 20, 2024, please contact NMS.

The online registration process must be completed by the Residency Program Director and can be started by clicking on the personalized link in the email sent by NMS.

As part of the registration process, the residency must agree to abide by the terms of the Residency Agreement, the ASHP Match Rules, and the Schedule of Dates.

---

[9] The "Early Commitment Process" allows organizations or health systems that operate both PGY1 and PGY2 pharmacy residency programs and elect to allow their PGY1 residents to commit to one of the organization's or health system's PGY2 residencies.

Consult the Program Registration Guide for step-by-step instructions for registering
for the ASHP Match.

90.     A copy of the Program Registration Guide is attached to this Complaint as
**Exhibit C**.[10]  As shown there, the Program Registration Guide explains how Residency Program
Directors must register their programs for the ASHP Match.  The process involves setting up an
account on the website operated by Defendant NMS and providing certain information about the
residency program.

91.     As shown in the Program Registration Guide, the fourth mandatory step of
registering a residency program for the ASHP Match is to "Accept the Match Agreement and
Rules."  The Program Registration Guideline provides: "You must electronically sign the
Residency Agreement for the 2025 ASHP Match.  Read the Agreement page carefully, as your
organization, residency and program(s) will be committed to abide by the Agreement once it is
registered."

92.     Registration emails for participation in the ASHP Match are sent to Residency
Program Directors in August each year, as stated in the Schedule of Dates on the ASHP Match
website.  By early November each year, the list of programs participating in the ASHP Match
becomes publicly available.  Therefore, the residency programs (including each of the Employer
Defendants) enter into the ASHP Match Program Agreement each year between August and
November.

93.     Each Employer Defendant has entered into the ASHP Match Program Agreement
between the months of August and November each year in the time frame applicable to this action.

---

[10] Previous versions of the ASHP Match Program Registration Guide in force during the time frame applicable to this
action included substantively the same provisions.

94.    Defendant NMS invited each Employer Defendant to join the ASHP Match through personalized emails sent to each Program Director which contained a link to a website where the program could manifest assent to the ASHP Match Program Agreement.

95.    Each Employer Defendant entered into the ASHP Match Program Agreement through the online portal of the ASHP website between the months of August and November in each year during the time frame applicable to this action.

96.    As an example, Defendant Johns Hopkins entered into the ASHP Match Program Agreement through the online portal of the ASHP website each year during the time frame applicable to this action between the months of August and November.  It did so after its Program Director received a personalized link and instructions to register for the ASHP Match as described above.  Defendant Johns Hopkins's entered into the ASHP Match Program Agreement within the State of Maryland in each year applicable to this action.

97.    Defendant ASHP sponsors, oversees, and directs Defendant NMS to send the personalized email invitations.

98.    Defendant ASHP further expressly requires as a condition of accreditation that all residency programs accredited by it participate in the ASHP Match and hire pharmacy residency exclusively through the ASHP Match.

99.    The ASHP Match Program Agreement specifically references, incorporates, and binds its signatories to adhere to the rules governing the ASHP Match.

### C.    *ASHP Match Rules*

100.    All residency programs accredited by the ASHP, including each Employer Defendant, must agree to abide by the Rules for the ASHP Pharmacy Resident Matching Programs (the "ASHP Match Rules"), as specifically required by Regulation IX(D) of the ASHP

Accreditation Regulations.

101.    The residency programs participating in the ASHP Match, including each Employer Defendant, agree to the ASHP Match Rules in the same manner by which they agree to the ASHP Match Program Agreement, as the ASHP Match Rules are expressly incorporated into the ASHP Match Program Agreement.

102.    Each Employer Defendant has agreed with one another, Defendant ASHP, and Defendant NMS to abide by the ASHP Match Rules at the times and in the same manner that they agreed to the ASHP Match Program Agreement.

103.    The ASHP Match Rules are binding upon both residency programs and pharmacists applying for residency positions through the ASHP Match.

104.    A copy of the ASHP Match Rules in effect as of August 2024 is attached to this Complaint as **Exhibit D**.[11]

105.    The ASHP Match Rules contain the following provisions:

- "All participants shall abide by all deadlines and their agreements for participation in the Match."

