**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ALEXIS ALBERT et al., | |
| Plaintiffs, | |
| v. | Civ. No. 8:25-cv-00673-DLB |
| AMERICAN SOCIETY OF HEALTH-SYSTEM PHARMACISTS, INC. et al., | |
| Defendants. | |

**DEFENDANT LEESBURG REGIONAL MEDICAL CENTER, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF
SUPPLEMENTAL MOTION TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6)**

Stephen Y. Wu (*pro hac vice*)
Ashley Fischer (*pro hac vice*)
Chelsea Mounayer (*pro hac vice*)
MCDERMOTT WILL & SCHULTE LLP
444 W. Lake Street, Suite 400
Chicago, IL 60606
(312) 372-2000
swu@mwe.com

Michael S. Nadel
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
mnadel@mwe.com

*Attorneys for Defendant Leesburg Regional Medical Center, Inc.*

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ ii

Table of Exhibits ............................................................................................................ v

Introduction ..................................................................................................................... 1

Background ....................................................................................................................... 2

Standard of Decision ...................................................................................................... 5

Argument ........................................................................................................................... 5

I.    Leesburg Regional Medical Center must be dismissed because of its Eleventh
      Amendment immunity ............................................................................................ 5

II.   Leesburg Regional Medical Center is entitled to *Parker* antitrust immunity. ...................... 12

Conclusion ....................................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*United States ex rel. Black v. Health & Hospitality Corp. of Marion Cnty.*,
    494 F. App'x 285 (4th Cir. 2012) ................................................................................3

*California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*,
    445 U.S. 97 (1980)....................................................................................................13, 14

*FTC v. Phoebe Putney Health Sys. Inc.*,
    568 U.S. 216 (2013)........................................................................................................14

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
    441 F. Supp. 3d 567 (D. Md. 2021) ..............................................................................10

*Hans v. Louisiana*,
    134 U.S. 1 (1890)..............................................................................................................6

*Harter v. Vernon*,
    101 F.3d 334 (4th Cir. 1996) ........................................................................................10

*Hillman v. Amazon.com Servs. LLC*,
    2025 WL 1556090 (D. Md. 2025) ..................................................................................3

*Hoover v. Ronwin*,
    466 U.S. 558 (1984)........................................................................................................12

*Hutto v. S.C. Ret. Sys.*,
    773 F.3d 536 (4th Cir. 2014) .......................................................................................8, 9

*Joynt v. Star Ins. Co.*,
    314 F. Supp. 3d 1233 (M.D. Fla. 2018).........................................................................7

*In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*,
    626 F. Supp. 3d 814 (D. Md. 2022) ...............................................................................3

*Md. Stadium Auth. v. Ellerbe Becket, Inc.*,
    407 F.3d 255 (4th Cir. 2005) ........................................................................................10

*Mims v. Kemp*,
    516 F.2d 21 (4th Cir. 1975) ............................................................................................3

*MUSC Health Ctr. Care Org., LLC v. Med. Univ. Hosp. Auth.*,
    659 F. Supp. 3d 700 (D.S.C. 2023)...............................................................................10

*N.C. State Bd. of Dental Examiners v. FTC*,
    574 U.S. 494 (2015)........................................................................................................13

*Nicholl v. Bd. of Regents of Univ. Sys. of Georgia*,
706 F. App'x 493 (11th Cir. 2017) .........................................................................14

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*,
745 F.3d 131 (4th Cir. 2014) ............................................................................7, 8

*Pan-Am Tobacco Corp. v. Dep't of Corr.*,
471 So. 2d 4 (Fla. 1984)..........................................................................................7

*Parker v. Brown*,
317 U.S. 341 (1943)..........................................................................12, 13, 14, 15

*Pharm & Diagnostic Servs., Inc. v. Univ. of Utah*,
801 F. Supp. 508 (D. Utah 1990) ..........................................................................14

*Porkka v. Univ. of S. Fla. Bd. of Trs.*,
2018 WL 2717235 (M.D. Fla. 2018) .......................................................................8

*Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*,
822 F.2d 456 (1987)................................................................................................8

*Regents of the Univ. of Cal. v. Doe*,
519 U.S. 425 (1997)..............................................................................................10

*Ristow v. S.C. Ports Auth.*,
48 F.3d 1051 (4th Cir. 1995) ..................................................................................7

*S.C. State Bd. of Dentistry v. FTC*,
455 F.3d 436 (4th Cir. 2006) ................................................................................12

*Saenz v. Univ. Interscholastic League*,
487 F.2d 1026 (5th Cir. 1973) ..............................................................................14

*Searcy, Denney, Scarola, Barnhart & Shipley v. State*,
209 So. 3d 1181 (Fla. 2017)....................................................................................7

*Seminole Tribe of Fla. v. Florida*,
517 U.S. 44 (1996)..................................................................................................6

