## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ALEXIS ALBERT**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. DLB-25-673** |
| **AMERICAN SOCIETY OF HEALTH-SYSTEM PHARMACISTS**, *et al.*, | * | |
| **Defendants.** | * | |

## MEMORANDUM OPINION

When an aspiring pharmacist completes their graduate degree, they have a range of career options. Some may go straight into the workforce, pursuing jobs in pharmaceutical retail or manufacturing. Others may seek additional training in the form of a pharmacy residency: a paid yearlong position, often at a hospital, where they care for patients under the supervision of a more experienced pharmacist.

A residency can open many doors in a young pharmacist's career. But the job is demanding and does not pay well. In this proposed class action under § 1 of the Sherman Act, 15 U.S.C. § 1, four former pharmacy residents—Alexis Albert, May Ann Hudgins, June Kim, and Meaghan Walker—claim that these working conditions are the result of anticompetitive conspiracies among the healthcare facilities that employ pharmacy residents, the association that accredits their residency programs, and the organization that coordinates the resident-employer matching process. The defendants have moved to dismiss the plaintiffs' complaint.

For the following reasons, the plaintiffs' claims are dismissed without prejudice. The Court does not have personal jurisdiction over two of the defendants, National Matching Services, Inc. ("NMS") and Dr. David Rubin, M.D., MSCE, who is sued in his official capacity as Executive

Vice President of University of California Health, The Regents of the University of California ("Dr. Rubin"). As for the remaining defendants, the plaintiffs have failed to state a claim against them. The plaintiffs' request to file an amended complaint is granted.

## I.      Background

For purposes of resolving the pending motions, the Court assumes the truth of the following well-pleaded facts in the plaintiffs' operative complaint, ECF 113.

### A.      Pharmacy Residencies

After attaining their bachelor's degree, an aspiring pharmacist usually completes a Doctor of Pharmacy degree ("PharmD") "at one of nearly 150 U.S.-based colleges and schools of pharmacy that offer" it. *Id.* ¶ 41. Then, once they pass a licensure exam and fulfill certain other requirements to practice, the graduate may go directly into the workforce or pursue additional training in a yearlong pharmacy residency. *Id.* ¶¶ 42–44. A residency is a prerequisite for certain pharmacist positions in, for example, hospitals and specialized pharmacy subfields such as infectious disease and emergency medicine. *Id.* ¶ 46. A residency also can accelerate a pharmacist's eligibility for board certification exams. *Id.* ¶ 48.

Residencies are demanding. On average, a resident works 50 to 60 hours per week. *Id.* ¶ 45. Some work nights with minimal days off. *Id.* And the pay, compared to non-residency positions, is poor. Residents generally earn "less than half of the average pharmacist's salary." *Id.* Nonetheless, many PharmD graduates seek out residencies because the residencies expand their career opportunities, provide "increased clinical training," and offer significant "reputational enhancements." *Id.* ¶ 130.

### B.       Residency Accreditation and the Match

Pharmacy residency programs in the U.S. are accredited by the American Society of Health-System Pharmacists ("ASHP"), a professional pharmacists' association with nearly 60,000 members, headquartered in Bethesda, Maryland. *Id.* ¶¶ 3, 15. ASHP "is the sole nationally-recognized body for accreditation of pharmacy residencies"; "[f]ewer than ten percent of pharmacy residency positions nationwide are not accredited by ASHP." *Id.* ¶¶ 52, 61. "Without an ASHP accreditation, pharmacy residency programs struggle to survive" because "[t]hey attract fewer and less competitive applicants, and their participants enjoy fewer reputational and career benefits[.]" *Id.* ¶ 61. When applying for accreditation, a residency program must submit its application materials to ASHP's Bethesda headquarters. *Id.* ¶ 40(e).

ASHP imposes various requirements on accredited residency programs, such as rules that cap the number of hours residents may work in a week. *Id.* ¶ 45. ASHP also organizes events and conferences, including job fairs. *Id.* ¶ 40(a). As a condition of accreditation, ASHP requires residency programs to participate in the ASHP Resident Matching Program ("Match"). *Id.* ¶¶ 63–64. The Match is the standardized, nationwide process by which pharmacy graduates seek and obtain residency positions with ASHP-accredited programs. *Id.* ¶¶ 54, 139. ASHP administers the Match through a contract with NMS, a corporation incorporated and headquartered in Canada. *Id.* ¶¶ 16, 56. 5,232 pharmacy residency positions were offered exclusively through the Match in 2024. *Id.* ¶ 144.

At a high level, the Match works as follows. Each year, candidates submit applications for residency positions through ASHP's online portal. *Id.* ¶ 54. In the process, they "rank the pharmacy programs where they wish to obtain employment from most desirable to least desirable." *Id.* Residency programs, using a website operated by NMS, likewise "rank the applicants they wish

3

to employ[.]" *Id.* ¶ 56. Then, the candidates' and programs' rank lists are transmitted to NMS, which runs an algorithm over the lists to "match" candidates with residency programs. *Id.* ¶ 57. The results of the Match are contractually binding. *Id.* ¶ 58. Once a candidate has been matched with a program, the program must offer them employment as a resident, and the candidate must accept. *Id.* If either party fails to comply with its obligations, ASHP may subject it to penalties, such as barring candidates from participation in future Matches or stripping programs of their accreditation. *Id.* ¶¶ 58, 78.

The terms of the Match are formalized in a set of rules and written agreements. Every ASHP-accredited residency program must agree to be bound by the ASHP Regulations on the Accreditation of Pharmacy Residencies ("Accreditation Regulations") as a condition of obtaining and renewing its accreditation. *Id.* ¶¶ 62, 68. These regulations require that each accredited program participate in the Match unless it obtains an exemption, which is granted in fewer than five percent of cases. *Id.* ¶¶ 63–64; *see also* ECF 113-1, ¶ XI(D). Per the regulations, a program "that is required to participate in the [Match] and fails to do so" may lose its accreditation. ECF 113-1, ¶ XIV(A)(5). The regulations further require that programs adhere to the ASHP Resident Matching Program Residency Agreement ("Residency Agreement") and abide by the Rules for the ASHP Pharmacy Residency Matching Program ("Match Rules"). ECF 113, ¶ 65; *see also* ECF 113-1, ¶ XI(D).

Directors of residency programs electronically sign the Residency Agreement and agree to abide by the Match Rules each year when registering their program for the Match. ECF 113, ¶¶ 79–82. Every August, ASHP emails each program director a personalized link to complete the registration process; clicking on the link directs program directors to a website where they provide certain information about their programs (e.g., application deadlines, program location, any special

areas of emphasis that the program covers) and agree to the Residency Agreement and Match Rules. *Id.* ¶¶ 80, 82–84; ECF 113-3, at 4–6. The Residency Agreement states that "[t]his organization, residency and program(s) agree to," among other things, abide by the Match Rules; "[o]ffer in Phase I of the Match all positions available in the residency" and offer "positions left unfilled in Phase I of the Match . . . in Phase II of the Match"; "[o]ffer an appointment to each applicant matched with this residency"; and "[n]ot offer a position to any applicant who was matched elsewhere, or committed elsewhere through the Early Commitment Process, and who has not received a written release from the residency program concerned." ECF 113, ¶ 76; *see also* ECF 113-2, at 2. The Residency Agreement also states that "ASHP possesses beneficiary standing to enforce this Agreement" and that in the case of violations, ASHP "may pursue all available remedies and impose penalties . . . including forfeiture of ASHP accreditation status." ECF 113-2, at 2.

The Match Rules similarly provide that applicants may not accept positions with a residency program if they already have been matched to another program. ECF 113, ¶ 89. The Match Rules also impose limitations on the information that may be shared between programs and applicants while the Match is ongoing. For instance, before Match results are released, programs may not communicate any information to applicants other than whether or not the applicant remains under consideration for admission. *Id.*

Candidates, too, must sign an agreement in order to participate in the Match: the Resident Matching Program Applicant Agreement ("Applicant Agreement"). *Id.* ¶¶ 92, 94. By signing the Applicant Agreement, prospective residents agree to, among other things, abide by the Match Rules, accept employment with the program with which they are matched, and not accept a

5

position with another program absent a written release from their employer. *Id.* ¶ 93; *see also* ECF 113-5, at 2.

For every year between 2013 and 2024, there were more applicants for residencies offered through the Match than residencies available. *Id.* ¶ 106. During this period, the number of matches and available positions was "either stabilizing or declining, relative to the growth in demand for residency-trained pharmacists." *Id.* ASHP has taken note of this trend, stating in 2021 that "[d]uring the past 15 years, the historical pharmacist shortage has transitioned into oversupply." *Id.* ¶ 111. In this same statement, however, ASHP also predicted that in the five years between 2021 and 2026, "[t]he number of pharmacy graduates will decline" and stated that "[a]lignment with [*sic*] the number of graduates with residency availability could accelerate ASHP's goal to ensure new pharmacy practitioners complete post-graduate training as a minimum credential." *Id.*

### C.    Information Sharing and Disclosure

ASHP maintains a database called the Residency Directory. *Id.* ¶ 96. The Residency Directory is publicly accessible. *See What is the Residency Directory?*, Am. Soc'y of Health-Sys. Pharmacists, https://www.ashp.org/professional-development/residency-information/residency-directory (last visited Aug. 12, 2026).[1] The Residency Directory contains "the salaries offered to residents" at ASHP-accredited programs "and other employment benefits." ECF 113, ¶ 97.

---

[1] The plaintiffs refer to the Residency Directory in their complaint, but they do not allege that it is publicly accessible. The defendants ask the Court to take judicial notice of the directory's public accessibility. In their opposition to the motion to dismiss, the plaintiffs do not object and tacitly concede that the Residency Directory is public. *See* ECF 223, at 43 (stating that the Residency Directory "is posted on ASHP's website"), 44 (not contesting that "the salary and benefits information [the defendants] exchange is, at some point, publicly posted"). The Court takes judicial notice that the Residency Directory is a publicly accessible database. *See* Fed. R. Evid. 201(b)(2); *Farrell v. Boeing Emps. Credit Union*, 761 F. App'x 682, 684 n.1 (9th Cir. 2019) (taking judicial notice "of the existence of [a] website in the public realm" without taking judicial notice of the truth of the website's contents) (internal quotation marks omitted).

Residency programs must list in the Residency Directory the number of positions they have available. *Id.* ¶ 110.

NMS, the Match's administrator, provides "competitiveness reports" to residency programs. *Id.* ¶ 99. These reports, according to NMS, "provide programs with insights into their desirability, the quality of their applicant pool, and the effectiveness of their evaluations," offering "comparisons to a peer group and the overall market." *Id.* These reports allow programs to "compare the competitive features of their respective programs." *Id.*

ASHP conducts regular surveys of residency programs. *Id.* ¶ 100. Participation in the surveys is mandatory per the Accreditation Regulations. *Id.* The information collected in one of these surveys "is aggregated to identify trends and shared with the pharmacy community and external agencies/partners." *Id.*

### D.    Residents' Wages and Benefits

Residents in ASHP-accredited programs are not well compensated. When compared to other pharmacists of similar experience and tenure, between 2017 and 2024 the median wage in ASHP-accredited programs was "substantially below the 10th percentile for all pharmacist wages." *Id.* ¶ 121. This trend held true across different subfields of pharmacy practice, such as hospitals, ambulatory health care services, and general merchandise retailers. *Id.* ¶¶ 122–24. Pharmacy residents also receive "fewer and inferior employment benefits" than their peers, including "more expensive and inferior health insurance, retirement benefits, and life insurance plans." *Id.* ¶ 125.

ASHP is not blind to the fact that pharmacy residents make less money than their counterparts in non-residency positions. In fact, ASHP publishes a guide called "How to Start a Residency Program." *Id.* ¶ 116. This guide encourages employers to start residency programs and

advises: "Splitting one pharmacist position into two residency positions will usually yield leftover dollars." *Id.*

### E.  The Parties and the Plaintiffs' Claims

The plaintiffs are former pharmacy residents Alexis Albert, May Ann Hudgins, June Kim, and Meaghan Walker. Albert resides in Lacey, Washington and was employed as a pharmacy resident by Leesburg Regional Medical Center, Inc. d/b/a UF Health Central Florida ("Leesburg") beginning in June 2023, where she earned an annual salary of $47,985.60. *Id.* ¶ 11. Hudgins resides in Ewa Beach, Hawaii and was employed as a pharmacy resident by The Queen's Health Systems beginning in July 2023, where she earned an annual salary of $50,000. *Id.* ¶ 12. Kim resides in Herndon, Virginia and was employed as a pharmacy resident by The Nemours Foundation at the Nemours Children's Hospital, Delaware beginning in June 2022, where she earned an annual salary of $54,000. *Id.* ¶ 13. Walker resides in Kyle, South Dakota and was employed as a pharmacy resident by Indiana University Health beginning in July 2023, where she earned an annual salary of $50,980.80. *Id.* ¶ 14. All four plaintiffs obtained their residencies through the Match. *Id.* ¶¶ 11–14.

The defendants are ASHP, NMS, and the following healthcare providers that offer pharmacy residencies: Allegheny Health Network, d/b/a Allegheny General Hospital; Ascension Health Alliance; The Cleveland Clinic Foundation, d/b/a The Cleveland Clinic; The Johns Hopkins Hospital; Kaiser Foundation Health Plan, Inc.; The Methodist Hospital d/b/a Houston Methodist Hospital; The New York and Presbyterian Hospital d/b/a New York Presbyterian Hospital; Northwestern Memorial Hospital; Rush University Medical Center; The University of Chicago Medical Center; Trustees of the University of Pennsylvania d/b/a University of Pennsylvania Medical Center-Hospital of the University of Pennsylvania; UPMC Presbyterian Shadyside; Dr.

8

Rubin; and the four organizations that employed the plaintiffs. The Court will refer to all defendants, except ASHP and NMS, collectively as "employer defendants."

The plaintiffs bring two claims under § 1 of the Sherman Act. In Count I, they claim that the defendants have conspired, through the Match, to artificially suppress residents' compensation and manipulate their terms of employment by, among other things, requiring prospective residents to accept employment with programs with which they match before they can negotiate the terms of their employment; prohibiting residents from transferring between programs; and limiting communication between programs and applicants during the Match process. *Id.* ¶¶ 155–56. The plaintiffs also allege that the defendants have "limit[ed] the number of residency positions available to ensure there is always a substantial excess of applicants applying for limited positions." *Id.* ¶ 155. In Count II, the plaintiffs claim that the defendants have conspired to restrain competition by exchanging residents' compensation information "in furtherance of a price suppression agreement[.]" *Id.* ¶¶ 164–65. The plaintiffs claim that, as a result of these anticompetitive conspiracies, they were compensated substantially less than they otherwise would have been. *Id.* ¶¶ 161, 167. They seek declaratory and injunctive relief against all defendants and treble damages against all defendants except Dr. Rubin.

Dr. Rubin has filed a motion to dismiss for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim. ECF 218. Leesburg has filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. ECF 219. NMS has filed a motion to dismiss for lack of personal jurisdiction. ECF 220. All defendants have filed a joint motion to dismiss for failure to state a claim. ECF 221. The motions are fully briefed. ECF 218-1, 219-1, 220-1, 221-1, 222, 223, 224, 225, 228, 229, 232, & 233. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

## II.  Standards of Review

### A.  Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction[,]" possessing "only that power authorized by Constitution and statute." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010) (quoting *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)). "A motion to dismiss based on lack of subject matter jurisdiction pursuant to [Rule] 12(b)(1) raises the question of whether the court has the competence or authority to hear the case." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). "Thus, when a district court lacks subject matter jurisdiction over an action, the action must be dismissed." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006)). The plaintiff, as the party asserting jurisdiction, bears the burden of establishing it. *Robb*, 609 F.3d at 362.