- "Residency program directors must ensure that all people involved in recruiting or selecting residents understand and adhere to these rules."

- "Faculty of schools of pharmacy with students interested in participating in the Match for pharmacy residencies are asked to assist in ensuring that their students understand and adhere to these rules."

- "Violations of these rules or Match agreements by applicants or programs may result in sanctions by ASHP or legal action by other Match participants."

- "Results of the [ASHP Match] constitute binding agreements between applicants and residency programs that may not be reversed unilaterally by either party."

---

[11] Previous versions of the ASHP Match Rules in force during the time frame applicable to this action included substantively the same provisions.

- "Residency programs that receive their Phase I Match results and have one or more positions left unfilled must offer those positions to applicants in Phase II of the Match."

- "The only information that persons at the residency may communicate to an applicant prior to the release of the results for each Phase of the Match is whether or not the applicant remains under consideration for admission."

- "Applicants may not accept an offer if they have been matched or have already accepted an offer from another residency program."

- "When the program contacts the applicant to confirm the acceptance of the offer, the program must also provide general information about the hiring process including pre-employment requirements."

106.    The ASHP Match Rules further prohibit applicants and residency programs from sharing information about their Rank Order Lists and provide for disciplinary measures to be taken against participants who violate the ASHP Match Rules.

### D.    *ASHP Match Applicant Agreement*

107.    As a result of the agreements described above, Pharmacists wishing to obtain employment as a pharmacy resident with an accredited residency program must apply through the ASHP Match.

108.    In order to participate in the ASHP Match, pharmacists must agree to the American Society of Health-System Pharmacists Resident Matching Program Applicant Agreement (the "ASHP Match Applicant Agreement").

109.    A copy of the ASHP Match Applicant Agreement is attached to this Complaint as **Exhibit E**.[12]

110.    Among other provisions, the ASHP Match Applicant Agreement provides that the applicant agrees:

---

[12] The version of the ASHP Match Applicant Agreement attached as **Exhibit E** applied to applicants seeking positions which began between June 1, 2024 and December 31, 2024. Previous versions in force during the time frame applicable to this action included substantively the same provisions.

- "To abide by the Rules of the ASHP Pharmacy Resident Matching Program ("ASHP Match Rules") as shown on the Match website (natmatch.com/ashprmp), which are incorporated by reference in and are an integral part of this Agreement."

- "To abide by the Schedule of Dates of the Match as shown on the Match website (natmatch.com/ashprmp), which is incorporated by reference in and is an integral part of this Agreement."

- "Not to make any commitment to or contract with any program registered for the Match prior to the release of the results for Phase I of the Match, except that if I am currently a PGY1 resident I may commit to a PGY2 residency position that is offered to me in accordance with the Early Commitment Process. Furthermore, if I do not obtain a position in Phase I of the Match or through the Early Commitment Process, I agree not to make any commitment to or contract with any program registered for the Match prior to the release of the results of Phase II of the Match. If I choose to accept a position either at a program that is not registered for the Match or at a registered program in accordance with the Early Commitment Process, or if I decide not to participate in the Match for any other reason, then I will submit a withdrawal from the Match, and will not submit a Rank Order List for the Match."

- "To accept appointment to the program with which I am matched. I cannot avoid accepting appointment to or attending the program with which I am matched without a written release from the program concerned; also, another program registered for the Match cannot offer me a position unless I have this release."

- "If I violate any of the terms of this Agreement or the ASHP Match Rules, such as refusing to accept a position at the program with which I have been matched, ASHP may pursue all available remedies, including reporting my actions to my school. Furthermore, ASHP may impose penalties on me, including barring me from participation in future ASHP Resident Matching Programs."

111.    Pharmacists may not apply for employment with any accredited residency program without agreeing to the ASHP Match Applicant Agreement, including, *inter alia*, the provisions quoted above.

### III.    Exchange of Resident Compensation Information

112.    Defendants further contract, combine, and conspire to exchange competitively sensitive information regarding the salaries and employment benefits offered to pharmacy residents ("Resident Compensation Information") by each residency program.

113.     Defendants contract, combine, and conspire to exchange Resident Compensation Information with the purpose and intent of depressing, standardizing, and stabilizing the salaries and other employment benefits received by resident pharmacists.