*Singleton v. Md. Tech. & Dev. Corp.*,
103 F.4th 1042 (4th Cir. 2024) ...................................................................... *passim*

*Souto v. Fla. Int'l Univ. Found., Inc.*,
446 F. Supp. 3d 983 (S.D. Fla. 2020) ...................................................................11

*Univ. of S. Fla. Bd. of Trustees v. CoMentis, Inc.*,
861 F.3d 1234 (11th Cir. 2017) ............................................................................11

*Walker v. Univ. of Fla.*,
  2020 WL 609298 (N.D. Fla. 2020)......................................................................11

**Statutes and Rules**

Fed. R. Civ. P. 12(b)(1)...............................................................................2, 3, 5, 12

Fed. R. Civ. P. 12(b)(6)...............................................................................................5

Fed. R. Evid. 201(b)(2).............................................................................................3

Fla. Const. art. IX, § 7..........................................................................................2, 8

Fla. Const. art. X, § 13...............................................................................................7

Fla. Stat. Ch. 617.......................................................................................................4

Fla. Stat. § 768.28...........................................................................................7, 11, 13

Fla. Stat. § 1001.70, et seq.........................................................................................8

Fla. Stat. § 1004.41, et seq............................................................................*Passim*

U.S. Const. amend. XI..............................................................................................6

**Other Authorities**

Fla. Senate & Fla. H. of Reps., *Legislative Claim Bill Manual* (2023), *available at*
  perma.cc/LKH5-5L4Z.............................................................................................8

Gerald T. Wetherington & Donald I. Pollock, *Tort Suits Against Government
  Entities in Florida*, 44 Fla. L. Rev. 1, 79 (1992)....................................................7

Instrumentality, *Black's Law Dictionary* (12th ed. 2024)........................................13

William H. Page & John E. Lopatka, Parker v. Brown, *the Eleventh Amendment,
  and Anticompetitive State Regulation*, 60 William & Mary L. Rev. 1465
  (2019).....................................................................................................................12

Wright & Miller's Federal Practice & Procedure § 1366 (3d ed. updated 2025)...........................3

## TABLE OF EXHIBITS

| Ex. | Description |
|---|---|
| **Declaration of Stephen Wu** | |
| 1 | UF College of Pharmacy, *Residencies and Fellowships* (as of Sept. 15, 2025) |
| 2 | UF Board of Trustees, *Current Trustees* (as of Sept. 15, 2025) |
| 3 | UF Health, *UF Health Leadership* (as of Sept. 15, 2025) |
| 4 | Shands Teaching Hospital and Clinics, Inc. Fla. Sec'y of State Amended Annual Report (Aug. 15, 2025) |
| 5 | Shands Teaching Hospital and Clinics, Inc. Fla. Sec'y of State Amended Articles of Incorporation (Aug. 29, 2025) |
| 6 | Central Florida Health, Inc. Fla. Sec'y of State Amended Annual Report (Aug. 14, 2025) |
| 7 | Central Florida Health, Inc. Amended and Restated Articles of Incorporation (Dec. 20, 2019) |
| 8 | Leesburg Regional Medical Center, Inc. Amended Annual Report (Aug. 15, 2025) |
| 9 | Leesburg Regional Medical Center, Inc. Amended and Restated Articles of Incorporation (Dec. 20, 2019) |
| **Declaration of Philip Braun** | |
| 10 | Shands Teaching Hospital and Clinics, Inc. Bylaws |
| 11 | Central Florida Health, Inc. Bylaws |
| 12 | Leesburg Regional Medical Center Bylaws |

# INTRODUCTION

Leesburg Regional Medical Center ("Leesburg") is a not-for-profit corporation operating medical facilities of the University of Florida. But its corporate form is a technicality only—its creation, mission, structure, and powers are all governed directly by Florida statutes. Florida has made the permissible organizational choice to incorporate some of its subdivisions—but that choice does nothing to undermine the fact that those subdivisions function *as* part of the State of Florida, a fact Florida made express in its statutes. And as part of the State of Florida, Leesburg is entitled to immunity from plaintiffs' antitrust claims for two distinct reasons.

*First*, Leesburg is an arm of the state for purposes of the Eleventh Amendment and entitled to immunity from suit in federal court. It is a subsidiary of a statutorily created corporate entity, Shands Teaching Hospital and Clinics, Inc. (Shands), authorized and organized to "support … the health affairs mission of the University of Florida"—a manifestly state concern. Fla. Stat. § 1004.41(4)(e). In exercising its supportive function, Leesburg "shall be conclusively deemed a corporation primarily acting as an instrumentality of the state." *Id.* The Board of Trustees of the University of Florida authorized its status as a Shands subsidiary, and the Shands Board serves as Leesburg's Board of Directors. Leesburg is actively supervised by State officials and is subject to audit and control by State actors. And, as an instrumentality of the State of Florida, if Leesburg is liable for damages in excess of $200,000, those damages can only be obtained directly from the State treasury. Leesburg thus bears all the hallmarks of entities that the Fourth Circuit has consistently found to share States' sovereign immunity under the Eleventh Amendment.