A defendant may challenge subject matter jurisdiction in two ways: a facial challenge, asserting that the complaint fails to allege facts upon which jurisdiction can be based, or a factual challenge, asserting "that the jurisdictional allegations of the complaint [are] not true." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (alteration in original) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). When, as here, the defendant asserts that facts outside of the complaint deprive the court of subject matter jurisdiction, the court "may then go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits," without converting the motion into one for summary judgment. *Vuyyuru*, 555 F.3d at 348 (citing *Adams*, 697 F.2d at 1219); *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004). A court should grant a Rule 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a

matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (quoting *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

### B.      Rule 12(b)(2)

A Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction challenges the propriety of a particular court's exercise of power over a particular defendant. *See Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 131 (4th Cir. 2020). The inquiry for a Rule 12(b)(2) motion is similar to the inquiry for a Rule 12(b)(6) motion: "[T]he district court must determine whether the facts proffered by the party asserting jurisdiction—assuming they are true—make out a case of personal jurisdiction over the party challenging jurisdiction." *Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 226 (4th Cir. 2019). The court also must "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). But unlike a Rule 12(b)(6) motion, on a Rule 12(b)(2) motion, "a court may look beyond the complaint to affidavits and exhibits in order to assure itself of personal jurisdiction." *Id*. (citing *Grayson v. Anderson*, 816 F.3d 262, 269 (4th Cir. 2016)). "When personal jurisdiction is addressed under Rule 12(b)(2) without an evidentiary hearing, the party asserting jurisdiction has the burden of establishing a *prima facie* case of jurisdiction." *Hawkins*, 935 F.3d at 226.

### C.      Rule 12(b)(6)

Under Rule 12(b)(6), a party may seek dismissal of a claim for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v.*

*Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and "draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). On a Rule 12(b)(6) motion, the court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents

integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b).

## III.    Discussion

### A.    Leesburg's Motion to Dismiss

Leesburg argues that the claims against it should be dismissed because (1) it is an arm of the state of Florida and thus entitled to sovereign immunity, and (2) it is entitled to immunity from antitrust liability under *Parker v. Brown*, 317 U.S. 341 (1943) and its progeny ("*Parker* immunity"). Neither argument is persuasive.

#### 1.    Sovereign Immunity

States generally enjoy sovereign immunity from suit in federal court. *Singleton v. Md. Tech. & Dev. Corp.*, 103 F.4th 1042, 1047 (4th Cir. 2024). This immunity is often called "Eleventh Amendment immunity." *Alden v. Maine*, 527 U.S. 706, 713 (1999).[2] "When a sovereign properly asserts its sovereign immunity in a suit, the federal courts lack jurisdiction to proceed any further against it." *Jackson Creek Marine, LLC v. Maryland*, 153 F.4th 423, 428–29 (4th Cir. 2025). "This immunity 'also extends to state agencies and other governmental entities that can be viewed as arms of the state.'" *Doe v. Univ. of N.C. Sys.*, 133 F.4th 305, 313 (4th Cir. 2025) (quoting *Singleton*, 103 F.4th at 1047). "[S]overeign immunity is 'akin to an affirmative defense'"; thus, "the burden of proof falls to an entity seeking immunity as an arm of the state, even though a plaintiff generally bears the burden to prove subject matter jurisdiction." *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019) (quoting *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014)).

---

[2] This appellation is "something of a misnomer." *Alden*, 527 U.S. at 713. "[S]tate sovereign immunity was not created by the Eleventh Amendment, but rather predated it"; the Eleventh Amendment, which immunizes "unconsenting state[s] . . . from suit[s] filed in federal court by . . . citizen[s] of another state," is "but an example of state sovereign immunity" and does not "define [its] contours[.]" *Stewart v. North Carolina*, 393 F.3d 484, 488 (4th Cir. 2005).

Leesburg claims it is entitled to sovereign immunity because it is an arm of the state of Florida. The arm-of-the-state inquiry presents "'a question of federal law' that 'can be answered only after considering the provisions of state law that define the agency's character.'" *Galette v. N.J. Transit Corp.*, 607 U.S. 509, 519 (2026) (quoting *Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997)); *see also Jackson Creek Marine*, 153 F.4th at 433 (characterizing inquiry as "more art than science"). In considering whether an entity qualifies as an arm of the state, courts must consider four nonexclusive factors:

(1) Whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;

(2) The degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions;

(3) Whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and

(4) How the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make [it] an arm of the State.

*Singleton*, 103 F.4th at 1048 (alterations in original) (quoting *S.C. Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 303 (4th Cir. 2008)). The first factor is the most important. *Id.* In evaluating the first factor, a court must ask whether the "state [would be] *functionally* liable" for judgments against the entity, "even if not *legally* liable." *Id.* at 1049 (emphases in original) (quoting *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 137 (4th Cir. 2014)). "[W]here an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the [E]leventh [A]mendment require that sovereign immunity attach to the agency." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 50 (1994) (first alteration in original) (quoting *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218, 227 (D.C. Cir. 1986)).

Earlier this year, a unanimous Supreme Court provided further guidance to courts assessing whether an entity is an arm of the state. In *Galette v. New Jersey Transit Corporation*, the Court explained that, while its "arm-of-the-State cases have accounted for various considerations over time, those precedents have consistently, and predominantly, examined whether the State structured the entity as a legally separate entity liable for its own judgments." 607 U.S. at 523–24. "The clearest evidence that a State has created a legally separate entity," the Court stated, "is that it created a corporation with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt." *Id.* at 524. The Court also explained that it was important to consider "whether 'any judgment' against the entity 'must be satisfied out of the state treasury,'" explaining that "[i]f the State is formally liable for judgments against an entity, that entity is more likely to be an arm of the State because its liabilities necessarily undermine the State's ability to make choices about how to allocate the State fisc." *Id.* at 525 (quoting *Hess*, 513 U.S. at 51).

In contrast, the Court cautioned, other factors carry less weight in the analysis. The Court explained that "an entity's practical financial relationship with the State, such as its expectation that the State would cover its judgments if needed, has less relevance" than the state's formal liability for the entity's judgments, since "a State cannot imbue an entity with its immunity simply by agreeing to 'pick up the tab[.]'" *Id.* (quoting *Lewis v. Clarke*, 581 U.S. 155, 165 (2017)). Similarly, although "courts may consider the degree of control the State asserts over the entity," they "should do so with caution." *Id.* at 526. After all, "ultimate control of *every* state-created entity resides with the State" and "the State might exercise control through various formal and informal levers . . . [that] are difficult to weigh against one another individually, let alone when assessing them in different combinations." *Id.* (emphasis added) (quoting *Hess*, 513 U.S. at 47). "In fact," the Court emphasized, it had "never once found a corporation that was liable for its own

15

judgments to be an arm of the State, even when the State had significant control over the entity"—including cases where the State could appoint and remove the entity's officers, was the entity's sole shareholder, or could veto the entity's actions. *Id.* at 526–27.

The *Galette* Court then considered whether, in light of these principles, New Jersey Transit—a corporation created by the New Jersey legislature to provide bus and rail services—qualified as an arm of the state of New Jersey. It concluded that it did not. *Id.* at 528. The Court relied heavily on the fact that New Jersey Transit had been structured as a corporation with traditional corporate powers, including the powers to sue and be sued, hold property, and enter contracts. *Id.* at 528–29. The Court also emphasized that under New Jersey law, New Jersey was not liable for New Jersey Transit's debts. *Id.* at 529–30. Even though New Jersey law dubbed New Jersey Transit an "instrumentality of the State," the Court did not give this fact much weight, reasoning that "[t]he term 'instrumentality' . . . lacks the historical weight the corporate form does" and pointing out that other New Jersey statutes excluded entities with sue-and-be-sued authority from the definition of the "State." *Id.* at 529. The Court also explained that, while New Jersey "[u]ndoubtedly . . . exerts a substantial amount of control over" New Jersey Transit (for instance, the Governor could appoint and remove members of the board and veto its actions), New Jersey Transit also was independent in some respects (for example, the Governor's removal authority over a majority of the board was limited to for-cause removal), and the state's "level of control [did] not meaningfully affect [New Jersey] Transit's status, given the fact that it is a legally separate corporation and is responsible for its own judgments." *Id.* at 530.

With this precedent in mind, the Court considers whether Leesburg is an arm of the state of Florida. Leesburg is a Florida nonprofit corporation and subsidiary of UF Health Central Florida, which is in turn a subsidiary of Shands Teaching Hospital and Clinics, Inc. ("Shands")—

16

a nonprofit "organized for the primary purpose of supporting the University of Florida Board of Trustees' health affairs mission of community service and patient care, education and training of health professionals, and clinical research." Fla. Stat. § 1004.41(4)(a); *see also* ECF 219-9, at 3; ECF 219-11, at 3. Shands and Leesburg have the same mission. *See* ECF 219-11, at 3 (Leesburg is organized "[t]o primarily support the health affairs mission of the University of Florida Board of Trustees, including, but not limited to, providing health care services, health care education, and research for the benefit of Florida citizens"). Shands and Leesburg also have the same board of directors, which is "appointed, subject to removal, and chaired by the President of the University of Florida, or his or her designee, and vice chaired by the Vice President for Health Affairs of the University of Florida or his or her designee." Fla. Stat. § 1004.41(4)(b)(2); *see also* ECF 219-14, at 2; ECF 219-15, at 2.

Shands, Leesburg's parent, is controlled by the University of Florida Board of Trustees, Fla. Stat. § 1004.41(4)(e), which audits Shands's and Leesburg's financial statements, *id.* § 1004.41(4)(b)(7). The Board of Trustees also selects the University of Florida's president, which (either directly or through their designee) chairs the boards of Shands and Leesburg. Fla. Bd. of Governors Regul. 1.001(5)(d). Six of the Board of Trustees' 13 members are appointed by the Governor of Florida, and five are appointed by the Board of Governors—a 17-member body, the majority of whose members are appointed by the Governor. Fla. Stat. §§ 1001.70(1), 1001.71(1). By statute, Shands and any nonprofit subsidiary "which directly delivers health care services," "whose governing board is chaired by the president of the university or his or her designee and is controlled by the University of Florida Board of Trustees," and "whose primary purpose is the support of the University of Florida Board of Trustees' health affairs mission," is "conclusively deemed a corporation primarily acting as an instrumentality of the state." Fla. Stat. § 1004.41(4)(e).

17

Subject to certain limitations not relevant here, Leesburg's articles of incorporation provide that Leesburg "shall be authorized to exercise the powers permitted not for profit corporations under Chapter 617, Florida Statutes[.]" ECF 219-11, at 4. Those powers include the power to sue and be sued, *see* Fla. Stat. § 617.0302(1); to "[m]ake contracts and guaranties" and "incur liabilities," *id.* § 617.0302(6); and to "[p]urchase, take, receive, lease, take by gift, devise, or bequest, or otherwise acquire, own, hold, improve, use, or otherwise deal in and with real or personal property, or any interest therein," *id.* § 617.0302(8).

Leesburg argues that, under the Fourth Circuit's four-factor arm-of-the-state test, it is an arm of the state of Florida. Two of these four factors—whether Leesburg is involved in state concerns and how Leesburg is treated under Florida law—cut in Leesburg's favor. However, the remaining two—including the most important, whether Florida would be liable for any judgment against Leesburg—do not. Because these latter factors weigh more heavily in the arm-of-the-state analysis, Leesburg is not an arm of the state of Florida and is not entitled to sovereign immunity.

Start with the factors that favor Leesburg. Leesburg argues that it is involved with state concerns because its purpose is to support the University of Florida Board of Trustees' health affairs mission by promoting "community service and patient care" and the "education and training of health professionals." *See* Fla. Stat. § 1004.41(4)(a). The plaintiffs counter that "Leesburg's focus is decidedly local" because it cares only for patients in a few Florida counties. ECF 224, at 14–15. Leesburg has the better argument. To be sure, Leesburg is a regional medical center. But it is bound up in state concerns because it supports the University of Florida—Florida's flagship public university—in its higher education mission, which is "an area of quintessential state concern[.]" *See Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 265 (4th Cir. 2005). Moreover, Leesburg's articles of incorporation specify that it is organized to provide health care

18

services, education, and research "for the benefit of Florida citizens," not just the residents of particular Florida counties. This fact, too, cuts in favor of finding that Leesburg is involved with state concerns. *See, e.g.*, *Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 586–87 (D. Md. 2021) (concluding that University of Maryland Medical System was intertwined with state concerns because Maryland General Assembly had declared that it was "created to 'provide medical care . . . for the citizens of the State and region' . . . and that such care 'extend[s] to all citizens of the State'") (citation omitted; alteration in original) (quoting Md. Code Ann., Educ. § 13-302), *appeal dismissed*, Nos. 23-1394 (L) & 23-1452, 2025 WL 1743504 (4th Cir. June 24, 2025).[3]

Likewise, Leesburg's status under Florida law weighs in Leesburg's favor. "In addressing this factor, 'a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question.'" *Md. Stadium Auth.*, 407 F.3d at 265 (quoting *Harter v. Vernon*, 101 F.3d 334, 342 (4th Cir. 1996)). Leesburg has not cited any Florida state-court decisions discussing its status under state law. But Florida statutes are clear. With certain exceptions, Florida extends sovereign immunity to "corporations primarily acting as instrumentalities or agencies of the state[.]" Fla. Stat. § 768.28(2); *see also Keck v. Eminisor*, 104 So. 3d 359, 367 (Fla. 2012) (explaining that § 768.28(2) "defines the state agencies or subdivisions entitled to sovereign immunity"). And, "[f]or purposes of sovereign immunity pursuant to s. 768.28(2)," "any not-for-profit subsidiary" of Shands that

---

[3] The only case the plaintiffs cite in which a court found a regional medical center was intertwined with local, not statewide, concerns is an unreported, out-of-circuit decision from the Eastern District of California. *See Firstsource Sols. USA, LLC v. Tulare Regional Med. Ctr.*, No. 1:15-cv-1136-DAD-EPG, 2017 WL 4410101 (E.D. Cal. Oct. 4, 2017). In that case, unlike here, there was no indication that the medical center supported a statewide public university in its higher education mission or was organized for the purpose of providing medical care to the citizens of an entire state.

"directly delivers health care services," "whose governing board is chaired by the president of the university or his or her designee and is controlled by the University of Florida Board of Trustees, which may act through the president of the university and his or her designee" and "whose primary purpose is the support of the University of Florida Board of Trustees' health affairs mission," is "conclusively deemed a corporation acting primarily as an instrumentality of the state." Fla. Stat. § 1004.41(4)(e). Leesburg appears to satisfy these statutory criteria. It is a nonprofit subsidiary of Shands. It provides healthcare services and was organized "[t]o primarily support the health affairs mission of the University of Florida Board of Trustees[.]" ECF 219-11, at 3. And its board of directors is chaired by the president of the University of Florida, who is selected by the Board of Trustees. *See* Fla. Bd. of Governors Regul. 1.001(5)(d). Thus, Leesburg likely qualifies as a "corporation primarily acting as an instrumentality of the state" under Florida law. *See, e.g.*, *Md. Stadium Auth.*, 407 F.3d at 265 (concluding that University System of Maryland was treated under Maryland state law as arm of state in part because Maryland statutes defined University as a state instrumentality); *Hutto*, 773 F.3d at 548 (South Carolina Retirement System was treated as state entity under South Carolina law where state statutes repeatedly referred to System as "State agency" and its director as "State agent"). Moreover, Florida law provides that Shands, Leesburg's parent corporation, is organized to support the University of Florida in its healthcare and higher education missions. *See* Fla. Stat. § 1004.41(4)(a); *see also Oberg*, 745 F.3d at 140 (Pennsylvania Higher Education Assistance Agency was treated under state law as arm of Pennsylvania where "[a] state statute provides that 'the creation of the agency [was] in all respects for the benefit of the people . . . and the agency [performs] an essential governmental function'") (all but first alteration in original) (quoting 24 Pa. Stat. § 5105.6). Thus, how Florida state law treats Leesburg supports the conclusion that Leesburg is an arm of the state.

20

Nevertheless, these considerations are outweighed by the other two factors: Florida's potential liability for judgments against Leesburg and the degree of Florida's control over Leesburg. First, Leesburg has not shown that Florida would be liable for any judgment against it— the most important consideration. Leesburg does not point to any provision of Florida law that would require the state to cover Leesburg's judgments. Indeed, Leesburg appears to concede that there is no such provision. *See* ECF 219-1, at 14 ("*Even though the state itself would not be directly liable*, it is 'functionally' liable.") (emphasis added). Nor does Leesburg argue that it is so financially dependent on the state of Florida that "as a practical matter, if [it] is to survive, a judgment must expend itself against state treasuries[.]" *Hess*, 513 U.S. at 50 (quoting *Morris*, 781 F.2d at 227). Instead, Leesburg argues that Florida would be functionally liable for a judgment against it by virtue of the so-called "claims bill" process.