114.     Defendant ASHP maintains a "Residency Directory" which contains Resident Compensation Information for every accredited residency program.

115.     The Residency Directory is accessible to every residency program which participates in the ASHP Match.

116.     The Residency Directory lists the salaries offered to residents in each accredited residency program.  The salaries are referred to as "stipends" in the Residency Directory.

117.     The Residency Directory also lists the other employment benefits offered to residents in each accredited residency program.  The other employment benefits are referred to as "fringe benefits" in the Residency Directory.

118.     Each Employer Defendant has agreed with one another and with Defendant ASHP to exchange Resident Compensation Information through the Residency Directory.

119.     Each Employer Defendant has renewed its agreement with one another and with Defendant ASHP to exchange Resident Compensation Information in the same manner and at the same time that the Employer Defendant agreed to participate in the ASHP Match each year (as described above).

120.     Each Employer Defendant renews their agreement with one another and with Defendant ASHP to exchange Resident Compensation Information in the same manner and at the same time that they agree to become accredited or renew their residency program's accreditation with ASHP (as described above).

121.    The exchange of Resident Compensation Information allows each of the Employer Defendants to fix, stabilize, standardize, and suppress pharmacy resident compensation.

122.    The exchange of Resident Compensation Information allows each of the Defendants to monitor and police compliance with the fixed, stabilized, standardized, and suppressed compensation levels resulting from the illegal conspiracy described in this Complaint.

## IV.    Demand-Side Controls

123.    Defendants conspire, contract, and combine with the purpose, intent and effect of suppressing pharmacy resident compensation by limiting and controlling the number of residency positions available to applicants.

124.    Defendants conspire, contract, and combine to intentionally keep the number of residency positions available in any given year well below the number of applicants entering the ASHP Match.

125.    In doing so, Defendants intentionally manage the demand side of the relevant market defined below and ensure a surplus of labor, which has the purpose and effect of suppressing, fixing, standardizing, and stabilizing the compensation of resident pharmacists.

126.    Every year from 2015 to 2024, the number of pharmacists applying for positions in the ASHP Match has exceeded the number of residency positions available.

127.    Defendants intentionally slowed and then reversed the growth of residency positions available in response to a decline in the number of applicants participating the ASHP Match.

128.    From 2015 to 2020, the number of pharmacist applicants entering the ASHP Match increased every year.

129. From 2020 to 2021, the number of pharmacist applicants entering the ASHP Match declined very slightly, from 7,364 to 7,321.

130. From 2015 to 2021, the number of residency positions offered by programs participating in the ASHP Match as employers increased every year.

131. From 2021 to 2022, there was a sharp drop in the number of pharmacists applying for positions through the ASHP Match: 7,321 pharmacists participated in the ASHP Match in 2021; only 6,417 pharmacists participated in 2022.

132. This decline continued for the following two years. Only 6,019 pharmacists participated in 2023. Only 6,009 participated in 2024.

133. In response to this decline in applicants, Defendants slowed and then reversed the growth in the number of residency positions.

134. The ASHP Match added 292 residency positions from 2021 to 2022. After seeing the sharp drop in applications in during that time, the ASHP Match added only 24 positions from 2022 to 2023.

135. Then, for the first time in a decade, the number of residency positions in the ASHP Match declined from 2023 to 2024, falling from 5,256 positions to 5,232 positions.



137.    As a result of this control of the demand side of the relevant market defined below, Defendants artificially maintain an excess supply of labor above the level of labor demand.

138.    This demand-side management has the purpose and effect of reducing competition between employers for pharmacy residents and suppressing, fixing, and stabilizing the compensation paid to pharmacy residents.

## V.    Anti-Competitive Effects

139.    The restraints on trade embodied in the contracts, combination, and conspiracy described above have anti-competitive effects on the market for the hiring, employment, and compensation of resident pharmacists.

140.    The agreements comprising the ASHP Match restrain trade in the market for the employment of resident pharmacists in the following ways, among others:

- Prohibiting pharmacists from applying for accredited residency positions outside of the ASHP Match.

- Prohibiting accredited residency positions from accepting applications for pharmacy residency positions outside of the ASHP Match.