*Second*, Leesburg is beyond the scope of the antitrust laws that form the basis of plaintiffs' claims. Congress has chosen not to extend antitrust liability to state actors. Leesburg's challenged actions are those of the sovereign because Leesburg is statutorily defined to be acting as a state instrumentality in serving the State's educational purposes. Florida has made the decision to accept political and legal responsibility for Leesburg's actions—placing them outside the scope of the

1

federal antitrust laws. Even if Leesburg were not entitled to *ipso facto* immunity, it nonetheless satisfies the more restrictive, two-part test applicable to non-sovereign state agencies. A Florida statute requires the creation and operation of a College of Pharmacy, which necessarily entails the selection and placement of pharmacy residents. And Leesburg is controlled and supervised by the state of Florida. Its actions are thus in service of clearly articulated state policies and are actively supervised by Florida.

Leesburg is thus doubly immune from this suit. The Court should dismiss the claims against it under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, 12(b)(6).

## BACKGROUND

Florida's Constitution creates the State's university system governed by a board of seventeen governors. Fla. Const. art. IX, § 7. The board of governors "shall operate, regulate, control, and be fully responsible for the management of the whole university system." *Id.* Florida's Governor appoints (and Senate confirms) fourteen governors, with the remaining three slots filled by designated state officials. *Id.* The university system consists of multiple public universities, each governed by a board of thirteen trustees. *Id.* Each board's powers are established by the statewide board of governors. *Id.* Each university's board of trustees has six citizen members appointed directly by the Governor and five citizen members appointed by the board of governors, all of whom must be approved by the Senate. *Id.* The trustees also include the chair of the faculty senate and president of the university's student body. *Id.*

Florida statutes establish the J. Hillis Miller Health Center at the University of Florida, which includes Florida's "College of Pharmacy." Fla. Stat. § 1004.41(1)(e). One way the College of Pharmacy educates pharmacy professionals is through its pharmacy residency program, which provides in-depth training designed to help residents and fellows develop knowledge and advanced clinical skills, while building confidence as a clinician and a contributing member of the health

2

care team. Ex. 1, UF College of Pharmacy, *Residencies and Fellowships* (as of Sept. 9, 2025)[1]; *see also* Amended Compl. ¶¶ 3 (alleging Leesburg operates a pharmacy residency program).

      As a component of the University of Florida system, the J. Hillis Miller Health Center fits into this web of state regulation. The same statutory provision that creates the Health Center directs the University of Florida Board of Trustees to lease certain hospital facilities to Shands, a "not-for-profit corporation organized for the primary purpose of supporting the University of Florida Board of Trustees' health affairs mission of community service and patient care, education and training of health professionals, and clinical research." Fla. Stat. § 1004.41(4)(a). By statute, Shands is governed "by a board of directors appointed, subject to removal, and chaired by the President of the University of Florida, or his or her designee, and vice chaired by the Vice President for Health Affairs of the University of Florida or his or her designee." *Id.* § 1004.41(b)(2); *see also* Ex. 4, Shands Fla. Sec'y of State Amended Annual Report (Aug. 15, 2025) (Chair Marsha Powers, Vice Chair Stephen Motew, Secretary Ryan Fuller, and directors Edmund Beebe, Kent Fuchs, Jennifer Hunt, Gregory Lewis, David Mann, Todd Neville, and Robert Stilley).[2] The University of Florida President's designee as Shands Board Chair is Marsha Powers, a trustee on the University of Florida Board of Trustees. Ex. 4, Shands Amended Annual Report; Ex. 2, UF Board of Trustees, *Current Trustees* (as of Sept. 9, 2025); Ex. 10, Shands Bylaws art. VII § 2. And the

---

[1]    The material facts and documents are all considerable as the subject of judicial notice; they are "not subject to reasonable dispute because [they] … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"—state records. Fed. R. Evid. 201(b)(2); *Hillman v. Amazon.com Servs. LLC*, 2025 WL 1556090, at *2 & n.1 (D. Md. 2025). Regardless, all facts may be considered for purposes of the Rule 12(b)(1) motion. "Declarations … and other materials in the record may … serv[e] as the basis for the factual resolution" of a Rule 12(b)(1) motion. *In re Marriott Int'l, Inc. Customer Data Sec. Breach Litig.*, 626 F. Supp. 3d 814, 831 (D. Md. 2022); *see also United States ex rel. Black v. Health & Hospitality Corp. of Marion Cnty.*, 494 F. App'x 285, 293 n.10 (4th Cir. 2012); *Mims v. Kemp*, 516 F.2d 21, 23 (4th Cir. 1975) (applying rule in antitrust context); Wright & Miller's Federal Practice & Procedure § 1366 (3d ed. updated 2025).