The claims bill process is a creature of Florida law that dovetails with a limited waiver of state sovereign immunity codified in Fla. Stat. § 768.28. That waiver permits a plaintiff to recover "for actions at law against the state or its agencies or subdivisions for tort money damages" under certain circumstances. *Searcy, Denney, Scarola, Barnhart & Shipley, etc. v. State*, 209 So. 3d 1181, 1190 (Fla. 2017). Recovery for such claims is capped at $200,000 per person or $300,000 per incident. *See* Fla. Stat. § 768.28(5)(a). If a court awards a judgment above these caps, "that portion of the judgment that exceeds [the caps] may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature." *Id.* This "further act of the Legislature" is known as a claims bill. *See Barnett v. Dep't of Fin. Servs.*, 303 So. 3d 508, 512 (Fla. 2020). "[A]bsent a special claims bill passed by the Legislature," it is impossible "for a claimant to collect more than the caps provide." *Breaux v. City of Miami Beach*, 899 So. 2d 1059, 1061 n.2 (Fla. 2005).

Leesburg's argument that Florida is potentially liable for a judgment against it is somewhat convoluted, but it appears to go something like this. Leesburg argues that if the plaintiffs could recover damages against it, those damages would be subject to the statutory caps in Fla. Stat. § 768.28(5)(a), and damages in excess of the caps would have to be reported to the Florida legislature as part of the claims bill process. Then, if the Florida legislature passed, and the Governor signed, a claims bill to compensate the plaintiffs for the amount of the judgment that exceeded the caps, that money would come out of the Florida treasury. Ergo, Leesburg argues, Florida would bear the burden of the judgment.

The Court will assume for the sake of argument that if the plaintiffs were awarded damages against Leesburg in excess of the statutory caps, the plaintiffs would have to use the claims bill process to recover any excess amount from the Florida treasury. (The plaintiffs dispute this.) Even if that were true, that would not counsel in favor of granting Leesburg sovereign immunity. The Florida Supreme Court has emphasized that the passage of a claims bill is an "act of grace" by the Florida Legislature—a "voluntary recognition of its moral obligation" that is "firmly entrenched in legislative discretion." *Searcy*, 209 So. 3d at 1189, 1195 (internal quotation marks omitted). In other words, when the Florida legislature passes a claims bill, it makes a voluntary decision to "pick up the tab" for part of a judgment. *See Galette*, 607 U.S. at 525 (quoting *Lewis*, 581 U.S. at 165). But under *Galette*, voluntary assumptions of liability by the state do not confer sovereign immunity. *See id.* (differentiating a state's choice to indemnify an entity from "formal legal liability"). The mere possibility that the Florida legislature might, in its discretion, decide to pay part of any future judgment against Leesburg out of state coffers does not imbue Leesburg with Florida's immunity. Leesburg has not met its burden to show that Florida would be liable for any judgment against it.

Leesburg also has not shown that it is so subject to state control that it should be deemed an arm of Florida. To be sure, Leesburg points to some indicia of state control. Members of its board of directors are appointed and can be removed by the president of the University of Florida, who is selected by the University of Florida Board of Trustees and approved by the Board of Governors. *See* Fla. Bd. of Governors Regul. 1.001(5)(d). And its parent corporation, Shands, is controlled by the Board of Trustees; the Board of Trustees also audits Leesburg's and Shands's financial statements. But crucially, Leesburg is a corporation. And it has traditional corporate powers: to sue and be sued, to hold property, to incur debts, and to make contracts. Leesburg hand-waves away these facts as "of no moment." ECF 219-1, at 15. They are anything but. The Supreme Court has made clear that when an entity is structured as a corporation and has traditional corporate powers, that is "[t]he clearest evidence" that the entity is legally independent of the state. *Galette*, 607 U.S. at 524; *see also Williams v. Charleston Cnty. Sheriff's Off.*, No. 24-1238, 2026 WL 2043182, at *1 (4th Cir. Jul. 15, 2026) (explaining that *Galette*'s "central holding" is that New Jersey Transit is not an arm of the state because it is a corporation with traditional corporate powers). Indeed, the significance of the corporate form is such that the Supreme Court "has never once found a corporation that was liable for its own judgments to be an arm of the State, even when the State had significant control over the entity." *Galette*, 607 U.S. at 526. Though Florida may have some control over Leesburg in some respects, that cannot overcome the fact that Leesburg is a corporation with traditional corporate powers and is liable for its own judgments.[4]

---

[4] In support of its position that its corporate form and powers are "of no moment" to the arm-of-the-state analysis, Leesburg cites the Fourth Circuit's 2014 decision in *Hutto*. Not only does Leesburg overread that decision, but the *Hutto* Court's analysis of the state-control factor also is difficult to reconcile with the Supreme Court's recent decision in *Galette*. In *Hutto*, the Fourth Circuit considered whether two state-created pension plans—the South Carolina Retirement System and the South Carolina Police Officers Retirement System (together, "the Retirement System")—and the trust that held their assets were arms of the state of South Carolina. It concluded

Leesburg has not met its burden of proving that it is an arm of the state of Florida. It is not entitled to sovereign immunity.

### 2. *Parker* Immunity

Leesburg argues, in the alternative, that it is entitled to *Parker* immunity.

*Parker* immunity—also known as state action immunity—refers to the principle that "federal antitrust laws do 'not apply to anticompetitive restraints imposed by the States as an act of government.'" *Cherry Grove Beach Gear, LLC v. City of North Myrtle Beach*, 162 F.4th 486, 489 (4th Cir. 2025) (quoting *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 370 (1991)), *petition for cert. docketed*, No. 25-1130 (U.S. Mar. 26, 2026). This principle derives from the Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341 (1943), which "interpreted the antitrust laws to confer immunity on anticompetitive conduct by the States when acting in their sovereign capacity." *N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 503 (2015) ("*N.C. Dental*"). Despite its name, *Parker* immunity is not truly an immunity from suit because it does not confer a right not to be sued. *See S.C. State Bd. of Dentistry v. FTC*, 455 F.3d 436, 444–45 (4th Cir. 2006) ("*S.C. Dentistry*"). It is more akin to a defense to antitrust liability. *Id.* at 444. And, *Parker* immunity does not implicate the Court's subject matter jurisdiction. *See, e.g.*, *Green Sols. Recycling, LLC v. Reno Disposal Co.*, 359 F. Supp. 3d 960, 967 (D. Nev. 2019), *aff'd*, 814 F. App'x 218 (9th Cir. 2020); *Am. Med. Response of Inland Empire v. Cnty. of San Bernardino*, No.

---

that they were. 773 F.3d at 548. In analyzing the state-control factor, the Fourth Circuit acknowledged that the Retirement System had the "power and privileges of a corporation" under South Carolina law but observed that "other factors point[ed] to state control." *Id.* at 546–47 (quoting S.C. Code Ann. §§ 9–1–20, 9–11–20). But far from concluding that the Retirement System's corporate form and powers were irrelevant, as Leesburg suggests, the *Hutto* Court thought them significant enough to render the state-control factor "inconclusive." *Id.* at 547. Moreover, given the emphasis *Galette* placed on the corporate form and corporate powers as indicia of an entity's independence, it is not at all clear that the Fourth Circuit would deem the state-control factor similarly "inconclusive" if it were to decide *Hutto* today.

24-3195, 2025 WL 1249445, at *2 n.4 (9th Cir. Apr. 30, 2025); *see also W. Star Hosp. Auth. v. City of Richmond*, 986 F.3d 354, 356 (4th Cir. 2021) (affirming dismissal with prejudice in part on basis of *Parker* immunity, even though dismissal for lack of subject matter jurisdiction must be without prejudice).

"At bottom, the *Parker* doctrine embodies 'the federalism principle that the States possess a significant measure of sovereignty under our Constitution'"—including the power "'to confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives.'" *W. Star*, 986 F.3d at 358 (quoting *Cmty. Commc'ns Co. v. City of Boulder*, 455 U.S. 40, 53 (1982), and then quoting *N.C. Dental*, 574 U.S. at 503). However, "given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws," *Parker* immunity "is disfavored, much as are repeals by implication." *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013) (quoting *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992)). "An entity may not invoke *Parker* immunity unless the actions in question are an exercise of the State's sovereign power." *N.C. Dental*, 574 U.S. at 504.

*Parker* immunity comes in three general varieties: one for states, one for municipalities, and one for private actors or other non-sovereign entities that are controlled by active market participants. *See S.C. Dentistry*, 455 F.3d at 442; *N.C. Dental*, 574 U.S. at 510. When the state itself—a state legislature or a state supreme court, "acting legislatively rather than judicially"—acts to displace competition, it is entitled to "*ipso facto*" *Parker* immunity because its actions "are an undoubted exercise of state sovereign authority." *N.C. Dental*, 574 U.S. at 504 (quoting *Hoover v. Ronwin*, 466 U.S. 558, 567–68 (1984)). But when the party invoking *Parker* immunity is a non-sovereign actor—i.e., "one whose conduct does not automatically qualify as that of the sovereign State itself"—it must satisfy a stricter standard to establish that its conduct "should be deemed

25

state action and thus shielded from the antitrust laws." *Id.* at 505–06 (quoting *Patrick v. Burget*, 486 U.S. 94, 100 (1988)). If the non-sovereign actor is a municipality, it must "demonstrate that [its] anticompetitive activities were authorized by the State pursuant to state policy to displace competition." *S.C. Dentistry*, 455 F.3d at 442 (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 39 (1985)). That state policy must be "clearly articulated[.]" *Id.* Private actors must clear an additional hurdle: They must show that they act pursuant to a clearly articulated state policy to displace competition *and* that their anticompetitive activity is "actively supervised by the State." *Phoebe Putney*, 568 U.S. at 225 (quoting *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980)).

Leesburg argues that it is entitled to *ipso facto Parker* immunity. For support, it points to its status under Florida law as an instrumentality of the state; the indicia of state control that it highlighted in connection with its sovereign immunity argument (such as the fact that the Board of Trustees audits its finances); and a handful of out-of-circuit decisions that have concluded that state universities, their divisions, and/or officials are entitled to *Parker* immunity. The Court is not persuaded. While neither the Supreme Court nor the Fourth Circuit have expressly delineated the outer bounds of *ipso facto Parker* immunity, they have suggested that its protection is limited to state legislatures and state courts. *See S.C. Dentistry*, 455 F.3d at 442 & n.6 (stating that *ipso facto Parker* immunity applies to "the state legislature or the courts" and noting that the Supreme Court has "suggested" that "a governor (and other executive branch officers)" may not claim its protection) (citing *S. Motor Carriers Rate Conf. v. United States*, 471 U.S. 48, 57 (1985)); *see also N.C. Dental*, 574 U.S. at 504–05 (stating that *ipso facto* immunity applies to state legislatures and state supreme courts and observing that "[s]tate agencies are not simply by their governmental character sovereign actors for purposes of state-action immunity"). Leesburg, of course, is neither.

Leesburg's only response is that the Supreme Court has never set out a "brightline rule limiting *ipso facto* immunity to state legislatures and supreme courts." ECF 233, at 12. Fair enough. But it is one thing to say that the Supreme Court has never squarely foreclosed a position; it is quite another to claim that the position is affirmatively supported by governing law. Absent any Supreme Court or Fourth Circuit cases supporting Leesburg's position, and mindful that *Parker* immunity is disfavored, the Court declines to extend *ipso facto Parker* immunity beyond its recognized bounds.

Leesburg next argues that, even if it is not entitled to *ipso facto Parker* immunity, it is a private entity entitled to *Parker* immunity because it (1) acts pursuant to a clearly articulated state policy and (2) is subject to active state supervision. The first prong is dispositive here. To establish that it is acting pursuant to a clearly articulated state policy, a non-sovereign actor must show that "the displacement of competition [is] the inherent, logical, or ordinary result of authority delegated [to it] by the state legislature" and that the state "fores[aw] and explicitly endorsed the anticompetitive effects as consistent with its policy goals." *N.C. Dental*, 574 U.S. at 506–07 (first alteration in original) (quoting *Phoebe Putney*, 568 U.S. at 229). In other words, "state-law authority to act is insufficient to establish state-action immunity; the [defendant] must also show that it has been delegated authority to act or regulate anticompetitively." *Phoebe Putney*, 568 U.S. at 228. "[W]hen a State's position 'is one of mere *neutrality* respecting the . . . actions challenged as anticompetitive,' the State cannot be said to have 'contemplated' those anticompetitive actions." *Id.* (quoting *Boulder*, 455 U.S. at 55).

Case law from the Fourth Circuit and Supreme Court provides helpful examples of state policies that satisfy the clear-articulation requirement, on the one hand, and those that do not, on

27

the other.[5] Start with the former. In *Cherry Grove Beach Gear, LLC v. City of North Myrtle Beach*, a private beach equipment company sued the City of North Myrtle Beach, South Carolina under the Sherman Act after the city enacted an ordinance that permitted only city officials to set up rented beach equipment on the city's beaches. 162 F.4th at 488. The Fourth Circuit concluded that the city was entitled to *Parker* immunity, reasoning that in enacting the challenged ordinance, the city had acted pursuant to a clearly articulated state policy. In support, the court pointed to a South Carolina statute that permitted the city to provide "lifeguard and other safety related services on and along the public beaches" and "clarifie[d] that the 'services' which the municipality may provide or contract out include 'the exclusive right . . . to rent . . . beach equipment . . . on the beach.'" *Id.* at 491 (quoting S.C. Code § 5-7-145). Because this statute "authorized the City to impose a monopoly on beach equipment installation," the court reasoned, the state had "plainly contemplated the displacement of competition" and "the City's monopoly [did] not constitute unexpected anticompetitive behavior." *Id.*

Similarly, in *Western Star Hospital Authority, Inc. v. City of Richmond*, a provider of medical transportation services brought an antitrust suit against the City of Richmond, Virginia and the Richmond Ambulance Authority after the city refused to grant the provider a permit to operate emergency medical services ("EMS") vehicles. 986 F.3d at 356. The Fourth Circuit concluded that the city and the ambulance authority were entitled to *Parker* immunity. It reasoned that the Virginia legislature had "conferred broad authority on local governing bodies to engage in

---

[5] Many cases applying the clear-articulation requirement, including the cases discussed here, involve allegedly anticompetitive activity by municipalities or other substate governmental entities. The Court nonetheless relies on these precedents in assessing whether Leesburg—which is not a municipality—is entitled to *Parker* immunity because both municipalities and private parties are subject to the same requirement that their anticompetitive activity result from a clearly articulated state policy to displace competition. *See Phoebe Putney*, 568 U.S. at 226.

anticompetitive conduct in the EMS vehicle services market" because Virginia law allowed local governments to "make it unlawful to operate EMS vehicles without a permit, control the issuance of permits, determine where EMS vehicles can and cannot operate, and fix the prices of EMS vehicle services." *Id.* at 358–59 (citing Va. Code Ann. § 32.1-111.14(A)). This statute, the court concluded, "greenlights regulation and service provision that necessarily supplants unrestrained market competition." *Id.* at 359. Thus, the city and ambulance authority were acting pursuant to a clearly articulated state policy.