- Requiring pharmacists to accept employment with the residency program to which they are assigned by the ASHP Match.

- Requiring ASHP Match applicants to agree to accept employment with the residency program to which they are matched before they have an opportunity to negotiate the terms of their employment;

- Prohibiting residency programs participating in the ASHP Match from communicating with pharmacists applying for employment through the ASHP Match about any subject besides whether they are still under consideration for the program.

- Prohibiting pharmacists from transferring between residency programs.

- Prohibiting pharmacists from applying for residency programs at times outside of the specific dates established by the ASHP Match.

141.    Defendants further restrain trade in the market for the hiring, employment, and compensation of resident pharmacists by contracting, combining, and conspiring to exchange Resident Compensation Information.

142.    Defendants further restrain trade in the market for the hiring, employment, and compensation of resident pharmacists by contracting, combining, and conspiring to control manipulate side of the market by controlling the number of residency positions available.

143.    Each of these agreements in restraint of trade has anti-competitive effects on the market for the employment of pharmacy residents.

144.    The anti-competitive effects of these restraints are demonstrated by the difference in salaries and benefits received by pharmacy residents and pharmacists who do not pursue a residency.

145.    The average salary for a first-year pharmacy resident is in the range of $50,000 to $60,000 per year.

146.    The average salary for a non-resident pharmacist in their first year of employment after graduation is over $100,000 per year.

147.    Pharmacy residents are paid about half of what their non-resident colleagues earn on average, despite having the same qualifications and the same amount of experience in the field of pharmacy.

148.    Pharmacy residents also have fewer and inferior other employment benefits than non-resident pharmacists with their same level of experience.  These include more expensive and inferior health insurance, retirement benefits, and life insurance plans.

149.    Pharmacy residents also work longer hours on average than non-resident pharmacists with the same level of experience, even despite being paid about half as much and receiving inferior other employment benefits.

150.    This wide differentiation in compensation between pharmacists with the exact same level of experience and training is directly and proximately caused by the anti-competitive restraints imposed by the contracts, combinations and conspiracies entered into by Defendants.

151.    Each Plaintiff and each member of the Class has been directly and proximately harmed by suffering suppressed compensation for their employment as a resident pharmacist as a result of the anti-competitive restraints imposed by Defendants.

152.    Defendants intentionally entered into the contracts, combinations, and conspiracies described above with the design and purpose of suppressing the compensation received by pharmacy residents in the relevant market defined below.

## VI.    Market Definition

153.    There is a distinct relevant market for the employment pharmacy residents in the United States.

### A.    *Relevant Labor Market*

154.    The product market (or in this case, the labor market) is the market for the employment of resident pharmacists (the "Relevant Labor Market").

155.    The residency programs, including each of the Employer Defendants, are the buyers in the Relevant Labor Market.

156.    The resident pharmacists, including the Named Plaintiffs and each member of the Class, are the sellers in the Relevant Labor Market.

157.    The Relevant Labor Market is distinct, stable, and insulated from price fluctuations in potential substitute markets.

158.    Pharmacists continue to apply for residency positions in the Relevant Labor Market despite the dramatically lower salaries and benefits than those offered in other potential employment markets for pharmacists because there are distinct qualities associated with the Relevant Labor Market.

159.    The distinct qualities of the Relevant Labor Market include: (1) increased clinical training; (2) reputational enhancements; (3) the ability to obtain later employment which requires participation in the Relevant Labor Market; (4) the ability to take board of pharmacy exams after one year of participating in the Relevant Labor Market compared to three years in potential substitute markets.

160.    The Relevant Labor Market is stable.  From 2015 to 2024, the number of residency positions available in the Relevant Labor Market rose slightly from about 4,000 to about 5,000.  In each of those years, more pharmacists applied for positions through the ASHP Match than there were positions available.

161.    The Relevant Labor Market is insulated from price fluctuations in potential substitute markets.  A small but significant non-transitory decrease (e.g., 5% over a period of one year) in the salaries of non-resident pharmacists would not cause a decline in the number of applicants seeking employment in the Relevant Labor Market.

### B.    *Relevant Geographic Market*

162.    The geographic market for the employment of resident pharmacists is the United States (the "Relevant Geographic Market") (together with the Relevant Labor Market, the "Relevant Market").