[2]    The University President is appointed by the Board of Trustees and approved by the Board of Governors, many of which are, in turn, appointed by the Governor. *See* pages 2, 8-9, *infra*.

designee of the Vice President for Health Affairs for Shands Vice Chair is Dr. Stephen Motew, President and CEO of UF Health. Ex. 4, Shands Amended Annual Report; Ex. 3, UF Health, *UF Health Leadership* (as of Sept. 9, 2025). Shands's bylaws specify that the University has the exclusive power to: approve amendments to the articles of incorporation and bylaws; appoint and remove any director of the Board; approve any corporate governance or day-to-day operations; and approve any material change in Shands's mission. Ex. 10, Shands Bylaws Art. IV.

Shands, in turn, "may create or have created either for-profit or not-for-profit subsidiaries and affiliates, or both" in "support of the health affairs mission of the University of Florida Board of Trustees and with the board's prior approval." Fla. Stat. § 1004.41(4)(e). One such Shands subsidiary is Central Florida Health, Inc. (which does business as UF Health Central Florida), a not-for-profit corporation organized under Fla. Stat. Ch. 617. Ex. 7, Central Florida Health Articles of Incorporation art. V. The Central Florida articles require that the Board be composed of the same individuals as the Board of Shands. *Id.* art. VII. UF Health Central Florida Board's Chair and Vice-Chair are the same as Shands's. *Compare* Ex. 4, Shands Amended Annual Report, *with* Ex. 6, Central Florida Health Amended Annual Report. Under UF Health Central Florida's organizing documents, the University of Florida's President or designee must: (1) monitor the use of the University's resources by the corporation; (ii) monitor the use of the University's name by the corporation; (iii) monitor compliance of the corporation with state and federal law; and (iv) approve any proposed contributions of funds by the corporation to support the University. Ex. 11, Central Florida Health Bylaws art. IX § 2.

Defendant Leesburg is a subsidiary of UF Health Central Florida and is also a Florida not-for-profit corporation. Ex. 9, Leesburg Reg'l Med. Ctr. Amended Articles of Incorporation art. II, V. Its purpose is "[t]o primarily support the health affairs mission of the University of Florida Board of Trustees." *Id.* art. V. The powers of the corporation are vested in Leesburg's Board of Directors. Ex. 12, Leesburg Reg'l Med. Ctr. Bylaws art. IV § 2. Leesburg's Board is the same as

4

Shands's and UF Health Central Florida's. *Id.* art. IV § 1. And the University of Florida President (or designee) has the same responsibilities with respect to Leesburg as for UF Health Central Florida. *Id.* art. XI § 2.

Leesburg is thus a subsidiary of Shands, the corporation designated by Florida Law to operate the state-owned hospital facilities and health center known as Shands Teaching Hospital and Clinics. Florida law establishes that "Shands Teaching Hospital and Clinics, Inc., and any not-for-profit subsidiary … whose primary purpose is the support of the University of Florida Board of Trustees' health affairs mission, shall be conclusively deemed a corporation primarily acting as an instrumentality of the state." Fla. Stat. § 1004.41(e).

## STANDARD OF DECISION

Rule 12(b)(1) requires a court to dismiss a claim over which it "lack[s] subject-matter jurisdiction," including on grounds of Eleventh Amendment immunity. *Singleton v. Md. Tech. & Dev. Corp.*, 103 F.4th 1042, 1045 (4th Cir. 2024). Rule 12(b)(6) requires a court to dismiss a claim that "fail[s] to state a claim upon which relief can be granted."

## ARGUMENT

Leesburg joins in full the joint motion to dismiss filed by all defendants. But as an instrumentality of the State of Florida, Leesburg is separately immune from plaintiffs' claims altogether. The Eleventh Amendment protects states and their operating components from suit in federal court without their consent. And, in recognition of the core principles of federalism and state sovereignty, Congress chose not to extend antitrust liability to state actors like Leesburg. Each form of immunity independently requires the dismissal of all claims against Leesburg.

## I.    LEESBURG REGIONAL MEDICAL CENTER MUST BE DISMISSED BECAUSE OF ITS ELEVENTH AMENDMENT IMMUNITY.

Leesburg is entitled to immunity from private suit under the Eleventh Amendment as an instrumentality of the State of Florida. The Court must thus dismiss Leesburg under Rule 12(b)(1) for lack of jurisdiction.

**A.** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Amendment incorporates a state sovereign immunity that prevents suits by any individual in federal court without the State's consent. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). "[F]ederal jurisdiction over" such suits was simply "'not contemplated by the Constitution when establishing the judicial power of the United States.'" *Seminole Tribe*, 517 U.S. at 54 (quoting *Hans*, 134 U.S. at 1).