Contrast these cases with the Supreme Court's decision in *FTC v. Phoebe Putney Health System, Inc.* In *Phoebe Putney*, the Federal Trade Commission sued the Hospital Authority of Albany-Dougherty County, Georgia, the corporations operating two hospitals in that county, and one of the hospitals itself, claiming that a proposed "purchase-and-lease transaction" involving the two hospitals would "create a virtual monopoly and would substantially reduce competition in the market for acute-care hospital services" in violation of the Federal Trade Commission and Clayton Acts. 568 U.S. at 222. The lower courts found that the defendants were entitled to *Parker* immunity. In affirming the district court's grant of *Parker* immunity, the United States Court of Appeals for the Eleventh Circuit relied on the fact that Georgia had, by statute, endowed the hospital authority with the power to acquire and lease projects; "[f]oreseeably," the Eleventh Circuit concluded, "acquisitions could consolidate ownership of competing hospitals, eliminating competition between them." *Id.* at 223 (internal quotation marks omitted). The Supreme Court reversed. The Court explained that "the Court of Appeals [had] applied the concept of 'foreseeability' from [its] clear-articulation test too loosely." *Id.* at 229. The general acquisition and leasing powers on which the Eleventh Circuit had relied, the Court concluded, were nothing more than a "[g]rant[] of general corporate power" that did not "clearly articulate and affirmatively

29

express a state policy empowering the [hospital] [a]uthority to make acquisitions of existing hospitals that will substantially lessen competition." *Id.* at 228. "[S]imple permission to play in a market," the Court explained, "does not 'foreseeably entail permission to roughhouse in that market unlawfully.'" *Id.* at 231 (quoting *Kay Elec. Coop. v. Newkirk*, 647 F.3d 1039, 1043 (10th Cir. 2011)). Even if a "reasonable legislature[]" could have "anticipate[d]" that the hospital authority might use its general grant of power in an anticompetitive manner, that fell "well short of clearly articulating an affirmative state policy to displace competition with a regulatory alternative[.]" *Id.*

Leesburg argues that, by participating in the Match, it acts pursuant to a clearly articulated state policy. It points to Florida statutes establishing a College of Pharmacy at the University of Florida and directing Leesburg's parent corporation Shands to "support the University of Florida Board of Trustees' health affairs mission of education and training of health professionals." ECF 219-1, at 20; ECF 233, at 13 (citing Fla. Stat. §§ 1004.41(1)(e), 1004.41(4)(a) & (e)). As Leesburg sees it, this statutory duty "obviously and necessarily entails selection and placement of pharmacy residents"; therefore, Leesburg's participation in the Match is the foreseeable consequence of its statutory mission. ECF 219-1, at 20.

This argument rings hollow. A statutory mandate to support the University of Florida in training and educating health professionals is the type of general, neutral grant of authority that the *Phoebe Putney* Court found insufficient to warrant *Parker* immunity. Unlike the laws at issue in *Western Star* or *Cherry Grove*—which explicitly authorized activities that reasonably could be expected to have anticompetitive effects, such as selling exclusive rights or fixing prices—the Florida laws on which Leesburg relies do not so much as *mention* pharmacy residencies or hiring, let alone authorize Leesburg to take any particular action in connection with the hiring of pharmacy

residents. Indeed, Leesburg's position is even weaker than that of the defendants in *Phoebe Putney*; there, at least, the state law on which the defendants relied specifically conferred the acquisition authority they misused. And even if the Court were to agree with Leesburg that hiring pharmacy residents was a foreseeable consequence of its statutory mandate, that would prove at most that Florida gave Leesburg "permission to play in [the] market"—to solicit and compete for pharmacy residents' labor. *Phoebe Putney*, 568 U.S. at 231 (quoting *Newkirk*, 647 F.3d at 1043). It would *not* prove that Florida gave Leesburg permission to do so through the Match, with all its allegedly anticompetitive trappings.

Leesburg insists that *Phoebe Putney* is distinguishable. It points out that in *Phoebe Putney*, the Court referred to the hospital authority's powers as "general powers routinely conferred by state law upon private corporations," whereas here Leesburg has a "specific mandate"—to support the health affairs mission of the Board of Trustees—that most corporations lack. ECF 233, at 14 (emphases omitted) (quoting *Phoebe Putney*, 568 U.S. at 227). That is a distinction without a difference. It may be that Leesburg's statutory mandate is unique. But *Phoebe Putney*'s analysis did not turn on whether the powers the Georgia statute conferred were common or distinctive. Rather, the key question was whether the statute clearly and foreseeably authorized anticompetitive activity. Like the statute at issue in *Phoebe Putney*, the Florida statutes on which Leesburg relies do not authorize anticompetitive activity.

Leesburg also points out that the *Phoebe Putney* Court stated that "to pass the clear articulation test, a state legislature need not expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." *Id.* (quoting *Phoebe Putney*, 568 U.S. at 226). True, but that does not get Leesburg very far. Even absent such an express legislative statement, "the anticompetitive effect" still must be "the 'foreseeable result'

31

of what the State authorized." *Phoebe Putney*, 568 U.S. at 227. Here, the statutes on which Leesburg relies come nowhere close to authorizing the kind of anticompetitive activity the plaintiffs challenge.

Leesburg has not shown that it qualifies for *ipso facto Parker* immunity or that its participation in the Match is the foreseeable result of a clearly articulated state policy. It is not entitled to *Parker* immunity.

Leesburg's motion to dismiss is denied.

### B.      Dr. Rubin's and NMS's Motions to Dismiss

Dr. Rubin and NMS argue that this Court lacks personal jurisdiction over them.[6] On this record, the Court agrees.

A federal district court may have either general or specific jurisdiction over a nonresident defendant. *See Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003). A court has general jurisdiction over a defendant if the defendant's conduct in the state is not the basis for the suit, *see id.*, and the defendant's connections to the state are "so constant and pervasive as to render it essentially at home in the forum State," *Fidrych*, 952 F.3d at 132 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)). The plaintiffs do not allege that NMS and Dr. Rubin have "constant and pervasive" connections to Maryland that would establish general jurisdiction. *See id.* (quoting *Bauman*, 571 U.S. at 122).

The plaintiffs, then, must establish that this Court has specific jurisdiction over NMS and Dr. Rubin. A court has specific jurisdiction over a nonresident defendant if "(1) the exercise of jurisdiction . . . [is] authorized under the state's long-arm statute; and (2) the exercise of jurisdiction

---

[6] Dr. Rubin also argues that he is entitled to sovereign immunity and *Parker* immunity. Because the Court concludes that it lacks personal jurisdiction over Dr. Rubin, it need not address those arguments.

. . . comport[s] with the due process requirements of the Fourteenth Amendment." *Carefirst*, 334 F.3d at 396.

Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b), limits specific jurisdiction to cases where the cause of action "aris[es] from any act enumerated in" the statute. Cts. & Jud. Proc. § 6-103(a). The statute authorizes jurisdiction over a party who, "directly or by an agent," acts in one of six ways:

> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply goods, food, services, or manufactured products in the State;
>
> (3) Causes tortious injury in the State by an act or omission in the State;
>
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;
>
> (5) Has an interest in, uses, or possesses real property in the State; or
>
> (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed, or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

*Id.* § 6-103(b).

Maryland's long-arm statute reaches as far as the Due Process Clause permits. *See Carefirst*, 334 F.3d at 396 (citing *Mohamed v. Michael*, 370 A.2d 551, 553 (Md. 1977)). Even so, courts cannot combine their analyses of the long-arm statute and the Due Process Clause. *Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 493 n.6 (Md. 2006). Rather, they first must apply the long-arm statute to the facts to determine whether the "defendant's activities are covered by the statutory language." *Dring v. Sullivan*, 423 F. Supp. 2d 540, 545 (D. Md. 2006) (quoting *Joesph M. Coleman & Assocs., Ltd. v. Colonial Metals*, 887 F. Supp. 116, 118 n.2 (D. Md. 1995)). After an analysis of the long-arm statute, courts then analyze whether the exercise

33

of personal jurisdiction over a nonresident defendant accords with due process. *See Carefirst*, 334 F.3d at 397. If, however, the exercise of personal jurisdiction would not comport with due process, then the court need not "engage in an extensive statutory inquiry" to conclude that there is no personal jurisdiction because Maryland's highest court has "construe[d] [the] long-arm statute as not authorizing the exercise of personal jurisdiction over [a] defendant" when doing so would violate due process. *CSR, Ltd. v. Taylor*, 983 A.2d 492, 475–76 & n.10 (Md. 2009) (quoting *Bond v. Messerman*, 895 A.2d 990, 999 (Md. 2006)).

### 1.    Personal Jurisdiction Over Dr. Rubin

Dr. Rubin is a California resident whom the plaintiffs have sued in his official capacity as Executive Vice President of University of California Health, The Regents of the University of California. The plaintiffs do not allege that Dr. Rubin has engaged in any activity that would bring him within the ambit of Maryland's long-arm statute. They do not allege that he has "[t]ransact[ed] any business or perform[ed] any character of work or service" in Maryland; that he has "[c]ontract[ed] to supply goods, food, services, or manufactured products in" Maryland; that he has engaged in any "act or omission" in Maryland that caused them an injury; that he "regularly does or solicits business, engages in any other persistent course of conduct . . . or derives substantial revenue from goods, food, services, or manufactured products used or consumed in" Maryland; that he uses, possesses, or has an interest in any real property in Maryland; or that he has "[c]ontracte[d] to insure or act as surety" in any respect. *See* Cts. & Jud. Proc. § 6-103(b). Instead, the plaintiffs argue that the Court can exercise personal jurisdiction over Dr. Rubin under the so-called "conspiracy theory of jurisdiction."

In certain, limited circumstances, one nonresident defendant's actions in Maryland can establish personal jurisdiction over other nonresident defendants under "an agency-based

34

'conspiracy theory of jurisdiction[.]'" *Dominion Fin. Servs., LLC v. Pavlovsky*, 673 F. Supp. 3d 727, 743 (D. Md. 2023) (quoting *Mackey*, 892 A.2d at 486). To establish personal jurisdiction over nonresident defendants with "no direct contacts with the forum" based on "overt acts in furtherance of [a] conspiracy" and "attributable to . . . co-conspirators," the plaintiff must show that:

> (1) two or more individuals conspire[d] to do something (2) that they could reasonably expect to lead to consequences in a particular forum, . . . and [3] those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state . . . .

*Id.* at 743–44 (quoting *Mackey*, 892 A.2d at 486). If these circumstances are present, then "'one co-conspirator is acting as the agent of the others,' and the other co-conspirators are thus liable for any acts 'done by an agent within the meaning of § 6-103(b) of the Maryland long-arm statute.'" *Id.* at 744 (quoting *Mackey*, 892 A.2d at 486). A plaintiff who seeks to make a prima facie showing of personal jurisdiction under a conspiracy theory must "'plead with particularity' concrete facts supporting the existence of a conspiracy" and cannot predicate jurisdiction on mere "'naked assertion[s] of conspiracy'" among the defendants. *Mobilization Funding, LLC v. Stokes*, 163 F.4th 55, 63 (4th Cir. 2025) (quoting *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013), and then quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). "[I]f the facts alleged 'could equally describe arms-length transactions' between the purported co-conspirators, then the party asserting jurisdiction has not met its burden." *Id.* (quoting *Unspam*, 716 F.3d at 330). And Maryland's highest court has held that "jurisdiction may be imputed to a co-conspirator 'only if [he] reasonably expects *at the time [he] agreed to participate in the conspiracy* that such acts will be done and that such acts will subject the co-conspirator who performs them to the personal jurisdiction of the forum state.'" *Dominion*, 673 F. Supp. 3d at 744 (alterations in original) (quoting *Mackey*, 892 A.2d at 489) (emphasis in *Mackey*).

The plaintiffs have not met their burden to establish personal jurisdiction over Dr. Rubin under the conspiracy theory of jurisdiction for the simple reason, explained in detail below, that they have failed to plausibly allege that the defendants were involved in a conspiracy. Because the plaintiffs have not met their burden to show that Dr. Rubin falls within the ambit of the long-arm statute, the Court need not consider whether the exercise of jurisdiction over Dr. Rubin comports with due process.[7] Dr. Rubin's motion to dismiss is granted, and the claims against him are dismissed without prejudice for lack of personal jurisdiction.

### 2.    Personal Jurisdiction Over NMS

The plaintiffs also have not established personal jurisdiction over NMS, a Canadian company.

The plaintiffs argue that personal jurisdiction over NMS is proper under either subsection (b)(1) or (b)(2) of the Maryland long-arm statute because NMS transacts business and performs services for ASHP in Maryland and contracts with AHSP, a Maryland-based company, to administer the Match. However, the Court need not "extensively consider whether the actions of [NMS] meet the requirements for jurisdiction set forth in those provisions [of the long-arm statute]" because the Court finds that the exercise of jurisdiction over NMS would violate due process and Maryland courts construe the long-arm statute "as not authorizing the exercise of personal jurisdiction" when doing so would violate due process. *Taylor*, 983 A.2d at 475–76 (quoting *Bond*, 895 A.2d at 999).

---

[7] The plaintiffs appear to argue that the Court should consider the Maryland contacts of the University of California Health, not just the Maryland contacts of Dr. Rubin as an individual, because the official-capacity claims against Dr. Rubin should be treated as a suit against the entity itself. ECF 225, at 20–21. Regardless of whether the Court considers Dr. Rubin's personal contacts with Maryland or the University of California Health's contacts with Maryland, the result is the same: The plaintiffs have not established a conspiracy theory of jurisdiction because they do not plead a conspiracy.

"A court's exercise of jurisdiction over a nonresident defendant comports with due process if the defendant has 'minimum contacts' with the forum, such that to require the defendant to defend its interests in the state 'does not offend traditional notions of fair play and substantial justice.'" *Carefirst*, 334 F.3d at 397 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). In conducting the due process inquiry, the "court considers (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 766 (D. Md. 2009). The first prong of the due process analysis—purposeful availment—is "the key issue in a specific jurisdiction case" and is the "touchstone of the minimum-contacts analysis[.]" *Fidrych*, 952 F.3d at 142. Only when the plaintiff satisfies the first prong does the court consider the second and third prongs of the due process inquiry. *See Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009).

In deciding whether the defendant "purposefully availed itself of the privilege of conducting activities in" Maryland, *CoStar*, 604 F. Supp. 2d at 766, the court considers a wide range of factors, including:

> [1] whether the defendant maintains offices or agents in the forum state; [2] whether the defendant owns property in the forum state; [3] whether the defendant reached into the forum state to solicit or initiate business; [4] whether the defendant deliberately engaged in significant or long-term business activities in the forum state; [5] whether the parties contractually agreed that the law of the forum state would govern disputes; [6] whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship; [7] the nature, quality and extent of the parties' communications about the business being transacted; and [8] whether the performance of the contractual duties was to occur in the forum.

*CSS Antenna, Inc. v. Amphenol-Tuchel Elecs., GmbH*, 764 F. Supp. 2d 745, 749 (D. Md. 2011) (alterations in original) (quoting *Consulting Eng'rs*, 561 F.3d at 278). "[W]hether the

defendant initiated contact" is particularly "essential" "in determining whether business negotiations give rise to specific jurisdiction[.]" *Id.* (quoting *CoStar*, 604 F. Supp. 2d at 766); *see also dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 133 (4th Cir. 2023) ("Our court 'place[s] special importance on the fact that the defendant initiated contact with the plaintiff in the forum state.'") (alteration in original) (quoting *Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.*, 911 F.3d 192, 200 (4th Cir. 2018)).

The plaintiffs have not met their burden to show purposeful availment. For starters, the mere existence of a contract between ASHP and NMS does not automatically establish minimum contacts sufficient to satisfy due process. *See Coastal Lab'ys, Inc. v. Jolly*, 502 F. Supp. 3d 1003, 1018 (D. Md. 2020). Turning to the factors in *Consulting Engineers*, the first two—whether NMS maintains offices or agents in Maryland and whether NMS owns property in Maryland—cut against a finding of personal jurisdiction. NMS's offices are in Canada; it has eight employees, all of whom are based in Canada; and it owns no property in the United States. *See* ECF 220-2, ¶¶ 2–3. The Court cannot assess the remaining factors because facts relevant to them are not in the record—which redounds to the plaintiffs' detriment, since they bear the burden to establish personal jurisdiction. For example, the plaintiffs do not allege: whether NMS reached into Maryland to initiate its business relationship with ASHP (the most important consideration in the purposeful availment analysis); how long NMS has been running the Match pursuant to a contract with ASHP or how substantial a share of NMS's business the ASHP contract represents; whether the parties contractually agreed that Maryland law would govern their disputes; whether any NMS representative made in-person contact with an ASHP representative in Maryland regarding their

38

business relationship; or whether, under the ASHP contract, NMS was required to perform any contractual duties in Maryland.[8]

The plaintiffs point to paragraph 56 of their complaint, which they claim shows that NMS "reached into the state to solicit or initiate business," "deliberately engaged in significant or long-term business activities in" Maryland, and "undertook extensive communications about the business being transacted with ASHP and other Maryland-based entities." ECF 222, at 13–14 (internal quotation marks omitted). Paragraph 56 does not show any of these things. Paragraph 56 states, in its entirety:

> Defendant ASHP contracts with Defendant NMS to administer the ASHP Match. Residency programs wishing to participate in the ASHP Match must register on a website operated by Defendant NMS (https://natmatch.com/ashprmp/). Using this website, the programs rank the applicants they wish to employ. They then submit their Rank Order List to Defendant NMS.