163.    The accreditation standards for colleges of pharmacy conferring PharmD degrees is standardized across the United States by the Accreditation Council for Pharmacy Education.

164.    The accreditation standards for pharmacy residency programs is standardized throughout the United States by Defendant ASHP.

165.    The ASHP Match operates only within the geographic boundaries of the United States.

166.    To obtain a pharmacy license, pharmacists across the United States must take the North American Pharmacist Licensure Exam.

167.    State boards of pharmacy licensure maintain reciprocity programs which permit license-holders in one state to obtain licensure in another state on an expedited basis.

168.    Pharmacists seeking employment as residents regularly move across the country and between states and geographic regions to obtain that employment.

## VI.    Market Power

169.    Defendants, by and through the contracts, combinations, and conspiracies described in this Complaint, have market power in the Relevant Market.

170.    In 2024, 5,232 residency positions were offered exclusively through the ASHP Match.  That number has gradually increased from 4,814 residency positions offered through the ASHP Match in 2021.

171.    Upon information and belief, fewer than 100 residency positions in unaccredited (including programs in pre-candidate and candidate accreditation statuses) pharmacy residency programs were offered nationwide during each of the years applicable to this action.

172.    Upon information and belief, fewer than 100 accredited residency positions in residency programs were exempted from participation in the ASHP Match.[13]

173.    Defendants have monopsony power in the Relevant Market through the operation of the contracts, combinations, and conspiracies described in this Complaint.

174.    Defendants have intentionally abused this monopsony power in the Relevant Market to suppress the compensation received by pharmacy residents in exchange for their labor.

## VII.    Antitrust Injury

175.    As a direct and proximate result of the actions and omission of the Defendants as described in this Complaint (including the operation of the ASHP Match, the corresponding agreements, the exchange of Resident Compensation Information, and the demand side management of the Relevant Market) the Named Plaintiffs and all members of the Class suffered substantial losses to their business or property in that their compensation associated with working as a pharmacy resident was artificially suppressed during the relevant time period.

## VIII.    Continuing Violation

176.    The violations of the Sherman Act by Defendants are ongoing and continuous.

177.    Pharmacy residents currently employed by members of the conspiracy, including the Employer Defendants, are being harmed on a repeated and ongoing basis by the Defendants' continuing violations of the Sherman Act.

## IX.    Interstate Commerce

178.    Each of the Defendants is engaged in interstate commerce.

---

[13] The vast majority of accredited programs exempt from participation in the ASHP Match are offered through the Commissioned Corps of the U.S. Public Health Service, including positions offered in the Indian Health Service.

179.    Defendant ASHP organizes events and conferences in several states and invites individuals from across state lines to attend those events and conferences. Defendant ASHP has members in all fifty states and accredits residency programs in nearly every state. Defendant ASHP accepts and sends payments and via interstate wires, distributes published materials in hard copy and over the internet in every state, and employs individuals in multiple states.

180.    Defendant NMS transacts business in the United States, including across state lines. Defendant NMS operates matching programs under contract with professional associations located in various states, including Maryland, Illinois, and Texas. Those matching programs accept applicants and employer programs from every state. Defendant NMS sends personnel to each of those various states to transact business with its clients. Defendant NMS accepts and sends payments and via interstate wires and distributes published materials over the internet in every state, including application fees from the Plaintiffs and each member of the Class.

181.    Each Employer Defendant transacts business across state lines, including through the purchase, sale, and delivery of goods and services across state lines; employment of individuals in different states; and contracting with businesses located in different states.

## CLASS ACTION ALLEGATIONS

182.    Pursuant to Federal Rules of Civil Procedure 23(b)(1), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), Plaintiffs bring this action on behalf of themselves and members of the "Class" defined as follows:

> All natural persons in the United States who obtained employment as a resident pharmacist through the ASHP Match at any time between February 28, 2021 and the date of class certification.

183.    Excluded from the Class are Defendants' officers, directors, and employees; any entity in which any Defendant has a controlling interest; and the affiliates, legal representatives,

attorneys, successors, heirs, and assigns of Defendants. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

184.    Plaintiffs reserve the right to modify the class definition, including based on discovery and further investigation.