It is also "well settled that Eleventh Amendment immunity … 'extends to state agencies and other governmental entities that can be viewed as arms of the state.'" *Singleton*, 103 F.4th at 1047 (quoting *Md. Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255, 260-261 n.8 (4th Cir. 2005)). "Such immunity is afforded because, when a governmental entity that qualifies as an arm of the state has been sued, the relationship between the two is such that 'the state is the real, substantial party in interest,' and the entity is its alter ego." *Id.* (quoting *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (1987)).

The Fourth Circuit has enumerated a "nonexclusive list" of factors to weigh in ascertaining whether a particular entity is an arm of the state:

> (1) Whether any judgment against the entity as defendant will be paid by the State …;
>
> (2) The degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;
>
> (3) Whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
>
> (4) How the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make [it] an arm of the State.

*Singleton*, 103 F.4th at 1048 (quoting *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 303 (4th Cir. 2008)). Each factor favors immunity for Leesburg.

*First*, the State of Florida will bear the burden of any judgment against Leesburg. The emphasis in this analysis is on "the practical effect of a putative … judgment." *Ristow v. S.C. Ports Auth.*, 48 F.3d 1051, 1053 (4th Cir. 1995). That is, a State treasury is responsible for a judgment "where the state is *functionally* liable, even if not legally liable." *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 137 (4th Cir. 2014).

In Florida, "sovereign immunity is the rule, rather than the exception." *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984); Fla. Const. art. X, § 13 (authorizing "provision … by general law for bringing suit against the state as to all liabilities now existing or hereafter originating"). The complaint identifies no waiver of sovereign immunity. At most, Florida has enacted a limited waiver of sovereign immunity for torts resulting in an injury to property or person, which does not include the antitrust claims in plaintiffs' complaint. Fla. Stat. 768.28(1). And even where damages are available, the State has limited recovery for any claim against the state, "its agencies or subdivisions" to $200,000 and has imposed a cap of $300,000 in damages on "all … claims or judgments paid by the state or its agencies or subdivisions arising out of the same incident or occurrence." *Id.* § 768.28(5)(a).

"This does not mean that a tort victim with excessive damages is without redress." *Joynt v. Star Ins. Co.*, 314 F. Supp. 3d 1233, 1238 (M.D. Fla. 2018). Instead, Florida's sovereign immunity waiver states that the "portion of the judgment that exceeds these amounts may be reported to the Legislature" through Florida's "claim bill" process. Fla. Stat. § 768.28(5)(a); Gerald T. Wetherington & Donald I. Pollock, *Tort Suits Against Government Entities in Florida*, 44 Fla. L. Rev. 1, 79 (1992). "[A] claims bill is a 'voluntary recognition of its moral obligation by the legislature.'" *Searcy, Denney, Scarola, Barnhart & Shipley v. State*, 209 So. 3d 1181, 1189 (Fla. 2017). The claim bill process allows plaintiffs to seek funds from the Florida Legislature for either the uncollected difference between the statutory cap and the excess damages or for equitable claims to relief even without an excess judgment. After proceeding through a legislative process, claims

7

approved by both houses and signed by the Governor are paid out directly from the Florida treasury. Fla. Senate & Fla. H. of Reps., *Legislative Claim Bill Manual* (2023), perma.cc/LKH5-5L4Z.

Because any judgment against Leesburg would be limited to the statutory maximum, any excess payments must come directly from the Florida treasury. Even though the state itself would not be directly liable, it is "functionally" liable. *Oberg*, 745 F.3d at 137. The first factor, responsibility for judgment, thus weighs heavily in favor of immunity. And the Fourth Circuit has "repeatedly emphasized" this factor as the most important in the arm-of-the-state inquiry. *Singleton*, 103 F.4th at 1048; *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014); *Ram Ditta*, 822 F.3d at 457.[3]

*Second*, the State of Florida exercises complete control over the affairs of Leesburg. The "State's control over" the corporation "is manifested structurally." *Singleton*, 103 F.4th at 1051. Leesburg's very existence as a subsidiary of Shands required the authorization of the University of Florida Board of Trustees. Fla. Stat. § 1004.41(4)(e). The Board of Trustees is composed of thirteen members, six of whom are appointed directly by the Governor and five of whom are appointed by the Board of Governors. Fla. Const. art. IX, § 7(c); Fla. Stat. § 1001.71(1). The Board of Governors, in turn, consists of 17 members: 14 appointed by the Governor; the State Commissioner of Education; the chair of the advisory council of faculty senates; and the president of the Florida student association. Fla. Const. art. IX, § 7(d); Fla. Stat. § 1001.70(1). "[T]he State of Florida controls" the University of Florida "through its board of trustees, who are governed by [the] statewide Board of Governors." *Porkka v. Univ. of S. Fla. Bd. of Trs.*, 2018 WL 2717235, at *2 (M.D. Fla. 2018); *see* Fla. Bd. of Governors Reg. 1.001(1). And that Board of Trustees controls

---

[3]    Even if this were not sufficient, the Fourth Circuit has been clear that an entity may still be an arm of the state even when a judgment would not be satisfied from the state treasury where the "entity is so connected to the State that the legal action against the entity would … amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Hutto*, 773 F.3 at 543. This condition is satisfied through "consideration of the remaining three factors"—each of which here points solidly toward immunity. *Singleton*, 103 F.4th at 1048.