ECF 113, ¶ 56. This paragraph says nothing about whether NMS reached into Maryland to solicit or initiate its contract with ASHP, the significance or duration of NMS's business activities in Maryland, or the extent of NMS's communications with ASHP or other Maryland entities about the ASHP contract.

The plaintiffs also contend that paragraph 40(b) of their complaint, as well as paragraph 4 of a declaration submitted by Elliott Peranson (a beneficial owner of NMS) in connection with NMS's motion to dismiss, show that NMS made "in-person contact with a resident of [Maryland]

---

[8] These facts relating to the due process analysis also are relevant to the long-arm analysis. For example, in assessing whether a nonresident party to a contract has "transacted business" in Maryland within the meaning of subsection (b)(1) of the long-arm statute—one of the subsections the plaintiffs invoke—the Court must consider whether "the party has performed 'purposeful acts' in Maryland 'in relation to the contract, albeit preliminary or subsequent to its execution'" and should pay special attention to whether the defendant initiated the business relationship in some way. *Orbita Telecom SAC v. Juvare LLC*, 606 F. Supp. 3d 240, 248 (D. Md. 2022) (quoting *Du-Al Corp. v. Rudolph Beaver, Inc.*, 540 F.2d 1230, 1232 (4th Cir. 1976)).

regarding the business relationship" with ASHP. ECF 222, at 13–14 (internal quotation marks

omitted). Again, neither paragraph says that. Paragraph 40(b) of the complaint reads:

> Defendant NMS transacts business in the United States, including across state lines. Defendant NMS operates matching programs under contract with professional associations located in various states, including Maryland. Those matching programs accept applicants and employer programs from every state. Defendant NMS sends personnel into each of those various states to transact business with its clients. Defendant NMS accepts and sends payments via interstate wires and distributes published materials over the internet in every or nearly every state, including Maryland, including application fees from the Plaintiffs and Class members.

ECF 113, ¶ 40(b). This paragraph at best states that NMS sends personnel into Maryland to transact

"business" of some sort—not that NMS personnel had in-person contact with a Maryland resident

regarding the business relationship *with ASHP*. And paragraph 4 of Peranson's declaration is even

less helpful to the plaintiffs. Peranson states that "[a]lthough NMS employees from time to time

have traveled to various states within the United States to meet with existing or potential clients

and to attend conferences and trade shows, NMS's business development practices have never

involved directly marketing to individual applicants." ECF 220-2, ¶ 4. This paragraph does not

mention Maryland at all. The plaintiffs have not established that NMS purposefully availed itself

of the privilege of conducting activities in Maryland. The first prong of the due process analysis is

not satisfied.[9] Thus, the Court does not reach the second and third prongs.

---

[9] The plaintiffs cite two cases in which they claim a court found "purposeful availment on considerably thinner contacts" with Maryland than are present here. ECF 222, at 15. In fact, both involved *more* contacts with Maryland than the plaintiffs have alleged. *See Jolly*, 502 F. Supp. 3d at 1019 (finding purposeful availment where defendants "diligently *pursued*, negotiated, and executed multiple contracts" with Maryland entities, "whereby [d]efendants agreed to perform and did perform services for . . . Maryland clients," directly encouraged Maryland residents to contract with them, and "sought patient information from [p]laintiffs' Maryland customers") (emphasis added); *Baker & Kerr, Inc. v. Brennan*, 26 F. Supp. 2d 767, 770 (D. Md. 1998) (finding purposeful availment where defendant conducted extensive business activities for Maryland entity, which included substantial communications with entity and travel to entity's Maryland offices at least six times in three years, as well as defendant's involvement in check-kiting scheme with Maryland

On the current record, the plaintiffs have not met their burden on the "touchstone" prong of the due process inquiry—purposeful availment. *See Fidrych*, 952 F.3d at 142. Thus, they have not shown that the exercise of jurisdiction over NMS would comport with due process. In consequence, the plaintiffs' claims against NMS must be dismissed without prejudice for lack of personal jurisdiction.[10]

### 3.    Jurisdictional Discovery

The plaintiffs request leave to take jurisdictional discovery.

"In considering a motion to dismiss for lack of personal jurisdiction, the Court may, in its discretion, postpone the decision and permit discovery." *Troy Brave LLC v. Grantsville Truck & Trailer, LLC*, 692 F. Supp. 3d 516, 524 (D. Md. 2023) (quoting *Plan 3, Inc. v. GE Grp. Adm'rs, Inc.*, No. AW-05-1581, 2005 WL 8175573, at *5 (D. Md. Feb. 21, 2005)). "Discovery under the Federal Rules of Civil Procedure," including jurisdictional discovery, is "broad in scope and freely permitted." *Mylan Lab'ys v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1993). At the same time, however, district courts "have broad discretion in [their] resolution of discovery problems that arise in cases pending before [them]." *Id.* (alterations in original) (quoting *In re Multi-Piece Rim Prods. Liab. Litig.*, 653 F.2d 671, 679 (D.C. Cir. 1981)). "When a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery." *Carefirst*, 334 F.3d at 402 (4th Cir. 2003).

---

entity's authorized agent; explaining that "the quality and nature of [the defendant's] services" for the entity "were such that [the defendant] should have been aware of their substantial effect in Maryland").

[10] The plaintiffs separately argue that this Court can exercise personal jurisdiction over NMS under the conspiracy theory of jurisdiction. The Court cannot do so because, as discussed below, the plaintiffs have not plausibly alleged a conspiracy.

It is possible that jurisdictional discovery might unearth facts relevant to the personal jurisdiction analysis. But even if the Court were inclined to grant jurisdictional discovery, it would not do so now. As discussed below, the Court is dismissing the plaintiffs' claims against all remaining defendants without prejudice for failure to state a claim. Thus—unless and until the plaintiffs file an amended complaint—there is no pleading pending before the Court. *See, e.g.*, *Pesa v. Scandinavian Airlines Sys.*, No. 2:19-cv-20415 (BRM) (JSA), 2021 WL 1660863, at *9 n.4 (D.N.J. Apr. 27, 2021) (declining to "address . . . arguments regarding jurisdictional discovery" when "there is no complaint pending for which to conduct such discovery"), *appeal dismissed sub nom. Pesa v. Scandinavian Airlines N. Am*, No. 21-2045, 2022 WL 2073024 (3d Cir. Mar. 21, 2022). The Court denies the plaintiffs' request to conduct jurisdictional discovery. The plaintiffs may renew their request if they file an amended complaint that names Dr. Rubin or NMS as defendants and either defendant again moves to dismiss for lack of personal jurisdiction.

The plaintiffs' request for jurisdictional discovery is denied.

### C.       The Defendants' Joint Motion to Dismiss

The plaintiffs assert two § 1 Sherman Act violations. The defendants have jointly moved to dismiss these claims for failure to state a claim.

Section 1 of the Sherman Act forbids "contract[s], combination[s] . . . , or conspirac[ies], in restraint of trade[.]" 15 U.S.C. § 1. "To establish a § 1 antitrust violation, a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 423–24 (4th Cir. 2015) (quoting *N.C. State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 371 (4th Cir. 2013), *aff'd*, 574 U.S. 494 (2015)).

The defendants argue both Sherman Act claims should be dismissed because: (1) the plaintiffs have not plausibly alleged an agreement or conspiracy; (2) the plaintiffs have not

plausibly alleged that any conspiracy or agreement constituted an unreasonable restraint of trade; and (3) the plaintiffs lack antitrust standing.[11]

For the following reasons, the Court finds that the plaintiffs have not plausibly alleged a violation of the Sherman Act. They have not alleged an agreement among the defendants—a pleading requirement for both Sherman Act claims—and for that reason alone, Counts I and II must be dismissed. They also have not alleged an unreasonable restraint of trade in connection with Count II, which is an additional reason to dismiss that count. If the plaintiffs can cure the substantive deficiencies in their claims, they will have antitrust standing.

The plaintiffs' claims are dismissed. Dismissal is without prejudice because this is the first time the plaintiffs' claims have been tested on a motion to dismiss and the first time they have had the benefit of the Court's assessment of the plausibility of their claims. The Court grants the plaintiffs' request for leave to amend their complaint.

### 1.    Whether the Plaintiffs Have Plausibly Alleged an Agreement

"[S]ection one's prohibition against restraint of trade applies 'only to concerted action,' . . . which 'requires evidence of a relationship between at least two legally distinct persons or entities[.]'" *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 284 (4th Cir. 2012) (citation omitted) (quoting *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010), and then quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) (en banc)). "To be actionable, the defendants must have specifically made a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *SD3*, 801 F.3d at 424 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). "Even 'conscious parallelism,' a common

---

[11] Despite its name, antitrust standing, unlike Article III standing, is not jurisdictional. *See Rx Sols., Inc. v. Caremark, LLC*, 164 F.4th 436, 444 n.4 (5th Cir. 2026) (collecting cases).

reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Twombly*, 550 U.S. at 553–54 (alterations in original) (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993)). "'[T]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express[.]'" *Id.* at 553 (second alteration in original) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).

A plaintiff may plausibly allege the existence of an agreement through either direct or circumstantial evidence. *See Robertson*, 679 F.3d at 289 (citing *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011)). Direct evidence, "usually referred to as the 'smoking gun,'" is "extremely rare in antitrust cases[.]" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (quoting *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003)). To qualify as direct evidence of an agreement, evidence must be "explicit and require[] no inferences to establish the proposition or conclusion being asserted." *Id.* (quoting *InterVest*, 340 F.3d at 159); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (3d Cir. 2010) ("[D]irect evidence of a conspiracy, if credited, removes any ambiguities that might otherwise exist with respect to whether the parallel conduct in question is the result of independent or concerted action."). If a plaintiff seeks to plead a conspiracy through circumstantial evidence, she must do more than simply allege that the defendants have engaged in parallel conduct, since such conduct is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market" as it is with an agreement. *SD3*, 801 F.3d at 424 (quoting *Twombly*, 550 U.S. at 554). Rather, she must allege "parallel conduct *and* something 'more,'" namely, "further circumstance[s] pointing toward a meeting of the minds." *Id.*

44

(alteration in original) (quoting *Twombly*, 550 U.S. at 557). These "further circumstances" are often referred to as "plus factors" and "must be evaluated holistically" because "[a]ctions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances." *Id.* at 424–25 (quoting *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 45 (1st Cir. 2013)).

"[T]he Supreme Court has not recounted a list of plus factors[.]" *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, No. 98-2847, 1999 WL 691840, at *9, 201 F.3d 436 (4th Cir. Sept. 7, 1999) (unpublished table disposition). The Fourth Circuit, however, has recognized several. Cognizable plus factors include: "the 'who, what, when and where' of the claimed antitrust misconduct," *SD3*, 801 F.3d at 430 (quoting W. Holmes & M. Mangiaracina, *Antitrust Law Handbook* § 9:14 (2014 supp.)); a "common motive to conspire," *id.* at 431 (quoting *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 320 (6th Cir. 2014)); "communications and meetings among conspirators" that "provide the means and opportunity to conspire," *id.* at 432; "[a] market in which sales power is concentrated in the hands of the few," *id.*; "attempts by [defendants] to hide their actions," *id.*; "acts contrary to a defendant's economic interest, but rational if the alleged agreement existed," *Rite Aid*, 1999 WL 691840, at *9; and "departure from normal business practices," *id.*

Unlike at the summary judgment stage, when "a [§ 1] plaintiff must summon 'evidence tending to *exclude* the possibility of independent action,'" at the pleading stage, a plaintiff's allegations of conspiracy simply must be plausible. *SD3*, 801 F.3d at 425 (emphasis added) (quoting *Twombly*, 550 U.S. at 554). On a motion to dismiss, the court should not attempt "to determine 'whether a lawful alternative explanation appear[s] more likely' from the facts of the complaint." *Id.* (alteration in original) (quoting *Houck*, 791 F.3d at 484). Nevertheless, the court

45

may not ignore "obvious alternative explanation[s]" for the challenged conduct, which may diminish any plausible inference of conspiracy. *Twombly*, 550 U.S. at 567; *see also Ins. Brokerage*, 618 F.3d at 322–23.

An agreement that violates § 1 may be "horizontal" (i.e., between competitors) or "vertical" (i.e., "between firms at different levels of distribution"). *United States v. Brewbaker*, 87 F.4th 563, 571 (4th Cir. 2023). Antitrust law also recognizes a type of conspiracy known as a "hub-spoke-and-rim" conspiracy—an agreement that contains both horizontal and vertical elements. In a "hub-spoke-and-rim" conspiracy, "competitors agree to restrain trade and are encouraged to do so by a shared vertical entity" that "is not a party to the competitors' agreement [but] merely an encourager of it, for example, through separate vertical agreements." *Id.* at 577–78. In contrast, a so-called "rimless wheel"—in which "various defendants enter into separate agreements with a common defendant, but . . . have no connection with one another, other than the common defendant's involvement in each transaction"—"is not a single conspiracy" violative of § 1. *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203–04 (4th Cir. 2002). Rather, it "amounts to multiple conspiracies between the common defendant and each of the other defendants." *Id.* at 203 (citing *Kotteakos v. United States*, 328 U.S. 750, 768–69 (1946)).

The plaintiffs allege that the defendants are involved in overarching conspiracies to participate in the Match and abide by its rules, to limit the number of available residency positions, and to exchange compensation information. *See, e.g.*, ECF 113, ¶¶ 154–67; ECF 223, at 12–16.[12]

---

[12] The defendants argue that the plaintiffs have engaged in improper "group pleading" by lumping all defendants together and making generalized allegations against them collectively. ECF 221-1, at 17–18; *see also SD3*, 801 F.3d at 422 ("A plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group."). The defendants have a point. The plaintiffs' complaint is replete with allegations against the defendants as a group and contains very few allegations particular to any one defendant—especially when it comes to the employer defendants. That said, the Court is not convinced that dismissal would be

If the plaintiffs' allegations make out only a "rimless wheel"—i.e., a series of individual agreements between the employer defendants and ASHP and/or NMS, without any horizontal agreement among the employer defendants—they have not plausibly pleaded the overarching conspiracies they allege.[13]

The Court addresses the Sherman Act violations alleged in Counts I and II separately because each count alleges a separate agreement.

###### a.      Count I

In Count I, the plaintiffs allege that the defendants have agreed with each other to participate in the Match on terms that stifle competition and to limit the number of available residency positions. Despite grouping these allegations under a single count in their complaint, in their opposition to the motion to dismiss, the plaintiffs confusingly split Count I into two agreements. They frame Count I as alleging an agreement to participate in the Match and abide by

---

appropriate on this basis. There is no *per se* prohibition on making allegations against a collective "where the complaint alerts defendants that identical claims are asserted against each defendant" and "provide[s] sufficient factual detail about the nature of [the] allegations and about each defendant to provide fair notice of [the] claims." *Chevron U.S.A. Inc v. Apex Oil Co.*, 113 F. Supp. 3d 807, 815 n.1 (D. Md. 2015) (quoting *Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co.*, No. 13-639, 2015 WL 4040882, at *3 (S.D.N.Y. Jul. 2, 2015), and then quoting *Frazier v. U.S. Bank. Nat'l Ass'n*, No. 118775, 2013 WL 1337263, at *3 (N.D. Ill. Mar. 29, 2013)). Here, the complaint identifies each employer defendant individually and alleges that they engaged in identical anticompetitive behavior. And the complaint includes several additional specific allegations against ASHP and NMS. That is enough to provide the defendants with fair notice of the accusations against them. *See, e.g.*, *Duffy v. Yardi Sys., Inc.*, 758 F. Supp. 3d 1283, 1290 (W.D. Wash. 2024).