185.    The members of the Class are so numerous that their individual joinder is impracticable. Plaintiffs are informed and believe, and thereupon alleges, that the members of the Class number in the tens of thousands. The precise number of members of the Class and their identities are unknown to Plaintiffs at this time but will be readily determined in discovery, including by reference to Defendants' records. Members of the Class may be notified of the pendency of this action by email, mail and/or publication through the records of Defendants.

186.    Plaintiffs' claims are typical of the claims of the members of the Class they seek to represent in that Plaintiffs and all members of the Class were injured and sustained damages by Defendants' uniform wrongful conduct—namely, Defendants' entry into agreements in restraint of trade in the Relevant Market which have suppressed the compensation received by members of the Class for their labor as resident pharmacists.

187.    Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual members. Legal and factual questions common to the Class include, but are not limited to:

   a.  Whether Defendants engaged in the alleged conduct;

   b.  Whether the Relevant Market is properly defined;

   c.  Whether the Defendants, by and through the conspiracy, contracts, and combinations described herein have market power in the Relevant Market;

   d.  Whether the restraints on trade described herein have anti-competitive effects;

e.   Whether compensation for resident pharmacists and other terms of employment have been fixed, depressed, standardized and/or stabilized at level below those which would prevail in a competitive market;

f.   Whether Defendants have illegally contracted, combined, and conspired to control the number of pharmacy residency programs in order to illegally create a labor surplus;

g.   The amount of damages suffered by members of the Class as a result of the Defendants' illegal restraints;

h.   Whether members of the Class are entitled to equitable relief, including injunctive relief;

i.   Whether Defendants are jointly and severally liable for the damages sustained by the Plaintiffs and the Class;

j.   Whether Plaintiffs' and the Class's damages should be trebled under the Sherman Act.

188.   Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other members of the Class they seek to represent, they have retained competent counsel experienced in antitrust matters and prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

189.   The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication,

economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of such issues.

### FIRST CLAIM FOR RELIEF
**Agreements in Restraint of Trade**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(By All Plaintiffs, Individually and on Behalf of Members of the Class,**
**Against All Defendants)**

190. Plaintiffs, individually and on behalf of the Class, incorporate and repeat the allegations contained in the foregoing paragraphs.

191. Defendants have contracted, combined, and conspired to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

192. The contact, combination, and conspiracy alleged in this Complaint consists of a continuing agreement, understanding, and concert of action among Defendants to restrain competition in the recruitment, hiring, employment, and compensation of resident pharmacists.

193. Defendants have agreed between and amongst themselves to restrain the aforesaid competition by entering into agreements, both express and implicit, designed to accomplish those ends, including but not limited to the agreements to adhere to the ASHP Regulations on Accreditation of Pharmacy Residencies, the ASHP Match Program Agreement, and ASHP Match Rules, as well as to impose the ASHP Match Applicant Agreement upon all individuals seeking employment as resident pharmacists through the ASHP Match, as well as to control the demand side of the Relevant Market defined in this Complaint.

194. Defendants illegally restrain competition in a number of related ways, including but not limited to:

- Requiring all applicants to accredited pharmacy residency programs to apply through the ASHP Match;

- Requiring ASHP Match applicants to agree to accept employment with the residency program to which they are matched before they have an opportunity to negotiate the terms of their employment;

- Prohibiting residency programs participating in the ASHP Match from communicating with pharmacists applying for employment through the ASHP Match about any subject besides whether they are still under consideration for the program;

- Prohibiting pharmacists from transferring between residency programs.

- Prohibiting pharmacists from applying for residency programs at times outside of the specific dates established by the ASHP Match.

- Controlling demand side of the Relevant Market by limiting the number of residency positions available to ensure that there is always a substantial excess of applicants applying for limited positions.

195.   The illegal restraints alleged in this Complaint have the purpose and effect artificially fixing, depressing, standardizing, and stabilizing resident pharmacist compensation and other terms of employment.

196.   The restraints on competition alleged in this Complaint are per se illegal under the Sherman Act.

197.   The Employer Defendants are horizontal competitors in the Relevant Market for the hiring, employment, and compensation of resident pharmacists.