Shands and its subsidiaries, including Leesburg.

The Florida legislature left no ambiguity about the degree of control the State exercises over the corporate entities supporting the University. The statute that authorizes the existence of Leesburg further specifies that "[t]he University of Florida Board of Trustees … may control Shands Teaching Hospital and Clinics, Inc." Fla. Stat. § 1004.41(e)(5). As discussed above, Leesburg's Board of Directors is identical to that of Shands, whose directors are "appointed, subject to removal, and chaired by the President of the University of Florida or his or her designee, and vice chaired by the Vice President for Health Affairs of the University of Florida or his or her designee." *Supra* page 3; Fla. Stat. § 1004.41(b)(2). Indeed, the current chair of both companies is a Trustee on the Board of Trustees.

It is thus of no moment that Leesburg has the "power and privileges of a corporation." *Hutto*, 773 F.3d at 546. "The means by which the entit[y's] officers are appointed suggest that the [entity] is beholden to the State." *Id.* Because the Board mirrors Shands's, and because Shands's Board is appointed and removable by the President of the University of Florida (an official selected by the Board of Trustees and confirmed by the Board of Governors, Fla. Bd. of Governors Reg. 1.001(4)(d)), Leesburg's board is appointed by the State. The Chair and Vice-Chair are or are selected by state officials. *Supra*, page 1-2. The Board structure is quite similar to the entity in *Singleton*, whose Board was comprised of a majority of state officials. 103 F.4th at 1045-1046. It would "be naïve to conclude that the State lacks any influence or control when it has the power of appointment." *Hutto*, 773 F.3d at 547.

Indeed, that is precisely the goal of the mirror-board structure: the University of Florida President must (1) monitor the use of the University's resources by the corporation; (ii) monitor the use of the University's name by the corporation; (iii) monitor compliance of the corporation with state and federal law; and (iv) approve any proposed contributions of funds by the corporation to support the University. Ex. 12, Leesburg Reg'l Med. Ctr. Bylaws art. XI § 2. These are all clear

indications of state control. And that control is backstopped by statutory requirements that the University of Florida audit the financial statements of Shands and "any not-for-profit subsidiary" such as Leesburg. Fla. Stat. § 1004.41(4)(B)(7); *Singleton*, 103 F.4th at 1046 (noting that audit and financial reporting requirements cut strongly in favor of immunity).

*Third*, Leesurg Regional Medical Center is involved with State concerns. As a subsidiary of Shands, Leesburg exists "for the primary purpose of supporting the University of Florida Board of Trustees' health affairs mission of community service and patient care, education and training of health professionals, and clinical research." Fla. Stat. § 1004.41(4)(a); Ex. 9, Leesburg Reg'l Med. Ctr. Articles of Incorporation art. V. Just like the University of Maryland Medical System, the statutory language authorizing the existence of Leesburg as a Shands subsidiary "reflects an involvement with statewide concerns" including the provision of medical care. *Hammons v. Univ. of Md. Med. Sys. Corp.*, 441 F. Supp. 3d 567, 587 (D. Md. 2021). And the other components of Leesburg's mission, like education and training, are classic state concerns as well. *Md. Stadium Auth. v. Ellerbe Beket, Inc.*, 407 F.3d 255, 265 (4th Cir. 2005); *MUSC Health Ctr. Care Org., LLC v. Med. Univ. Hosp. Auth.*, 659 F. Supp. 3d 700, 713 (D.S.C. 2023) (finding that South Carolina's university hospital system's "dual purposes, to provide medical care throughout [the state]" and "to facilitate the 'training and education of health professionals'" weighed '"heavily in favor of finding MUHA is an alter ego of the State").

*Fourth*, Florida law unequivocally designates Leesburg as a state instrumentality. While the arm-of-the-state inquiry is governed by federal law, it "can be answered only after considering the provisions of state law that define the [entity]'s character." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 419 n.5 (1997). The Court must consider "the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." *Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir. 1996).

In creating the University of Florida medical teaching colleges, Florida made express that

"any not-for-profit subsidiary" of Shands, "which directly delivers health care services and whose governing board is chaired by the president of the university or his or her designee and is controlled by the University of Florida Board of Trustees … and whose primary purpose is the support of the University of Florida Board of Trustees' health affairs mission, *shall be conclusively deemed a corporation primarily acting as an instrumentality of the state.*" Fla. Stat. § 1004.41(4)(e) (emphasis added). Leesburg satisfies each criterion. It is a not-for-profit subsidiary of Shands. Ex. 9, Leesburg Articles of Incorporation art. II, VII. It delivers health care services, and its primary purpose is the support of the University's health care mission. Ex. 9, Leesburg Articles of Incorporation art. V. Its Board is chaired by the University of Florida President's designee and ultimately controlled by the Board of Trustees. *See supra* at 9. As a matter of Florida law, Leesburg is thus "conclusively" an arm of the state.