[13] In what may be an effort to avoid dismissal if the Court concludes they have alleged only a rimless wheel (i.e., a series of individual bilateral agreements), the plaintiffs argue—citing exclusively criminal cases—that the "question whether the evidence shows a single conspiracy or multiple conspiracies . . . is one of fact and is properly the province of the jury." ECF 223, at 33 (citations omitted). But the plaintiffs' complaint clearly alleges overarching conspiracies among all defendants, so the plaintiffs may not "hedge their bets" to avoid dismissal by reframing their complaint as alleging multiple bilateral conspiracies. *See Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256–57 (3d Cir. 2010).

its rules and another agreement to limit the number of available residency positions. ECF 223, at 12–15. Further confusing matters, the plaintiffs defend Count I by focusing almost exclusively on how direct and circumstantial evidence supports the first of these two alleged agreements. In evaluating the plausibility of Count I, the Court follows the plaintiffs' lead and focuses on whether Count I plausibly alleges an agreement to participate in the Match and abide by its rules. To the extent the plaintiffs also attempt to allege a standalone agreement to limit the number of available residency positions, they devoted very little attention to defending that theory, and the Court will not attempt to divine their arguments for them.

### i.    Direct Evidence

The plaintiffs argue that they have alleged direct, "smoking-gun" evidence of an agreement. This evidence, they argue, is the Residency Agreement and the Match Rules. They note that the Residency Agreement and Match Rules—by which each employer defendant agrees to abide when they sign up for the Match—"include explicit restraints on competition" such as "prohibit[ing] participating employers from hiring any competitor's pharmacy residents." ECF 223, at 20. "These written commitments," the plaintiffs urge, "are direct documentary evidence of the conspiracy's terms." *Id.*

The Residency Agreement and Match Rules are not direct evidence of a horizontal conspiracy among the employer defendants because these documents are not agreements among the employer defendants. Rather, they appear to be individual agreements between each employer defendant and ASHP. The Residency Agreement is not signed or adopted by all employer defendants collectively. According to the plaintiffs, ASHP presents each employer defendant with a separate copy of the Residency Agreement when the employer defendant registers for the Match, and each employer defendant individually signs that copy and agrees to be bound by the Match

Rules. ECF 113, ¶¶ 79–84. These facts hardly "remov[e] any ambiguities" as to whether the employer defendants acted independently or in concert. *Ins. Brokerage*, 618 F.3d at 324 n.23. True, as the plaintiffs point out, the Residency Agreement is not a model of clarity: It does not fully "define its parties"; it describes what "programs" (in the plural) are obliged to do; and it states that ASHP has "beneficiary standing," which could suggest there is some unnamed party to the agreement who is not ASHP. ECF 223, at 29, 30 n.15. But it would require a significant inferential leap to conclude, from these silences and ambiguous textual cues, that the Residency Agreement represents an agreement among the employer defendants. Direct evidence of a conspiracy requires no inferences at all. *See Am. Chiropractic Ass'n*, 367 F.3d at 226.

The plaintiffs cite cases where courts have held that an organization's bylaws directly evinced a conspiracy among the members or officers of the organization that passed or assented to them. *See, e.g.*, *Robertson*, 679 F.3d at 289; *Associated Press v. United States*, 326 U.S. 1, 4, 8, 19 (1945). The Residency Agreement and Match Rules, the plaintiffs argue, are akin to such bylaws. They are not. Certainly, when a body adopts bylaws, it may be reasonable to conclude that those rules represent concerted action by that body's members. But here, the plaintiffs do not allege that ASHP—the organization that sets the Match Rules and presents the Residency Agreement to the employer defendants—is comprised of or controlled by the employer defendants. Rather, the plaintiffs allege that ASHP is a separate accrediting body comprised of pharmacists. There is no reason to infer that the employer defendants have any say in the terms of the Residency Agreement or Match Rules, so there is no reason to infer that those documents directly evince a horizontal conspiracy among the employer defendants.

The plaintiffs have not alleged direct evidence of an agreement.

### ii.    Circumstantial Evidence

Without direct evidence, the plaintiffs must allege circumstantial evidence of an agreement: parallel conduct and "plus factors."

"A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'" *SD3*, 801 F.3d at 427 (quoting *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993)). The defendants do not dispute that the plaintiffs have alleged parallel conduct. And they have. All employer defendants sign up for the Match through an identical process and participate in the Match under the same set of rules.

The key question, then, is whether the plaintiffs have plausibly alleged "plus factors" that, considered holistically, plausibly suggest that this parallel conduct constitutes concerted action. The plaintiffs insist they have alleged six plus factors: (1) the "who, what, when, and where" of the conspiracy; (2) a common motive to conspire; (3) meetings among coconspirators that provide the means and opportunity to conspire; (4) enforcement mechanisms; (5) an agreement contrary to economic self-interest; and (6) a controlling presence in the market. ECF 223, at 22–27. Some of these proffered plus factors distort, or are undercut by, the plaintiffs' actual allegations. Some are not supported by the case law. The rest are insufficient to plausibly suggest an agreement.[14]

Start with the first plus factor: the "who, what, when, and where" of the conspiracy. The plaintiffs believe they have alleged this factor because they allege "that each [e]mployer [d]efendant renews its participation in the conspiracy annually" by registering for the Match on

---

[14] The Court is not taking each plus factor in isolation, determining whether it individually supports an inference of conspiracy, and then moving on to the next. Instead, by examining each of the plaintiffs' proffered plus factors sequentially, the Court is addressing an antecedent question: Of the plus factors the plaintiffs *claim* to have alleged, which have they *actually* alleged? Only after the Court has clarified the plus factors that have properly been alleged can the Court determine whether, considered holistically, those factors support a plausible inference of conspiracy.

ASHP's website, signing the Residency Agreement, and agreeing to the Match Rules. *Id.* at 22. But that is nothing more than the parallel conduct itself. Compare these allegations with those in *SD3*. There, the plaintiffs accused the defendants of organizing a group boycott. The Fourth Circuit explained that the plaintiffs alleged parallel conduct because they alleged that all defendants had refused to purchase licenses from them or implement their technology. *SD3*, 801 F.3d at 427. But the plaintiffs *also* alleged the "who, what, when, and where" of the conspiracy because, in addition to alleging parallel conduct, they "identifie[d] the particular time, place, and manner in which the boycott initially formed, describing a separate meeting held for that purpose," "nam[ing] at least six specific individuals who took part in forming the boycott," identifying "the means by which the defendants sealed their boycott agreement," and detailing how the boycott was implemented. *Id.* at 430. Here, by contrast, the plaintiffs have not alleged when or where the alleged conspiracy to hire residents through the Match was formed, who devised it, or how the agreement was consummated. The plaintiffs' argument makes sense only if one assumes the employer defendants formed the conspiracy simply by registering for the Match. But, as explained in the previous section, the plaintiffs have not alleged they did.

Skipping the second plus factor (for now), the third plus factor—meetings—is not apparent from the complaint. The plaintiffs insist they have alleged meetings that provided the employer defendants an opportunity to conspire: ASHP's annual events. But the plaintiffs merely allege that "one or more" employer defendants attend these events. ECF 113, ¶ 40(a). This is far too vague. Is it one, or is it more? Which employer defendants attend which events? Are any events attended by *all* employer defendants? The complaint does not say. From the current allegations, the Court cannot plausibly infer that the employer defendants had the means and opportunity to conspire at ASHP-sponsored events.

The fourth plus factor—enforcement mechanisms—misses the mark. The plaintiffs point out that ASHP "enforces compliance" with the Residency Agreement and Match Rules by threatening to withdraw accreditation from employer defendants who do not abide by the Match's terms and by threatening to bar prospective residents who violate the rules from future Matches. ECF 223, at 25–26. They urge that these enforcement mechanisms constitute a plus factor because "[e]nforcement mechanisms . . . facilitate the survival of any cartel." *Id.* But the cases the plaintiffs cite in support of this proposition concerned *competitors* enforcing rules against *each other* to preserve an anticompetitive conspiracy. *See Petruzzi's*, 998 F.2d at 1233; *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 826–28 (D. Minn. 2025). None of their cases suggest that an anticompetitive conspiracy can be inferred when a single *non-competitor* defendant who is not controlled by competitors—here, ASHP—sets and enforces rules governing how competitors may engage with one another and prospective hires in the labor market.[15]

The fifth plus factor—that the Match would contravene the employer defendants' interests absent an agreement—is undermined by the plaintiffs' own allegations. The plaintiffs argue that the employer defendants would have no incentive to participate in the Match unless they had agreed with each other to do so because ordinarily, the employer defendants' "incentives are to make offers to the most attractive candidates they can find, including offering the best salaries and benefits to attract those candidates" and "the Match eliminates those competitive market dynamics[.]" ECF 223, at 26. But the plaintiffs' allegations suggest an "obvious alternative explanation," *see Twombly*, 550 U.S. at 567, for why an employer defendant might want to

---

[15] One provision of the Match Rules states that "[v]iolations of these rules or Match agreements by applicants or programs may result in sanctions by ASHP or legal action by other Match participants." ECF 113-4, at 2. However, the plaintiffs do not rely on this provision of the Match Rules in connection with their argument that they have plausibly alleged enforcement mechanisms.

52

participate in the Match, regardless of whether it has agreed with its competitors to do so: Participating in the Match is a condition of each employer defendant's ASHP accreditation. As the plaintiffs themselves allege in their complaint, "pharmacy residency programs struggle to survive" without ASHP accreditation, because unaccredited programs "attract fewer and less competitive applicants, and their participants enjoy fewer reputational and career benefits[.]" ECF 113, ¶ 61. If the choice is between participating in the Match and struggling to survive as a program, then it is clearly in an employer defendant's self-interest to choose the former, no matter what other programs decide to do.

The Court's conclusion on the fifth plus factor (an agreement contrary to economic self-interest) defeats the plaintiffs' attempt to analogize this case to the landmark hub-spoke-and-rim case, *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939). In *Interstate Circuit*, a movie theater chain sent identical letters to eight movie distributors—each letter listing all eight recipients as addressees—demanding that, as a condition of the chain continuing to show the distributors' movies in its first-run theaters at a specified price, the distributors agree to certain restrictions on the terms under which they would license their movies to the chain's competitors. *Id.* at 216–17. The distributors complied with the chain's demands, and the Supreme Court recognized their compliance as evidence of a hub-spoke-and-rim conspiracy in violation of the Sherman Act—i.e., it inferred from their compliance that the distributors had agreed with each other to give in. "Key to [this] conspiracy finding," however, "was [the Court's] determination that each distributor's decision to accede to [the chain's] demands would have been economically self-defeating unless the other distributors did the same." *Ins. Brokerage*, 618 F.3d at 331; *see also Interstate Circuit*, 306 U.S. at 222 ("Each [distributor] was aware that all were in active competition and that without substantially unanimous action . . . there was risk of a substantial loss of . . . business and good

will . . . but that with it there was the prospect of increased profits."). Here, by contrast, the plaintiffs' allegations indicate that participating in the Match is in the employer defendants' economic interests even absent an agreement among them to do so, because Match participation is a condition of each employer defendant's accreditation and program survival. Thus, *Interstate Circuit* is inapposite.[16]

Turning to the sixth plus factor, the plaintiffs argue it is the defendants' controlling presence in the market. They rely on *SD3*, but their framing of the relevant plus factor— "controlling presence in the market"—is not quite correct. The *SD3* Court did not say that when some group of defendants, no matter how large, has a controlling presence in the market, that constitutes a plus factor. Instead, the *SD3* Court said that market *concentration* was a plus factor and that control of a large market share by a *few* firms could be evidence of concentration. *See* 801 F.3d at 432 ("[a] market in which sales power is concentrated in the hands of the few can . . . facilitate coercion" because "[f]ewer 'minds' must 'meet' in a concentrated market"). The court then explained that the *SD3* plaintiffs had plausibly alleged market concentration because they alleged that the defendants—less than two dozen saw manufacturers—controlled nearly 85% of

---

[16] Nor do the plaintiffs have any better luck with their attempt to invoke another landmark antitrust case, *United States v. Masonite Corp.*, 316 U.S. 265 (1942). There, the Supreme Court held that a series of contracts, each containing price-fixing terms, between Masonite (a building materials manufacturer) and its competitors violated the Sherman Act even though, in entering the contracts, each competitor had "acted independently of the others, negotiated only with Masonite, desired the agreement regardless of the action that might be taken by any of the others, did not require as a condition of its acceptance that Masonite make such an agreement with any of the others, and had no discussions with any of the others." *Id.* at 275. However, as the authors of the leading antitrust treatise have cautioned, the *Masonite* Court did not find a horizontal agreement among the competitors who entered into separate agreements with Masonite because the competitors' decisions to do so were independent of each other. *See* P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1427d; *see also In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 57 (1st Cir. 2016) ("*Masonite* makes no holding on horizontal conspiracy."). *Masonite* is of no help in determining whether the plaintiffs here have "enclosed the rim" by alleging a horizontal conspiracy among the employer defendants.

the table-saw market. *Id.* The plaintiffs here do not make similar allegations. They do not allege that the employer defendants—17 employers of pharmacy residents—collectively hire a disproportionate share of pharmacy residents each year. Nor could the Court take judicial notice that the employer defendants do so, since even a cursory review of the Residency Directory indicates that there are thousands of available residency positions, including many at organizations the plaintiffs have not sued. *See Residency Directory*, Am. Soc'y of Health-Sys. Pharmacists, https://accreditation.ashp.org/directory/residency#/program/residency (last visited Aug. 12, 2026) (under "Country," check "United States"; under "Categories," check "(Select All)"; then click "Search"). Moreover, the plaintiffs repeatedly (if obliquely) acknowledge throughout their complaint that there are other pharmacy resident employers who have not been named as defendants. *See* ECF 113, ¶¶ 35 ("[v]arious other institutions and individuals, known and unknown to Plaintiffs at this time, participated as co-conspirators in the acts complained of"), 75 ("every other [e]mployer [d]efendant *and every other employer of pharmacy residents which participates in the . . . Match* has similarly entered into the [Residency Agreement]"), 85 ("[a]ll residency programs accredited by ASHP, *including* each [e]mployer [d]efendant, must agree" to the Match Rules) (emphases added). Perhaps the 17 named employer defendants do hire the bulk of all pharmacy residents, but the plaintiffs have not alleged that.[17] The Court cannot infer that only a "[f]ew[] minds must meet" to conspire to reduce competition for pharmacy residents' labor. *SD3*, 801 F.3d at 432 (internal quotation marks omitted).

---

[17] Indeed, aside from the fact that the plaintiffs worked for four of the employer defendants, it is not clear why the plaintiffs chose to sue the employer defendants among all employers of pharmacy residents.