198.   The Employer Defendants have agreed with one another to restrain competition for the hiring, employment, and compensation of resident pharmacists in the manners described in this Complaint.

199.   Alternatively, the restraints on competition alleged in this Complaint are illegal under either a "quick look" or rule of reason analysis because they are facially anti-competitive with no valid procompetitive justifications.  Moreover, even if there were valid procompetitive

justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

200.    Each Defendant has participated in one or more overt acts in furtherance of the alleged contract, combination and conspiracy and has participated in the conspiratorial activities described in this Complaint.

201.    Plaintiffs and each member of the Class was injured by the illegal restraints alleged in this Complaint.    Among other things, Plaintiffs and the members of the Class were compensated substantially less than they would have been in the absence of the illegal restraints. Plaintiffs and each member of the Class have sustained substantial losses and damages to their business and property due to the illegal restraints.

## SECOND CLAIM FOR RELIEF
### Exchange of Competitively-Sensitive Information
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (By All Plaintiffs, Individually and on Behalf of Members of the Class,
### Against All Defendants)

202.    Plaintiffs, individually and on behalf of the Class, incorporate and repeat the allegations contained in the foregoing paragraphs.

203.    Defendants have contracted, combined, and conspired to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

204.    The contact, combination, and conspiracy alleged in this Complaint consists of a continuing agreement, understanding, and concert of action among Defendants to restrain competition in the recruitment, hiring, employment, and compensation of resident pharmacists.

205.    Defendants have agreed between and amongst themselves to restrain the aforesaid competition by entering into agreements, both express and implicit, designed to accomplish those ends, including but not limited to agreements to exchange Resident Compensation Information.

206.    This information exchange has been undertaken in furtherance of a price fixing agreement, which is unlawful *per se*.

207.    Defendants' information exchange is also unlawful under either a "quick look" or rule of reason analysis because the exchange is facially anti-competitive with no valid procompetitive justifications.  Moreover, even if there were valid procompetitive justifications, such justifications could have been reasonably achieved through means less restrictive of competition.

208.    Each Defendant has participated in one or more overt acts in furtherance of the information exchange.

209.    Plaintiffs and each member of the Class was injured by the information exchange alleged in this Complaint.  Among other things, Plaintiffs and the members of the Class were compensated substantially less than they would have been in the absence of the information exchange.  Plaintiffs and each member of the Class have sustained substantial losses and damages to their business and property due to the illegal information exchange.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seeks a judgment against Defendants, individually and on behalf of the members of the Class, as follows:

A.    For an order certifying the Class pursuant to Federal Rule of Civil Procedure 23 and naming Plaintiffs as representatives of the Class and Plaintiff's undersigned attorneys as counsel to represent the Class;

B.    For an order enjoining all aspects of Defendants' continuing violation of Section 1 of the Sherman Act pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26;

C.      For an order entering judgment in favor of Plaintiffs and the members of the Class against Defendants on the claim for relief stated in this Complaint;

D.      For an order awarding Plaintiffs and the Class three times their actual damages against Defendants, jointly and severally, for their violation of Section 1 of the Sherman Act set forth in this Complaint;

E.      For an order awarding pre- and post-judgment interest; and

F.      For an award of attorneys' fees, costs and expenses to Plaintiffs' counsel.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and members of the Class, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims and issues so triable.

Dated: February 28, 2025                    Respectfully submitted,

/s/ Stuart A. Berman
Stuart A. Berman #08489
Stanley J. Reed #00315
Lerch, Early & Brewer, Chtd.
7600 Wisconsin Avenue, Suite 700
Bethesda, MD 20814
Telephone: (301) 657-0729
saberman@lerchearly.com
sjreed@lerchearly.com

Frank S. Hedin*
Hedin LLP
1395 Brickell Avenue, Suite 610
Miami, Florida 33131
Telephone: (305) 357-2107
fhedin@hedinllp.com

Tyler K. Somes*
Hedin LLP
1100 15th Street NW, Ste 04-108
Washington, D.C. 20005
Telephone: (202) 900-3331
tsomes@hedinllp.com

* Pro Hac Vice Application Forthcoming

*Counsel for Plaintiffs and the Putative Class*