As an instrumentality of Florida, Leesburg enjoys sovereign immunity under Florida law. Florida's sovereign immunity statute defines "state agencies or subdivisions" to include "the independent establishments of the state, including state university boards of trustees" and "corporations primarily acting as instrumentalities of the state." Fla. Stat. § 768.28. That language tracks the language in Section 1004.41—showing that Florida specifically intended that the actions of Leesburg be directly attributable to the State.

Ultimately, "[i]t is well settled in Florida that state universities are arms of the state that are entitled to Eleventh Amendment immunity." *Walker v. Univ. of Fla.*, 2020 WL 609298, at *2 (N.D. Fla. 2020); *accord Univ. of S. Fla. Bd. of Trustees v. CoMentis, Inc.*, 861 F.3d 1234, 1236 (11th Cir. 2017); *Souto v. Fla. Int'l Univ. Found., Inc.*, 446 F. Supp. 3d 983, 990-991 (S.D. Fla. 2020). Leesburg is an entity that serves the University of Florida's purposes and is controlled by the leadership of the University of Florida and by the State of Florida itself. There is no basis to afford it different treatment—especially when Florida law evidences the opposite intent.

\* \* \*

All four factors confirm immunity. Given that Leesburg is an arm of the state, the Court should dismiss the claims against it for lack of jurisdiction under Rule 12(b)(1). *See Singleton*, 103 F.4th at 1047.[4]

## II.    LEESBURG REGIONAL MEDICAL CENTER IS ENTITLED TO *PARKER* AN-TITRUST IMMUNITY.

Separate and apart from Eleventh Amendment sovereign immunity,[5] Leesburg is entitled to immunity from antitrust liability for actions it takes on behalf of the state. *Parker v. Brown*, 317 U.S. 341 (1943). Because the Sherman Act does not reach anticompetitive acts by or blessed by states, plaintiffs cannot state an antitrust claim against Leesburg.

For decades, the Supreme Court has "declined to construe the Sherman Act as prohibiting the anticompetitive actions of a State." *Hoover v. Ronwin*, 466 U.S. 558, 567 (1984) (citing *Parker*). This holding is based "on principles of federalism and state sovereignty." *Id.* "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker*, 317 U.S. at 350-351. And there is "nothing in the language of the Sherman Act or in its history which suggests" such an intent. *Id.* A plaintiff thus fails to state a Sherman Act claim when it alleges anticompetitive conduct by a sovereign actor. *See S.C. State Bd. of Dentistry*, 455 F.3d at 445.

*Parker* and its progeny confirmed the limits on the reach of federal antitrust laws in the context of state actions. *Hoover*, 466 U.S. at 567-568. But while "the Sherman Act confers

---

[4]    The Eleventh Amendment ends the inquiry because Congress cannot abrogate state sovereign immunity through antitrust legislation, which is enacted under the Commerce Clause power. *E.g.*, *Parker v. Brown*, 317 U.S. 341, 348-349 (1943); *see also* William H. Page & John E. Lopatka, Parker v. Brown*, the Eleventh Amendment, and Anticompetitive State Regulation*, 60 William & Mary L. Rev. 1465, 1482 (2019) ("The only mechanisms open to Congress to abrogate Eleventh Amendment immunity have no practical application to antitrust.").

[5]    *S.C. State Bd. of Dentistry v. FTC*, 455 F.3d 436, 447 (4th Cir. 2006) ("Nothing stops states or public officials from asserting [sovereign immunity] defenses in addition to claiming *Parker* protection.")

immunity on the States' own anticompetitive policies out of respect for federalism," it "does not always confer immunity where … a State delegates control over a market to a nonsovereign actor." *N.C. State Bd. of Dental Examiners v. FTC*, 574 U.S. 494 (2015). In such cases, the entity enjoys *Parker* immunity only if satisfies the stricter two-part test enunciated in *California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980). Leesburg is entitled to immunity under either standard.

**A.** First and foremost, Leesburg is entitled to *ipso facto Parker* immunity because it is a sovereign actor. "For purposes of *Parker*, a nonsovereign actor is one whose conduct does not automatically qualify as that of the sovereign State itself." *N.C. Bd. of Dental Examiners*, 574 U.S. at 505. By logical implication, an entity whose conduct *does* automatically qualify as that of a state therefore *is* a sovereign actor. By taking direct responsibility for an entity's actions, it endows those actions with "more than a mere façade of state involvement" and "satisfies "*Parker's* rationale to ensure the States accept political accountability for anticompetitive conduct they permit and control. *Id.*

As discussed above (at pages 7-11), Florida's statutes conclusively state that Leesburg is "primarily acting as an instrumentality of the state" in operating the educational programs at issue here. Fla. Stat. § 1004.41(e). And an instrumentality is "[a] means or agency through which a function of another entity is accomplished, such as a branch of a governing body." Instrumentality, *Black's Law Dictionary* (12th ed. 2024). That conclusion is particularly clear in light of Florida's decision to imbue Leesburg with sovereign immunity. Fla. Stat. § 768.28; *supra*, page 11. These provisions together paint an unmistakable picture: Florida law operates to ensure that the State is politically accountable for Leesburg, which acts as an arm of the state in fulfilling the State University's statutorily authorized health care and education missions.