That leaves only the plaintiffs' second plus factor: a common motive to conspire. The plaintiffs argue that the employer defendants had a "common economic motive . . . to save money through wage suppression" by "avoid[ing] competition for pharmacy residents" and that ASHP was motivated to participate in the conspiracy "to continue receiving accreditation fees and preserve its existing role as a gatekeeper[.]" ECF 223, at 23–24. The Court will assume, for the sake of argument, that the plaintiffs have plausibly alleged this plus factor. Even so, the plaintiffs offer no support for the proposition that a common motive to conspire, standing alone, can render allegations of a conspiracy plausible. Indeed, case law suggests the contrary. *See, e.g.*, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (explaining that "common motive does not suggest an agreement" because "[a]ny firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors"); *accord Hyland*, 771 F.3d at 321 ("If this Court were to find that Defendants' motive to maximize profits supported an inference of an illegal conspiracy, then all businesses would be subject to anti-trust liability.") (internal quotation marks omitted). This plus factor—the only one the plaintiffs may have validly alleged—does not support a plausible inference of conspiracy.[18]

---

[18] In footnotes of their opposition, the plaintiffs argue that they have alleged two more plus factors: the defendants' public statements (specifically, ASHP's statement that "[a]lignment with the number of graduates with residency availability could accelerate ASHP's goal to ensure new pharmacy practitioners complete post-graduate training as a minimum credential") and the posting of salary information to the Residency Directory (which also is the basis of the conspiracy alleged in Count II). The first of these two plus factors concerns the plaintiffs' allegation of an agreement to limit the number of pharmacy resident positions. But ASHP's statement does not plausibly suggest any such agreement. Rather, it is clear from context that ASHP was simply predicting that, as the number of pharmacy graduates decreased, a higher share of graduates would be able to obtain residencies, which would "accelerate ASHP's goal to ensure new pharmacy practitioners complete post-graduate training[.]" *Id.* ¶ 111. That is not the same as calling for a decrease in the number of available residency positions. As for the other plus factor—posting salary information—the cases the plaintiffs cite for the proposition that this is a plus factor appear to have involved exchanges of *nonpublic* information among competitors, not sharing salary information in a public forum. *See Todd v. Exxon Corp.*, 275 F.3d 191, 213 (2d Cir. 2001) (Sotomayor, J.);

The plaintiffs' allegations suggest that each employer defendant entered into an agreement with ASHP to participate in the Match and to abide by its restrictive rules. But the plaintiffs have not plausibly alleged that the employer defendants also agreed with *each other* to do so. The plaintiffs have, at best, alleged a "rimless wheel": a series of individual agreements between each employer defendant and ASHP, the common "hub", but no agreement among themselves, the "spokes." That is insufficient. Because the plaintiffs have failed to plausibly allege an agreement, Count I must be dismissed.

### b.    Count II

In Count II, the plaintiffs allege the defendants entered into a different agreement: an agreement to exchange information about pharmacy residents' compensation in order to depress compensation. To allege this agreement, the plaintiffs rely on the same circumstantial evidence of an agreement on which they relied in connection with Count I. *See* ECF 223, at 45 ("Plaintiffs incorporate the circumstantial evidence recited above, which is equally applicable to Count Two."). Yet they do not explain—and it is not obvious to the Court—how this circumstantial evidence is in fact equally applicable to Count II. Without further elaboration by the plaintiffs about how the circumstantial evidence supporting the alleged agreement in Count I also supports the alleged agreement in Count II, the Court finds the evidence is insufficient for the reasons already discussed.

In addition, the plaintiffs argue that the "actions against self-interest" plus factor supports the inference of a conspiracy in Count II slightly differently than it does for a conspiracy in Count

---

*Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 161 (N.D.N.Y. 2010); *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 709 n.3 (7th Cir. 2011); *see also In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2025 WL 461407, at *2 (N.D. Ill. Feb. 1, 2025) (no indication that information was public). The plaintiffs do not explain how posting public salary information in a forum visible to job applicants and competitors alike is a cognizable plus factor.

I. As the plaintiffs see it, the employer defendants "have no incentive to share wage information with their competitors or post it publicly absent an agreement [*sic*] wages (e.g., the [Residency] Agreement, Match Rules, and Applicant Agreement) that they know will prevent job applicants from using the publicly posted information to negotiate for higher." ECF 223, at 26 n.13. Put another way, the plaintiffs argue that, were it not for the terms of the Match, the defendants would not have publicized compensation information.

This argument does not help the plaintiffs show the conspiracy alleged in Count II. If, as the plaintiffs believe, the sharing of wage information and the public posting of salaries would—absent the Match terms—be against the self-interest of the employer defendants, that is an argument for why the defendants conspired to agree to the Match terms: in other words, for why the agreement alleged in Count I, *not* Count II, is plausible. And, even as an argument in support of Count I, this argument does not get the plaintiffs very far. The fact that the employer defendants publicly posted salary information *could* be consistent with a horizontal agreement to abide by the rules of the Match, but it is equally consistent with a rational reaction to the fact that those rules exist. Even in combination with the "motive-to-conspire" plus factor, this argument does not push the plaintiffs' alleged agreement in Count I across the line from conceivable to plausible.

The plaintiffs have not plausibly alleged an agreement in connection with Count II.

### 2. Whether the Plaintiffs Have Plausibly Alleged an Unreasonable Restraint of Trade

To satisfy the second element of a § 1 Sherman Act claim, an antitrust plaintiff must allege that the conspiracy effected an "unreasonable restraint of trade." *SD3*, 801 F.3d at 423–24. When determining whether a restraint of trade is unreasonable, "there are three avenues of analysis under section 1 of the Sherman Act that apply depending on how obviously anticompetitive the

challenged conduct is: (1) *per se* liability, (2) quick-look scrutiny, and (3) rule of reason analysis." *Robinson v. NCAA*, 172 F.4th 271, 290 (4th Cir. 2026) (italics added; footnote omitted).

*Per se* liability applies only in narrow circumstances: when "economic evidence shows the restraint has 'manifestly anticompetitive effects' and 'lack[s] . . . any redeeming virtue,'" i.e., when it is "devoid of procompetitive effects[.]" *Brewbaker*, 87 F.4th at 573–74 (first alteration in original) (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007)). *Per se* liability "only extend[s] to certain categories of horizontal restraints, including agreements between competitors to fix prices or divide markets." *Id.* at 575.

Quick-look scrutiny "applies in cases where the anticompetitive or procompetitive effects of a restraint are sufficiently obvious, but the restraint does not fall neatly within a *per se* illegal category." *Robinson*, 172 F.4th at 291 (italics added). It should be used only when courts "have amassed considerable experience with the type of restraint at issue and can predict with confidence that it would be invalidated in all or almost all instances." *Id.* (quoting *NCAA v. Alston*, 594 U.S. 69, 89 (2021)). Like *per se* liability, quick-look scrutiny rarely applies. *See Alston*, 594 U.S. at 89.

The third avenue—the rule of reason—is the default mode of analysis. *See Brewbaker*, 87 F.4th at 573. "Under this rule, the factfinder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Leegin*, 551 U.S. at 885 (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)).

The defendants argue that the plaintiffs do not plausibly allege an unreasonable restraint in either count of their complaint. The Court considers each count in turn.

59

### a.     Count I

As a threshold matter, the parties dispute whether the conspiracy alleged in Count I—the use of the Match to limit competition for residents—should be subject to *per se* liability, quick-look scrutiny, or a rule of reason analysis. The Court need not resolve this dispute. Even if, as the defendants urge, the alleged conspiracy is subject to a rule of reason analysis, the Court still would not dismiss Count I for failure to allege an unreasonable restraint of trade.

The rule of reason requires the court to conduct a "fact-specific assessment of market power and market structure to assess the restraint's effect on competition." *Robinson*, 172 F.4th at 293. When applying the rule of reason, the court often "must first define the relevant market." *Id.* Importantly, at the 12(b)(6) stage, "'[f]ailure to plead a relevant product market' rarely is grounds for dismissal '[b]ecause market definition is a deeply fact-intensive inquiry' for which discovery generally is necessary." *Intell. Ventures I LLC v. Cap. One Fin. Corp.*, 99 F. Supp. 3d 610, 620 (D. Md. 2015) (second alteration in original) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011)). "When dismissal does occur, it typically is for '(1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.'" *Id.* (quoting *Kolon Indus.*, 637 F.3d at 443).

The plaintiffs' alleged market is the market "for the employment of pharmacy residents in the United States." ECF 113, ¶ 128. "In the labor market context, the market is comprised of those employers seen by workers as reasonably good substitutes." *Robinson*, 172 F.4th at 293 (citing *Fourqurean v. NCAA*, 143 F.4th 859, 869 (7th Cir. 2025)).

60

The defendants argue that the plaintiffs have not plausibly alleged a relevant market. They contend that the plaintiffs have gerrymandered their alleged market to exclude non-residency jobs that are available to pharmacy graduates. In the defendants' view, pharmacy graduates see entry-level non-residency jobs as reasonably good substitutes for residencies, and thus, such jobs should be included in the relevant market. This is so, the defendants argue, because (1) non-residency jobs often are more lucrative than residencies, and (2) recent pharmacy graduates, who have not yet developed specialized expertise in a particular sub-field, are equally qualified for both residencies and entry-level non-residency positions. The plaintiffs' mere preference for residencies, the defendants urge, cannot justify limiting the relevant market to residency positions.

At this early stage, these arguments do not carry the day. The plaintiffs have offered a plausible reason why they have limited their proposed market to residency positions. Residencies carry unique benefits. They are a prerequisite for various pharmacy positions; they accelerate eligibility for board certification exams; they provide increased training; and they enhance a young pharmacist's reputation in their field. In light of these benefits, it is no wonder that pharmacy graduates are willing to accept a salary lower than they would receive if they went directly into another entry-level pharmacy job. It is certainly plausible that a pharmacy graduate would view residencies in a league of their own. The plaintiffs have plausibly alleged a relevant market.

The defendants' counterarguments are unpersuasive. They are correct that non-residency positions, by the plaintiffs' own allegations, pay more than residencies. But pay is not the only factor in determining whether one job is a reasonably good substitute for another. *See, e.g.*, *Jien v. Perdue Farms, Inc.*, No. SAG-19-2521, 2020 WL 5544183, at \*11 (D. Md. Sept. 16, 2020) (explaining that plaintiffs reasonably could view jobs outside their industry as poor substitutes for their current positions because, among other things, the plaintiffs had industry-specific skills and

61

language barriers that made it difficult to transition to other jobs). Nor is this case like cases cited by the defendants in which courts have rejected antitrust claims that sought to limit the relevant market to a single institution or sub-type of product. *Cf. Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (plaintiff defined relevant product market as "the UCLA women's soccer program"); *Therapearl, LLC v. Rapid Aid Ltd.*, No. CCB-13-2792, 2014 WL 4794905, at *7–8 (D. Md. Sept. 25, 2014) (product market of "hot/cold therapy packs" was deficient where plaintiff had "not attempted a plausible explanation as to why the market should be [thus] limited" and exclude, "for example, therapy packs which become either just hot or just cold"). The plaintiffs do not similarly limit the relevant market.

Moreover, a pharmacy graduate's lack of specialized expertise also is not dispositive of whether the plaintiffs have plausibly alleged a relevant market. In support of this argument, the defendants rely heavily on an unreported decision from the Western District of Tennessee, *Clarke v. Baptist Memorial Healthcare Corporation*, No. 06-2377 Ma/V, 2007 WL 9870961 (W.D. Tenn. May 17, 2007). *Clarke* does not help them. In *Clarke*, the court considered whether "services provided to hospitals by RN employees" constituted a valid labor market. It concluded that it did, pointing out that hospital and non-hospital RN positions could differ in benefits, hours, and working conditions; that hospitals "recognize[d] hospital RN positions as distinct from non-hospital RN positions"; *and* that working as a hospital RN might "require[] different skills than working as an RN for a non-hospital employer[.]" 2007 WL 9870961, at *10–11. So, the fact that hospital RNs had a specialized skillset that other RNs did not have was but one factor among several in the court's analysis of whether the plaintiffs had adequately defined their labor market.

The defendants point to footnote 8 of the *Clarke* decision. They claim that in that footnote, the *Clarke* Court held that entry-level RNs "would not be a plausible labor market" because they

would not have "acquired industry-specific skills." ECF 221-1, at 33. But the *Clarke* Court did not say that. In footnote 8, the court noted that the plaintiffs' alleged market, "which includes the services of all hospital RNs, might appear over-inclusive" because it included entry-level hospital RNs who had not "acquired industry-specific skills and experience that would make them significantly more valuable to hospitals than to other employers." 2007 WL 9870961, at *10 n.8. However, the court found that, in light of the other factors supporting a conclusion that hospital RN positions were not reasonably interchangeable with other types of jobs, the plaintiffs had "adequately alleged that all hospital RN positions are sufficiently distinct from all non-hospital RN positions." *Id.* The Court does not read this footnote to hold that a market for a certain type of position, in which the job-seekers were exclusively entry-level employees, would be categorically implausible as a relevant labor market. Here, notwithstanding a pharmacy graduate's lack of specialized expertise, the plaintiffs have pointed to several characteristics of residency positions that plausibly suggest they are distinct (and would reasonably be regarded as distinct) from non-residency jobs.[19]

The plaintiffs have plausibly alleged a relevant market.

### b.    Count II

The defendants argue that the plaintiffs also have failed to plausibly allege an unreasonable restraint of trade in connection with Count II. Their arguments are twofold. First, they argue that

---

[19] The defendants also argue that the plaintiffs have failed to plausibly allege that the defendants have market power. Specifically, they argue that in a *plausibly defined* market (which, they claim, the plaintiffs have not alleged), the plaintiffs' allegations show that the defendants lack sufficient market power. *See* ECF 221-1, at 35 (stating that the employer defendants "provide a small portion of employment opportunities that are available to entry-level pharmacists, which precludes a plausible allegation of market power in a broader market encompassing all entry-level pharmacists' labor, *which any plausible market must include*") (emphasis added). Because the Court has found that the plaintiffs have plausibly alleged a market, this argument fails.

Count II should be dismissed for failure to allege a relevant market. This argument fails because the relevant market for Counts I and II is the same, and the plaintiffs have alleged a relevant market. Second, the defendants argue that the plaintiffs do not plausibly allege that the exchange of compensation information adversely affected competition.

Under certain circumstances, entities may violate § 1 of the Sherman Act through the act of exchanging price or salary information. *See United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978); *Todd*, 275 F.3d at 198–99. "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *Gypsum*, 438 U.S. at 441 n.16. Thus, the exchange of price or salary information is not *per se* unlawful. *Id*. Rather, a claim of an unlawful information exchange is evaluated under the rule of reason. *See Todd*, 275 F.3d at 199; *Jien*, 2020 WL 5544183, at *9. A plaintiff bringing a claim subject to the rule of reason analysis must plausibly allege that the restraint she challenges harmed market competition. *See Robertson*, 679 F.3d at 290. "It is sufficient" to get past the pleading stage if "the alleged anticompetitive effects" of the challenged restraint "are economically plausible in light of the . . . restrictions recounted in the complaint." *Id.* at 291.

In *Todd v. Exxon Corporation*, the United States Court of Appeals for the Second Circuit set forth several factors a court should consider in determining whether an information exchange constitutes an unreasonable restraint of trade under the rule of reason. Those factors include: the defendants' market power; whether the relevant market is "susceptible to the exercise of market power through tacit coordination"; "the nature of the information exchanged"; and the exchange's market-wide effects on competition. *Todd*, 275 F.3d at 199, 207–08, 211, 213 (quoting *Todd v.*

64

*Exxon Corp.*, 126 F. Supp. 2d 321, 326 (S.D.N.Y. 2000), *vacated & remanded*, 275 F.3d 191 (2d Cir. 2001), and then quoting *Gypsum*, 438 U.S. at 441 n.16).

In Count II, the plaintiffs claim that the defendants have unlawfully exchanged resident compensation information. The only vehicle for such an information exchange identified in the complaint is the Residency Directory, a publicly-accessible database of resident salary information maintained by ASHP.[20] Whether the use of the Residency Directory amounts to an unreasonable restraint of trade is a close question. The factors outlined in *Todd* do not uniformly cut against the plaintiffs. However, on the whole, the Court finds that the plaintiffs have not plausibly alleged that the use of the Residency Directory to publicly display resident salary information amounts to an unreasonable restraint of trade.

First, consider the defendants' market power. A plaintiff may allege that defendants have market power by alleging that they collectively hold a high market share or by pointing to actual anticompetitive effects of their challenged conduct. *Id.* at 206–07. As explained above, the plaintiffs do not allege that the employer defendants control a large share of the market for residents' labor. They do, however, attempt to allege anticompetitive effects. Specifically, the plaintiffs allege that by exchanging compensation information, the employer defendants "suppress pharmacy resident compensation." ECF 113, ¶ 102. To demonstrate their point, the plaintiffs include charts documenting residents' strikingly low salaries compared to other pharmacy positions. *See, e.g.*, *id*. at ¶¶ 120–24. But the plaintiffs do not persuasively connect the dots between the employer defendants' posting of salaries in the Residency Directory and lower salaries market-wide. And other considerations, discussed below, make it less plausible that the employer

---

[20] The plaintiffs argue that the "competitiveness reports" and "mandatory surveys" they refer to in their complaint also are vehicles for exchanging compensation information, but nothing in the complaint suggests these reports or surveys contain compensation data.

defendants' posting of salaries in the Residency Directory has the anticompetitive effects the plaintiffs allege. This factor is neutral.