Beyond that, Leesburg's actions "result from procedures that suffice to make [them] the State's own." *N.C. State Bd. of Dental Examiners*, 574 U.S. at 506. Leesburg's Board mirrors

Shands's, which is selected and controlled by the Board of Trustees and University President. *Supra*, page 9. Its finances and actions are policed and audited by the State. And the President of the University of Florida (or his designee) chairs the board and is obligated to monitor numerous aspects of Leesburg's operations. These mechanisms ensure that Leesburg makes decisions that are legally, politically, and procedurally traceable to the State.

The Sherman Act thus does not reach any alleged conduct on Leesburg's part, just as numerous courts evaluating similar state university and medical entities have concluded that they are entitled to *ipso factor Parker* immunity as well. *See, e.g.*, *Nicholl v. Bd. of Regents of Univ. Sys. of Georgia*, 706 F. App'x 493, 496 (11th Cir. 2017); *Saenz v. Univ. Interscholastic League*, 487 F.2d 1026, 1027-1028 (5th Cir. 1973); *Pharm & Diagnostic Servs., Inc. v. Univ. of Utah*, 801 F. Supp. 508 (D. Utah 1990).

**B.** Even under the *Midcal* test, Leesburg is entitled to *Parker* immunity. That test has two parts: "first that the challenged restraint … be one clearly articulated and affirmatively expressed as state policy, and second that the policy … be actively supervised by the state." *FTC v. Phoebe Putney Health Sys. Inc.*, 568 U.S. 216, 225 (2013) (quoting *Midcal*, 445 U.S. at 105) (cleaned up). Leesburg satisfies both.

Leesburg's actions in selecting pharmacy students are "clearly articulated and affirmatively expressed as state policy." Florida statute requires the creation and operation of a College of Pharmacy and authorizes the creation of entities like Leesburg to support the University of Florida Board of Trustees' health affairs mission of education and training of health professionals. Fla. Stat. § 1004.41(4)(5). That educational mission—running a pharmacy school—obviously and necessarily entails selection and placement of pharmacy residents. Leesburg is only alleged to have violated the antitrust laws by carrying out that state function. *See* Amended Compl. ¶¶ 154-167.

And Leesburg is controlled and supervised by the State of Florida. *See supra* at 1-2. Its board (which mirrors Shands's) is subject to removal and chaired by the President of the University

14

of Florida's designee and vice chaired by the Vice President for Health Affairs of the University of Florida's designee. Fla. Stat. § 1004.41(b)(2); Ex. 9, Leesburg Articles of Incorporation art. VII. This supervisory authority is more than hypothetical. The President *must* monitor compliance of the corporation with state and federal law. Ex. 12, Leesburg Bylaws art. XI § 2. Leesburg's very corporate structure is designed to ensure that the State has direct control of its actions in pursuing the University of Florida's mission. And that control comes with state accountability—Florida has expressly deemed Leesburg an instrumentality of the state. Fla. Stat. § 1004.41(4)(e).

Thus, even if Leesburg were not entitled to *ipso facto Parker* immunity—it is—it would still be entitled to *Parker* immunity under the *Midcal* test. The antitrust laws thus do not extend to Leesburg's conduct, and plaintiffs have therefore failed to state a claim against Leesburg.

## CONCLUSION

The Court should dismiss the claims against Defendant Leesburg.

Dated: September 17, 2025                            Respectfully Submitted:

                                                    /s/   *Michael S. Nadel*
                                                    Michael S. Nadel (Bar No. 16241)
Stephen Y. Wu (*pro hac vice*)                      MCDERMOTT WILL & SCHULTE LLP
Ashley Fischer (*pro hac vice*)                     500 North Capitol Street NW
Chelsea Mounayer (*pro hac vice*)                   Washington, DC 20001
MCDERMOTT WILL & SCHULTE LLP                        (202) 756-8000
444 W. Lake Street, Suite 400                       mnadel@mwe.com
Chicago, IL 60606
(312) 372-2000
swu@mwe.com

*Attorneys for Defendant Leesburg Regional Medical Center, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2025, I electronically filed the foregoing with the Clerk of this Court using the CM/ECF system, and counsel for all parties will be served by the CM/ECF system.

Dated: September 17, 2025                    _/s/ Michael S. Nadel_