Second, consider market susceptibility. Markets in which buyers exercise power are generally susceptible to tacit coordination if the markets are highly concentrated and contain fungible products with inelastic supply. *Todd*, 275 F.3d at 208, 211. The plaintiffs have alleged inelastic supply because labor is "a classic example of inelastic supply flow[.]" *See id.* at 211. But the plaintiffs have not plausibly alleged that residency positions are fungible. "Varied jobs in a complex industry"—such as pharmacy residencies—"are far less fungible than, say, a product such as corrugated containers." *Id.* at 210. And "[s]ervices generally tend not to be fungible or susceptible to standardization[.]" *Id*. Fungibility is a "significant" consideration "in evaluating the anticompetitive potential of an information exchange," because "it is less realistic for a cartel to establish and police a price conspiracy where it is difficult to compare the products being sold." *Id.* at 209. And finally, as already discussed, the plaintiffs have not plausibly alleged that the market for pharmacy residents' labor is highly concentrated among a few providers. This factor weighs against the plaintiffs.

Third, consider the nature of the information. When, as here, the information allegedly exchanged is salary data, the court should consider the data's time frame, its specificity, whether it is made publicly available, and whether the defendants participated in "frequent meetings" to discuss it. *Id.* at 211–13. The plaintiffs allege that the Residency Directory contains "the salaries offered to residents in each accredited residency program and other employment benefits." ECF 113, ¶ 97. The Court can infer from this allegation that the Residency Directory contains each participating program's current, specific salary information for the program's available residency positions. The exchange of such information can have anticompetitive effects. *See Todd*, 275 F.3d

66

at 211–12 (explaining that exchanges of current price information "have greater potential to affect future prices and facilitate price conspiracies" and further explaining that "[p]rice exchanges that identify particular parties, transactions, and prices are seen as potentially anticompetitive because they may be used to police a secret or tacit conspiracy to stabilize prices"). However, as discussed above, the plaintiffs do not allege that the employer defendants had frequent meetings to discuss this information. And more importantly, the salary information in the Residency Directory is public. This fact is critical because "[p]ublic dissemination is a primary way for data exchange to realize its procompetitive potential." *Id.* at 213. "[D]issemination of [salary] information to . . . employees" can help "mitigate[] any anticompetitive effects of the exchange and possibly enhance[] market efficiency by making employees more sensitive to salary increases." *Id.*

The plaintiffs resist this conclusion. Though they acknowledge the information in the Residency Directory is public, they contend that under the circumstances of this case, its public availability "has exclusively anticompetitive effects" because residents "cannot negotiate the terms of their employment or move between employers." ECF 223, at 44. Thus, the plaintiffs urge, "residents cannot *act* on the public information." *Id.* This conclusion does not follow. The Court takes the plaintiffs' point that, because of the Match Rules, residents cannot *maximize* the procompetitive potential of public salary information. But by the plaintiffs' own allegations, residents are still able to *act* on this information. Recall how the Match works: candidates and residency programs rank each other in order of desirability and are matched accordingly. Under this regime, candidates presumably can consult the Residency Directory and consider salaries when deciding which program(s) to rank more highly.[21] Because both the programs and the

---

[21] Not all residency salaries are the same, and the Match terms do not dictate salaries. The Accreditation Regulations require that accredited residency programs ensure that "[p]ay and

candidates can view the Residency Directory, the candidates can be "more sensitive to salary increases" and are "better equip[ped] to compare" positions. *Todd*, 275 F.3d at 213. And so, programs may have an incentive to offer more competitive salaries to entice more attractive candidates. The Court cannot so easily discount the public character of the Residency Directory. The third factor—the nature of the information exchanged—weighs against the plaintiffs.

Fourth and finally, consider whether the exchange of salary information depressed competition market-wide. This factor overlaps with the first. For the reasons already discussed, the plaintiffs allege, in conclusory fashion, that the posting of salary information in the Residency Directory caused suppressed salaries, but the plausibility of this allegation is undercut by the plaintiffs' failure to plausibly allege that the market is susceptible to coordination or that the nature of the information exchanged could have anticompetitive effects. This factor is, at best, neutral.

In light of the Residency Directory's public character, the lack of market concentration among the employer defendants, the non-fungible nature of residency positions, and the plaintiffs' failure to make a strong showing on any of the factors outlined in *Todd*, the plaintiffs have not plausibly alleged that the information exchange alleged in Count II amounts to an unreasonable restraint of trade. Count II must be dismissed on this basis as well.

### 3. Whether the Plaintiffs Have Plausibly Alleged Antitrust Standing

Finally, the defendants argue that the plaintiffs have failed to plausibly allege that they have antitrust standing.

In addition to satisfying the requirements of Article III standing, a private antitrust plaintiff also must satisfy the non-jurisdictional requirement of "antitrust standing." *See Novell, Inc. v.*

---

benefits are comparable for all residents" but do not fix resident salaries at any particular range or amount. ECF 113-1, at 6.

*Microsoft Corp.*, 505 F.3d 302, 310 (4th Cir. 2007). This means they must show that their harm is sufficiently connected to the challenged antitrust violation that they are a proper plaintiff to bring suit. *See id*. In considering whether a plaintiff has antitrust standing, the court must consider five factors:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws; (3) the directness of the alleged injury; (4) the existence of more direct victims of the antitrust injury; and (5) problems of identifying damages and apportioning them among those directly and indirectly harmed.

*Id.* at 311 (quoting *Kloth v. Microsoft*, 444 F.3d 312, 324 (4th Cir. 2006)).

For purposes of this analysis, the Court assumes that the plaintiffs can amend their complaint to plausibly allege the defendants engaged in an anticompetitive conspiracy that reduced competition and depressed compensation in the market for pharmacy residents. If they can do so, the Court is satisfied that they will have antitrust standing. They will have alleged a causal connection between the conspiracy and their reduced compensation. And their injuries are among the types of harm Congress sought to remedy when it passed the antitrust laws. *See, e.g., 2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 809 F. Supp. 3d 371, 382 (W.D.N.C. 2025) (stock-car racing teams had antitrust standing where they alleged that NASCAR "exercised its monopsony power to pay below competitive compensation to the Cup Series race teams"); *In re High-Tech Empl. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1123 (N.D. Cal. 2012) ("In alleging that Defendants conspired to fix salaries at artificially low levels, Plaintiffs have alleged an example of the type of injury the antitrust laws are meant to protect against.") (internal quotation marks omitted).

The third and fourth factors—the directness of the alleged injury and whether there are more direct victims—are closely intertwined. *See Novell*, 505 F.3d at 317. Here, if the plaintiffs

69

can plausibly allege a conspiracy, they—former residents who participated in the Match and were poorly compensated due to the defendants' anticompetitive practices—are its direct victims. It is hard to imagine who would be more directly harmed by a conspiracy to reduce competition for residents' labor and to keep residents' wages down than the residents themselves.

Finally, the fifth factor—problems of identifying and apportioning damages—generally bars antitrust standing when the plaintiffs have been "*indirectly* injured by the allegedly anticompetitive behavior, raising the specter of complex apportionment of damages among, or duplicative recoveries by, direct and indirect victims[.]" *Id.* at 319. Because the plaintiffs claim to have been directly injured by the defendants' anticompetitive conduct, "there is little risk that any damages [they] might prove would need to be allocated or apportioned among any more-directly injured parties." *Id.*

The defendants push back. They claim the plaintiffs cannot allege that the Match directly caused them harm because "there are too many speculative links in the chain of causation between the alleged antitrust violation and their injury." ECF 221-1, at 42. As the defendants see it, the plaintiffs' "claim that they were injured by the Match depends on a series of unsupported and speculative inferences, such as: (1) that [employer defendants] would even offer residency positions without the Match . . .; (2) that any [p]laintiff could have found a residency through an alternative process to the Match; and (3) that any [p]laintiff could have successfully negotiated higher wages and better benefits absent the Match." *Id*. This argument is unpersuasive.

The defendants rely primarily on the Fourth Circuit's decision in *Kloth* and the United States Court of Appeals for the Ninth Circuit's decision in *City of Oakland v. Oakland Raiders*, 20 F.4th 441 (9th Cir. 2021), but neither case supports their position. In the portion of *Kloth* on which the defendants rely, the Fourth Circuit concluded that users of Microsoft products had failed

70

to allege a direct antitrust injury when they claimed that, as a result of Microsoft's monopoly in the software market, they lost the benefit of competitive technology. This injury, the court reasoned, was not a direct antitrust injury because it amounted to a "generalized" and "abstract societal harm[]" that was not unique to the plaintiffs. 444 F.3d at 324. Such an injury "could not possibly be adequately measured" because it would require the court "to create in hindsight a technological universe that never came into existence" and "determine the relevant benefits and detriments that non-Microsoft products would have brought to the market and the relative monetary value . . . to a diffuse population of end-users." *Id* (internal quotation marks omitted). Key to the *Kloth* Court's reasoning was its conclusion that the plaintiffs had alleged a vague, abstract harm shared by society as a whole. Here, in contrast, the plaintiffs allege that they earned less as residents than they would have in a competitive market. This injury is concrete, quantifiable, and specific to them. *Kloth* does not defeat the plaintiffs' antitrust standing.

*Oakland* does not either. There, the Ninth Circuit concluded that the City of Oakland lacked antitrust standing to challenge an alleged horizontal price-fixing agreement among the NFL and its 32 member teams. Oakland claimed that the defendants had conspired to jack up the price of hosting an NFL team beyond what the city could afford, and as a result, Oakland had lost its team, the Raiders, to Las Vegas. 20 F.4th at 448. The court held that Oakland had not alleged a direct antitrust injury from this price-fixing scheme because the city had not paid a supra-competitive price to host an NFL team; instead, by its own allegations, it had been priced out of the market. *Id.* at 459. "[A]ctual purchasers" of NFL teams who had paid higher prices, the court reasoned, were "more direct victims" of the challenged conspiracy. *Id.* Moreover, Oakland also had not alleged a direct injury because "its contention that . . . it would have retained the Raiders (or acquired another team)" absent the defendants' conduct was "too speculative to establish antitrust standing"; there

71

was simply "no way of knowing[]what would have occurred in a more competitive marketplace." *Id.* The court emphasized that because Oakland was a "[n]onpurchaser[] who [had been] priced out of the market," Oakland had "to reconstruct the hypothetical marketplace absent [the] defendants' anticompetitive conduct." *Id*. at 460 (internal quotation marks omitted). Plaintiffs in those circumstances "present a special problem, due to the speculative nature of the harm," and must establish "a reasonable level of certainty" to receive antitrust standing. *Id.*

   *Oakland* is different than this case. Unlike the plaintiff in *Oakland*, the plaintiffs here did not sit on the market's sidelines; they jumped into the fray. Had the plaintiffs declined to seek a residency *at all* (say, because they could not afford the low salary) and then brought suit claiming the defendants' anticompetitive conduct prevented them from obtaining a residency, *Oakland* might have more force here. Then, there would be more speculative links in the chain of causation. The Court might wonder whether in a Match-free world the plaintiffs would have qualified for residencies, whether programs would have offered positions on terms the plaintiffs were willing to accept, or the like. The Court also might conclude that those who had participated in the Match process and been undercompensated were (like the cities that paid supracompetitive prices for football teams) more direct victims of the alleged antitrust violation. But because the plaintiffs went through the Match process and were underpaid relative to their peers, the *Oakland* Court's concern over speculative harm carries significantly less force here. *Oakland* does not require the plaintiffs to reconstruct an alternate universe free of the defendants' alleged misconduct to establish antitrust standing.[22]

---

[22] The defendants also rely, in passing, on the Fourth Circuit's decision in *Pocahontas Supreme Coal Company v. Bethlehem Steel Corporation*, 828 F.2d 211, 219 (4th Cir. 1987), for the general and uncontroversial proposition that antitrust standing cannot be based on "speculative, abstract, or impractical measures of damages[.]" The Fourth Circuit in *Pocahontas* concluded that the plaintiff—a mining company that claimed it had been harmed by the termination of mining

If the plaintiffs can cure the substantive deficiencies in their claims, the Court is satisfied they will have antitrust standing.[23]

### 4.    Whether the Plaintiffs' Claims Should be Dismissed With Prejudice

For the foregoing reasons, the plaintiffs' claims are dismissed. The defendants argue that the Court should dismiss the claims with prejudice. As they see it, the plaintiffs are incapable of plausibly pleading their claims because they extensively investigated this case before filing it and the complaint "is now the fourth complaint filed across this action and the consolidated and related actions[.]" ECF 221-1, at 46. The plaintiffs object to dismissal with prejudice and request leave to amend.

The Court will not dismiss the plaintiffs' claims with prejudice. First, the defendants' contention that this is the plaintiffs' "fourth complaint," while technically true, is misleading. The

---

agreements with a third party mining company because the plaintiff had stood to receive royalty payments from those agreements—lacked antitrust standing to challenge the agreements' termination because the third party was the more direct victim. *Id.* The existence of a more direct victim, the court reasoned, "raise[d] a threat of duplicative treble damages recoveries which counsel[led] restraint in allowing recovery for more indirect injuries." *Id.* "The ascertainment of damages based on loss of necessarily speculative royalties," the court continued, "would necessarily be difficult and equally speculative." *Id.* at 219–20. The court's concern over speculative damages was predicated on the existence of a more direct victim of the challenged antitrust misconduct. Here, the defendants have not pointed to a more direct victim than the plaintiffs themselves. *Pocahontas* is inapposite.

[23] At various points in their motion to dismiss, the defendants point out that Congress has exempted from antitrust liability the residency matching program for *medical school* students. *See* 15 U.S.C. § 37b. In connection with that exemption, Congress made certain findings about the procompetitive nature of the medical residency match and its benefits for medical students and residency programs. *See id.* § 37b(a)(1). The defendants urge the Court to rely on those Congressional findings to conclude that the Match is similarly procompetitive and beneficial for prospective pharmacy residents and employers alike and that, absent the Match, the pharmacy-resident labor market would be chaotic and inefficient. Without any supporting authority for this position, the Court will not presume that Congress's factual findings about the medical residency matching program apply equally to a *different* Match that Congress did *not* exempt from antitrust liability.

plaintiffs have filed four complaints because this case was originally three cases: one filed by plaintiff Kim, one filed by plaintiff Walker, and one filed by plaintiffs Albert and Hudgins. Each of those cases, of course, began with its own complaint. The *Kim* and *Albert* cases were consolidated under this case number on April 1, 2025, *see* ECF 28; then Walker voluntarily dismissed her action on June 30, 2025, *see* ECF 29 in *Walker v. Am. Soc'y of Health-Sys. Pharms., Inc.*, No. DLB-25-1284; and that same day, the plaintiffs together filed the operative consolidated class action complaint, ECF 113. Three separate complaints plus one consolidated complaint makes four complaints, but the plaintiffs have not filed four complaints in a repeated effort to cure deficiencies. Rather, their four complaints are the natural result of three cases becoming one.

Second, this is the first time in this or the related actions that the plaintiffs' claims have been tested on a motion to dismiss. Accordingly, this also is the first time the plaintiffs have had the benefit of the Court's assessment of their claims' plausibility. The plaintiffs may not be able to cure the pleading deficiencies the Court has identified, but they will be given an opportunity to try.

## IV.    Conclusion

For the foregoing reasons, Leesburg's motion to dismiss is denied. NMS and Dr. Rubin's motions to dismiss are granted, and the claims against them are dismissed without prejudice for lack of personal jurisdiction. The defendants' joint motion to dismiss is granted, and the plaintiffs' claims against all defendants except NMS and Dr. Rubin are dismissed without prejudice for failure to state a claim. If the plaintiffs wish to file an amended complaint, they shall do so, accompanied by a redlined version, by September 11, 2026. If the plaintiffs do not file an amended

75

complaint by that date, their claims against all defendants except NMS and Dr. Rubin will be dismissed with prejudice. A separate Order follows.


Date: August 12, 2026                                          _____
                                                               Deborah L. Boardman
                                                               United States District Judge